**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| | § | **Chapter 11** |
| **In re:** | § | |
| | § | **Case No. 24-60018 (CML)** |
| **NITRO FLUIDS, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |
| | § | |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(C) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION,
(E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING,
AND (G) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE
> CONDUCTED ON THIS MATTER ON MAY 22, 2024, AT 9:00 A.M.
> (CENTRAL TIME) PARTICIPATION AT THE HEARING WILL BE BY
> AN AUDIO AND VIDEO CONNECTION ONLY.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE
> THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU
> MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN
> RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT
> MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE
> RELIEF REQUESTED.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-
> IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave., Ste. 560, San Antonio, Texas 78232.

**ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**RELIEF IS REQUESTED NO LATER THAN MAY 22, 2024.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Nitro Fluids, LLC ("Fluids"), NFH Leasing, LLC ("Leasing") and Straitline Pumps, LLC ("Straitline," and collectively with Fluids and Leasing, the "Debtors") as debtors and debtors in possession (collectively, the "Debtors" or "Borrower"), respectfully move (this "Motion") and represent as follows:

## PRELIMINARY STATEMENT[2]

1.      By this Motion, the Debtors seek entry of an interim order in the form attached as **Exhibit A** (the "Interim Order") and entry of a final order (the "Final Order", and together with the Interim Order, the "DIP Orders"), as applicable:

> *a.* authorizing the Debtors to obtain postpetition financing from Simmons Bank, in its capacity as postpetition lender (the "DIP Lender" or "Postpetition Lender") on a superpriority priming senior secured basis (the "DIP Facility", and the loans made, advanced or deemed advanced thereunder, the "DIP Loans") in the form of (i) a new money multiple draw term loan facility in an aggregate principal amount of up to $6 million (the "New Money Term DIP Facility"), pursuant to which (A) an aggregate principal amount of $1.5 million shall be funded (the "Interim Funding") following entry of the Interim Order, and (B) following entry of the Final Order, the remaining aggregate principal amount under the New Money Term DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim Funding, a "DIP Borrowing", and, collectively, the "DIP Borrowings"), and (ii) a credit facility pursuant to which $6 million in an aggregate principal amount outstanding

---

[2]     Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in the Motion.

under the Prepetition Secured Notes held by the Prepetition Fluids Lender, shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "<u>Roll Up</u>") on a cashless dollar for dollar basis, in each case, in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and DIP Orders;

*b.*   authorizing the Debtors to (i) execute, deliver, and perform under the DIP Loan Agreement (together with all loan documents appurtenant thereto, the "<u>DIP Loan Documents</u>")[3], (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, collectively the "<u>DIP Obligations</u>", and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the DIP Orders, the DIP Loan Documents, and the transactions contemplated hereunder and thereunder;

*c.*   granting to the DIP Lender, the DIP Liens in all DIP Collateral, as set forth in the DIP Orders, and subject to the relative priorities set forth in the DIP Orders;

*d.*   granting to the DIP Lender, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the Interim Order;

*e.*   authorizing the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Fluids Facilities Collateral, including Cash Collateral, in accordance with the terms and conditions set forth in the DIP Orders and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Loan Documents;

*f.*   approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, and (ii) the Prepetition Fluids Facilities and liens relating thereto, the Prepetition Fluids Facilities Loan Documents, and the Prepetition Fluids Facilities Collateral, in each case, subject to the terms and provisions of the DIP Orders;

*g.*   approving the Debtors' waiver of the right to surcharge (a) the DIP Collateral as to the DIP Lender, pursuant to section 506(c) of the Bankruptcy Code or otherwise and (b) the Prepetition Fluids Facilities Collateral, pursuant to section

---

[3] For purposes of the Interim Funding, the "DIP Loan Documents" shall consist of the Interim Order attached as **Exhibit A**, the DIP Term Sheet attached as **Exhibit A-1** and the Budget attached as **Exhibit A-2**.

506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in and subject to the entry of the Final Order;

h.   approving (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender, and (ii) subject to the Final Order, the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral, in each case, upon the terms set forth in the DIP Orders;

i.   modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the DIP Orders, and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders, providing for the immediate effectiveness of the DIP Orders, and granting related relief; and

j.   scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Lender, and approving the form of notice with respect to such Final Hearing.

2.      The DIP Facility is the result of the pre-petition process more fully described in the First Day Declaration and arms-length negotiations, involving both principals and advisors, in a competitive environment that allowed the Debtors to achieve their strategic goals in obtaining post-petition financing in connection with commencing these Chapter 11 Cases.  The result is a DIP Facility that provides the Debtors with up to 5 months of runway and significant flexibility in terms of milestones and covenants governing the DIP Loans.  The DIP Facility lays the foundation on which the Debtors will pursue the Marketing Process more fully described in the First Day Declaration.

3.      Approval of the DIP Orders, which will enable the Debtors to use Cash Collateral and obtain new capital, is the only actionable source of post-petition financing currently available to the Debtors and thus represents the best source of post-petition financing.  As described herein, the DIP Facility contains terms that are reasonable under the circumstances

and provides the Debtors with the urgent liquidity needed to  (a)  avoid  immediate  and irreparable  harm,  (b)  pay  outstanding  prepetition  amounts  to employees, vendors, insurers, taxing authorities, and other critical stakeholders, as requested by the Debtors in the First Day Motions (as defined in the First Day Declaration (defined below)), (c) pay their ordinary course operating expenses, and (d) to fund bankruptcy administration expenses and provide a stable path forward for the duration of these Chapter 11 Cases.

4.    Additional information regarding the DIP Facility is set forth in the *Declaration of Brad Walker in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "<u>First Day Declaration</u>").[4]

## <u>JURISDICTION AND VENUE</u>

5.    The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent pursuant to Bankruptcy Rule 7008 to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 364, 507, 541, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

---

[4]    Capitalized terms used by not defined in this Motion shall have the meanings ascribed to such terms in the First Day Declaration.

## BACKGROUND

### A.    General Background

8.      On May 15, 2024 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, these "Chapter 11 Cases"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their financial affairs as debtors in possession.

9.      On May 16, 2024, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, which was approved by the Court. No request for a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

10.     Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the First Day Declaration.

### B.    The Debtors' Prepetition Secured Indebtedness[5]

i.    Fluids

11.     The chart below sets forth Fluids' funded secured debt obligations as of the Petition Date:

| Fluids Debt Obligation | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|
| Underlying Credit Facility | $1.20 Million *Promissory Note* | August 31, 2025 | Substantially All Assets of Fluids, Including Ownership Interests in Leasing; Certain Assets of Straitline |

---

[5] Certain information relating to Fluids' prepetition secured indebtedness and the governing loan documents, notes and collateral documents are based on information received from and asserted by the Prepetition Fluids Lender.

| Fluids Debt Obligation | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|
| MSELF Credit Facility | $36.95 Million<br>*Promissory Note* | November 29, 2025 | Substantially All Assets of Fluids, Including Ownership Interests in Leasing; Certain Assets of Straitline |
| Fluids Vehicle Financings | $87,000<br>*Promissory Note* | Various | Secured to certain vehicles of Fluids |

12.     As of the Petition Date, Fluids has approximately $234 thousand of cash, approximately $38.23 million in total principal amount outstanding under its funded secured debt obligations, and approximately $14.40 million in total outstanding unsecured debt obligations.[6] The funded secured debt obligations consist of a (a) first lien secured credit facility with a principal amount outstanding of approximately $1.2 million as of the Petition Date, (b) a *pari pasu* first lien Main Street Loan credit facility with a principal amount outstanding of approximately $36.95 million, and (c) certain vehicle financing facilities in the aggregate amount of approximately $87 thousand as more fully described below.

> a.  *Fluids Underlying Credit Facility*

13.     On July 17, 2019, Spirit of Texas Bank, SSB (the "Original Prepetition Fluids Lender") extended a loan to Fluids in the original principal amount of $4,000,000, which was renewed on August 31, 2020 (as amended and restated, the "Underlying Credit Facility"). The Underlying Credit Facility is evidenced by that certain Promissory Note, dated August 31, 2020 (the "Underlying Note"), made by Fluids payable to the order of the Original Prepetition Fluids Lender, and the Underlying Credit Facility is secured by that certain Security Agreement dated August 31, 2022 ("Underlying Security Agreement") as to certain collateral constituting

---

[6]     This includes approximately $12.0 million owed to non-Debtor affiliates on account of notes payable.

substantially all of the assets of Fluids, in addition to assets of certain of Fluids' non-Debtor affiliates.

14.     Although the original maturity date for the Underlying Credit Facility was August 31, 2020, prior to maturity, the Original Prepetition Fluids Lender and Fluids renewed the Underlying Credit Facility pursuant to the Underlying Note and extended its maturity to August 31, 2025.

15.     Subsequent to the origination of the Prepetition Fluids Facilities (defined below), Simmons Bank (the "Prepetition Fluids Lender") became the successor in interest by merger to the Original Prepetition Fluids Lender under the documents evidencing, governing, and securing the Underlying Credit Facility (collectively, the "Underlying Facility Documents").

16.     As of the Petition Date, the principal balance under the Underlying Credit Facility was approximately $1.20 million. The Underlying Credit Facility accrues interest at a rate per annum equal to the higher of: (a) the Wall Street Journal Prime Rate plus one percentage point (totaling 9.5 percent as of the Petition Date), or (b) 4.25 percent.

      *b.  Fluids MSLEF Facility*

17.     On November 25, 2020, the Original Fluids Prepetition Lender made an additional extension of credit to Fluids in the original principal amount of $36,000,000 (as amended and restated, the "MSELF Facility" and together with the Underlying Credit Facility, the "Prepetition Fluids Facilities").  The MSELF Facility is evidenced by that certain Second Corrected Amended and Restated MSELF Promissory Note, dated May 15, 2023 (the "MSELF Note"), made by Fluids payable to the Prepetition Fluids Lender.  The MSELF Facility is secured by certain collateral (as set forth in the MSELF Security Agreement (defined below), the "MSELF Facility Collateral"), in addition to certain assets of Straitline, and is guaranteed by certain of Fluids' non-Debtor affiliates.

The MSELF Facility (a) is secured by those two certain Amended and Restated Security Agreements, dated November 25, 2020 (collectively, the "MSELF Security Agreement"), one entered into by the Original Prepetition Fluids Lender and Fluids and the other entered into by the Original Prepetition Fluids Lender and certain of Fluids' non-Debtor affiliates; and (b) is governed by that certain Amended and Restated Loan Agreement, dated November 25, 2020, entered into by the Original Prepetition Fluids Lender and Fluids (as amended, the "Loan Agreement" and together with the MSELF Note, the MSELF Security Agreement and all other loan documents related to the foregoing, the "MSELF Loan Documents"). The Underlying Facility Documents and the MSELF Facility Documents are, collectively, the "Prepetition Fluids Loan Documents".

18.    As set forth in the Prepetition Fluids Loan Documents, the Prepetition Fluids Lender asserts a lien on substantially all assets of Fluids, including its ownership interests Leasing, and certain assets of Straitline.

19.    The MSELF Facility was issued pursuant to the Main Street Lending Program instituted by the Federal Reserve Bank of Boston (the "Fed"). Accordingly, the Fed purchased a 95% participation in the MSELF Note, and the Prepetition Fluids Lender is serving as the administrative agent under the MSELF Note.[7]

20.    As of the Petition Date, the principal balance under the MSELF Facility was approximately $36.95 million. The maturity date of the MSELF Facility is November 25, 2025. The MSELF Facility initially accrued interest at a rate per annum equal to LIBOR, as of the applicable LIBOR Determination Date (as defined in the MSELF Note), *plus* 3.0 percent. As of

---

[7]    The term Prepetition Fluids Lender shall refer to such in its capacity as lender and/or as Administrative Agent, as the context may provide.

May 15, 2023, the MSELF Program began using the SOFR index in place of LIBOR; accordingly, the interest accrues at a current interest rate per annum equal to term SOFR *plus* 3.11448%.[8]

>   c. *Fluids Vehicle Financing Facilities*

21.     Fluids also has certain vehicle financing arrangements pursuant to which certain lenders have first-priority liens on certain vehicles of Fluids (in the aggregate, the "Fluids Vehicle Debt"); however, as of the Petition Date, the principal balance of the Fluids Vehicle Debt is approximately $87,000.

>   ii.   Straitline Financing

22.     The chart below sets forth Straitline's funded debt obligations as of the Petition Date:

| Straitline Debt Obligation | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|
| Straitline SBA Facility | $150,000 *Promissory Note* | May 16, 2050 | Substantially All Assets of Straitline |
| Straitline Blue Sky Facility | $15 Million *Promissory Note* | April 5, 2027 | Certain assets of Straitline |
| Straitline Vehicle Financings | $397,000 *Promissory Note* | Various | Certain vehicles of Straitline |
| Straitline Promissory Note in favor of Fluids (assigned to the Prepetition Fluids Lender) | $27.4 Million *Promissory Note* | Nov. 25, 2025 | Certain assets of Straitline |

---

[8]     Subject to the applicable Maximum Rate (as defined in the Prepetition Fluids Loan Documents).

23.     As of the Petition Date, Straitline has approximately $150 thousand of cash,[9] approximately $43 million in total principal amount outstanding under its funded secured debt obligations, and approximately $60.78 million in total outstanding unsecured debt obligations.[10] The funded secured debt obligations consists of (a) a first lien credit facility with a principal amount outstanding of $150 thousand, (b) a secured credit facility with a principal amount outstanding of $15 million, and (c) certain vehicle financing facilities described below totaling approximately $397 thousand.

> a.   *SBA Secured EDIL*

24.     On May 16, 2020, the Small Business Administration (the "SBA") made an extension of credit to Straitline in the amount of $150,000 (the "Straitline SBA Facility").  The Straitline SBA Facility is evidenced by that certain Note (the "SBA Note"), dated May 16, 2020, made by Straitline payable to the SBA.  In connection with the SBA Note, Straitline executed that certain Loan Authorization and Agreement, dated May 16, 2020 (the "SBA Loan Agreement"), between the SBA and Straitline, and that certain Security Agreement, dated May 16, 2020 (the "SBA Security Agreement" and together with the SBA Note, the SBA Loan Agreement, and all other loan documents related thereto, the "SBA Loan Documents").  Pursuant to the SBA Security Agreement, the obligations owing under the SBA Note are secured by security interests in certain assets of Straitline constituting substantially all of the assets of Straitline (the "SBA Facility Collateral").

---

[9]   On April 25, 2024, Blue Sky responded to a Receiver's Levy issued by a receiver appointed in Texas State Court pursuant to the request of creditor GD Energy Services (73rd Dist., Bexar County, Texas, Cause No. 2023CI26184).  Accordingly, this cash-on-hand figure reflects a balance that includes the amount held by such receiver.  The Debtors intend to compel turnover of such cash.  Approximately $106,191.89 is frozen in the Blue Sky accounts; accordingly, only $44 thousand is available immediately.

[10]   This includes approximately $46.30 million owed to non-Debtor affiliates on account of notes payable.

25.     As of the date of the Petition Date, the principal balance under the SBA Facility was approximately $150 thousand.  The maturity date of the SBA Facility is May 16, 2050. The SBA Facility accrues interest at a rate per annum equal to 3.75 percent.

b.  *Blue Sky Secured Note*

26.     On June 5, 2023, Blue Sky Bank ("Blue Sky") made an extension of credit to Straitline in the amount of $15,000,000 (the "Blue Sky Facility" and together with the SBA Facility, the "Prepetition Straitline Facilities").[11]  The Blue Sky Facility is evidenced by that certain Promissory Note, dated June 5, 2023 (the "Blue Sky Note"), made by Straitline payable to Blue Sky.  In connection with the Blue Sky Note, Straitline executed that certain Loan and Security Agreement, dated June 5, 2023 (the "Blue Sky Loan Agreement" and together with the Blue Sky Note and all other loan documents related thereto, the "Blue Sky Loan Documents"), between Blue Sky and Straitline.  The Debtors believe that Blue Sky will assert that obligations owing under the Blue Sky Note are secured by liens in certain assets of Straitline (the "Blue Sky Facility Collateral").

27.     As of the Petition Date, the principal balance under the Blue Sky Facility was approximately $15,000,000.  The maturity date of the Blue Sky Facility is April 5, 2027. The Blue Sky Facility accrues interest at a rate per annum equal to the higher of: (a) the Wall Street Journal Prime Rate plus one percentage point (totaling 9.5% as of the Petition Date), or (b) 6.5%.

c.  *Straitline Vehicle Financing Facilities*

28.     Straitline also has certain vehicle financing arrangements with Ford Motor Credit and GM Financial pursuant to which such lenders have first-priority liens on certain vehicles of

---

[11]   The Prepetition Straitline Facilities and the Prepetition Fluids Facilities are collectively referred to as the Prepetition Secured Facilities.

Straitline (in the aggregate, the "Straitline Vehicle Debt"); however, as of the Petition Date, the principal balance of the Straitline Vehicle Debt is approximately $397 thousand.

**C.     *The Debtors' Need for Debtor in Possession Financing and Use of Cash Collateral***

29.     The Debtors require immediate access to the DIP Facility, in addition to continued use of Cash Collateral, to ensure they have sufficient liquidity to satisfy their working capital and business operating needs, and the administrative costs of these Chapter 11 Cases. First Day Decl., ¶¶ 90, 97, 112. Without immediate approval of the DIP Facility and access to Cash Collateral, the Debtors will lack funding that is essential to these Chapter 11 Cases and the support of their key stakeholders which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. *Id.*

30.     The DIP Facility solves the Debtors' near-term liquidity constraints by providing the Debtors with access to necessary capital. The Debtors will draw from the DIP Facility in one or more borrowings (each a "DIP Borrowing") with $1.5 million of the DIP Facility being drawn following the entry of the Interim Order and the remaining $4.5 million being drawn in one or more DIP Borrowings following the entry of the Final Order. As explained in the First Day Declaration, this funding of the DIP Facility will provide the Debtors with necessary liquidity, while also securing the consensual use of Cash Collateral, which together with the DIP Facility will allow the Debtors to fund their operations and these Chapter 11 Cases.

31.     A seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative for the Debtors to preserve their asset value, complete projects currently in process, collect accounts receivable and maintain the value of the Debtors' businesses and assets. *Id.* ¶ 87, 97. The Debtors also believe that by immediately bolstering their balance sheet with incremental liquidity and ensuring the Debtors have access to additional liquidity in the

future, the DIP Facility also will send a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors will have sufficient liquidity during these Chapter 11 Cases. *Id.* ¶ 87. Specifically, the Debtors believe that commencing these Chapter 11 Cases with adequate financing, coupled with the Debtors' access to the DIP Facility, should communicate to such stakeholders that the Debtors will be able to continue to operate and manage their businesses in a manner as close to the ordinary course as possible and maintain the Debtors' equipment for the Marketing Process. *Id.* ¶ 90.

32.     The DIP Orders also provide for the consensual use of Cash Collateral, which is a critical element of the Debtors' decision to enter into the DIP Facility.  *Id.* ¶¶ 90, 107. The Debtors rely on the use of cash generated from operations to fund working capital, payroll, taxes, and for other general corporate purposes. *Id.* Absent the consent of the Prepetition Fluids Lender, there would have likely been a dispute at the outset of these Chapter 11 Cases regarding the use of Cash Collateral. *Id.* ¶ 90. Instead, the DIP Facility resolves these issues by providing for consensual use of Cash Collateral, which, in turn, allows the Debtors to preserve the going-concern value of the estates for the benefit of all stakeholders. *Id.* ¶¶ 96, 108, 112.

**D.     *Alternative Sources of Financing Are Not Available on Better Terms***

33.     The Debtors believe that the DIP Facility represents the best terms available to the Debtors for financing.  *Id.* ¶ 105. The Debtors and their advisors conducted a marketing process to determine the availability of third-party financing sources that were able to accommodate the Debtors' financial situation and the terms of the DIP Facility permit the Debtors to further market and solicit the DIP Facility prior to entry of the Final Order. *Id.* ¶¶ 99-101. The Debtors developed a list of parties that could be interested in providing financing in a competitive process on the best terms available in the market including existing creditors in the Debtors' capital structures, banks

outside the Debtors' capital structures, and alternative lenders outside the Debtors' capital structures. *Id*. Because substantially all of the Debtors' assets are encumbered and subject to liens, the strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structures. *Id*.

34.     No party other than the DIP Lender was willing to provide postpetition financing on anything other than a "priming" basis with respect to substantially all of the Debtors' assets, which would have likely subjected the Debtors to a priming dispute with the Prepetition Fluids Lender. *Id*. ¶¶ 98-101.

35.     After extensive, arm's-length negotiations with the DIP Lender, the Debtors were able to secure the proposed $12 million DIP Facility.  *Id*. ¶¶ 102-03. The DIP Facility is critical to the Debtors' ability to pay the administrative costs of these Chapter 11 Cases and should provide the Debtors with sufficient liquidity to operate their businesses without creating a priming or valuation dispute at the outset of these Chapter 11 Cases.

36.     The Debtors submit that there are no alternative sources of financing reasonably available to the Debtors and no alternative sources of financing available on both better and executable terms than those being provided by the DIP Facility. *Id*. ¶¶ 98-101, 104.  No party that the Debtors communicated with as part of the marketing process, and no other party that the Debtors are aware of, was interested in providing, or willing to provide, post-petition financing to the Debtors on an unsecured basis. *Id*. Similarly, the Debtors are not aware of any party that was willing to provide post-petition financing on anything other than a priming basis with respect to substantially all of the Debtors' assets, which priming liens would not have been consented to by the secured lenders and would have subjected the Debtors to a priming dispute. *Id*. Accordingly,

the DIP Facility is reasonable and appropriate under the circumstances and is the Debtors' best available option under the Debtors' circumstances. *Id*.

37.     For all the reasons set forth herein, the DIP Facility is in the best interests of the Debtors' estates, and the Debtors respectfully request that the Court approve the DIP Facility on the terms and conditions described herein.

## <u>CONCISE STATEMENT OF MATERIAL TERMS PURSUANT TO BANKRUPTCY RULE 4001</u>

38.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B):

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| **Parties to the DIP Loan Documents** Bankruptcy Rule 4001(c)(1)(B) | <u>Borrowers/Debtors</u>:  Nitro Fluids, LLC, NFH Leasing, LLC, and Straitline Pumps, LLC <br><br> <u>Guarantors/Pledgors</u>:  Nitro Construction, LLC ("<u>Construction</u>") and Nitro Downhole, LLC ("<u>Downhole</u>"). <br><br> <u>Post-Petition Lender</u>:     Simmons Bank. |
| **Term** Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The earliest to occur of the following (the "<u>Maturity Date</u>"): <br><br> (a) the first business day that is 150 days after the date of entry of the Interim Order; (b) consummation of a sale or sales aggregating substantially all of the assets of the Debtors, which is approved by final order of the Court; (c) acceleration of the DIP Loans after the occurrence of an Event of Default; (d) the effective date of any plan of reorganization; (e) conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (f) dismissal of the Chapter 11 Cases; or (g) appointment of a chapter 11 trustee, or an examiner with expanded powers, in these Chapter 11 Cases without the Post-Petition Lender's consent. |
| **Principal Amount of Loan** Bankruptcy Rule 4001(c)(1)(B) | Up to $12,000,000 ($6,000,000 New Money; $6,000,000 dollar-for-dollar Roll Up) |
| **Loan Commitment** Bankruptcy Rule 4001(c)(1)(B) | Up to $12,000,000 ($6,000,000 New Money; $6,000,000 dollar-for-dollar Roll Up) |

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Reimbursement of Post-Petition Expenses</u>:  The DIP Lender shall be entitled to reimbursement of its reasonable out-of-pocket expenses, including attorneys' and professionals' fees, incurred in connection with the DIP Facility and as provided for in the DIP Loan Documents.<br><br><u>Releases</u>:  Debtors shall provide the DIP Lender (in its capacities as DIP Lender, the Prepetition Fluids Lender, and the Administrative Agent under the MSELF Facility) a standard release of any and all claims and causes of action, whether such claims and causes of action arise against it pre-petition or post-petition, including any claims under Chapter 5 of the Bankruptcy Code.  The Debtors' release of claims shall be subject to a customary challenge period for a creditors' committee, if appointed.<br><br>For the Interim Funding, as set forth in the DIP Term Sheet:<br><br>(a)      Receipt of satisfactory Budget;<br>(b)      Execution and delivery of satisfactory definitive documentation;<br>(c)      Bankruptcy Court's entry of an order approving a cash management system for the Debtors satisfactory to the Post-Petition Lender;<br>(d)      Bankruptcy Court's entry of an Interim Order approving the DIP Facility and other arrangements described herein, in form and substance acceptable to the Post-Petition Lender;<br>(e)      Bankruptcy Court's entry of a cash collateral order in form and substance satisfactory to the Post-Petition Lender, which may be part of the Interim Order; and<br>(f)      The Post-Petition Lender shall have received such documents and other instruments as it may reasonably request. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Interest Rate</u>:  1 month SOFR (as of the Petition Date) + 7.5% per annum (the "<u>Pre-Default Rate</u>") accrued month to month, and fully due and payable on Maturity Date or upon acceleration.  Default interest shall be the lesser of the Pre-Default Rate plus 2% or the maximum rate allowed by applicable law. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The DIP Orderes shall authorize the Debtors to use the Prepetition Fluids Lender's cash collateral (as defined under section 363(a) of the Bankruptcy Code) as provided in the Budget.<br><br>The Debtors shall be permitted to use cash collateral, proceeds of DIP Loans and proceeds of the Collateral only for the purposes and in the amounts set forth in the weekly operating budget attached hereto as **<u>Exhibit A-2</u>** (the "<u>Budget</u>"), subject to a 10% variance and carry over of any unused amounts.  Except for the line item(s) for professional fees and expenses (which shall be tested as described below), the aggregate expenditures under the Budget will be tested weekly on a cumulative basis (*i.e.*, the sum of all actual amounts expended for the current week and all previous weeks in the Budget cannot exceed the sum of all budgeted disbursements for such cumulative period). |

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | Simmons Bank<br>Blue Sky asserts an interest in certain cash collateral |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | <u>DIP Facility Fee</u>:  A one-time fee of $100,000. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The Debtors shall only be permitted to use cash collateral, proceeds of DIP Loans and proceeds of the Collateral for the purposes and in the amounts set forth in the Budget, subject to a 10% variance and carry over of any unused amounts.  Except for the line item(s) for professional fees and expenses (which shall be tested as described below), the aggregate expenditures under the Budget will be tested weekly on a cumulative basis (*i.e.*, the sum of all actual amounts expended for the current week and all previous weeks in the Budget cannot exceed the sum of all budgeted disbursements for such cumulative period). |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | On or prior to noon central time each Thursday during the DIP Facility term, the Debtors shall prepare and deliver to the Post-Petition Lender a written reconciliation (by line item and on a cumulative basis) of: (i) the actual disbursements for the immediately preceding week with the budgeted disbursements for such week as provided in the Approved Budget; and (ii) the cumulative actual disbursements for the entire DIP Facility term with the cumulative budgeted disbursements for the entire DIP Facility term as provided in the Approved Budget. |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | <ul><li>Within seven (7) days of the entry of the Interim Order, file with the Bankruptcy Court a motion to employ a broker, agreed upon by the DIP Lender (the "<u>Broker Retention Motion</u>"), seeking an order in form and substance acceptable to the DIP Lender (the "<u>Broker Retention Order</u>"), which approves retention of such broker to market the Debtors' assets for sale, pursuant to section 363 of the Bankruptcy Code;</li><li>Within seven (7) days of the entry of the Interim Order, file with the Bankruptcy Court a motion seeking authority to sell the Debtors' assets and approval of sales procedures (the "<u>Initial Sales Procedures Motion</u>"), seeking an order in form and substance acceptable to the DIP Lender (the "<u>Initial Sales Procedures Order</u>"), which authorizes the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and approves such sale procedures;</li><li>On or before the 30th day following the filing of the Broker Retention Motion, the Debtors shall obtain entry of the Broker Retention Order on a final and non-appealable basis;</li><li>On or before the 30th day following the filing of the Initial Sales Procedures Motion, the Debtors shall obtain entry of the Initial Sales Procedures Order on a final and non-appealable basis;</li><li>At least three (3) days prior to the filing of any fee application to be filed with the Bankruptcy Court for approval of professional fees and expenses, provide any such application to the DIP Lender for review and comment; and</li></ul> |

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| | • On or before the Maturity Date, the Court shall have (i) entered a final, non-appealable order (which may be through multiple orders) approving the sale of all or substantially all of the Debtors' assets (at least comprising the DIP Lender's pre-petition and post-petition collateral), such sale being approved by the DIP Lender in its sole discretion or (ii) entered a final, non-appealable order confirming a plan of reorganization or liquidation, approved by the DIP Lender in its sole discretion. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | The Debtors' indebtedness under the DIP Facility and all other Obligations (as defined in the DIP Loan Documents) will be secured by security interests and liens granted pursuant to section 364(c)(1), (c)(2), and (d)(1), as applicable, of the Bankruptcy Code (the "<u>DIP Liens</u>"), in and on all of the Debtors' and the Debtors' bankruptcy estates' real and personal property, tangible or intangible, whether now existing or hereafter acquired and all proceeds, products, rents, revenues and profits thereof (the "<u>Collateral</u>"), that are senior to (priming) all other liens and security interests in the Collateral, including without limitation, the liens and security interests securing the Prepetition Fluids Lender's pre-petition indebtedness and indebtedness under Prepetition Straitline Facilities; *provided*, *however*, that the DIP Liens granted on account of the Roll Up shall apply to the collateral (whether pre-petition or post-petition) specified under the definitive DIP Loan Documents. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender has agreed to a carve-out of its Collateral for: (a) court-approved administrative expense claims of (i) professionals retained by the Debtors pursuant to section 327 of the Bankruptcy Code (the "<u>DIP Professionals</u>") for fees, expenses and other costs incurred from the Petition Date through any applicable Carve Out Termination Date, as set forth in the DIP Term Sheet and Final Order, in the amounts set out and approved in the Budget; (ii) an amount to be negotiated for fees and expenses of professionals retained by the Official Committee of Unsecured Creditors (the "<u>Committee Professionals</u>"), if any; and (iii) fees and expenses of the DIP Lender, in the amounts set out in the Budget; (b) unpaid fees payable pursuant to 28 U.S.C. § 1930; and (c) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; and (d) up to $500,000 of fees and expenses incurred by DIP Professionals from the first day following a Carve-Out Termination Date, to the extent allowed by the Bankruptcy Court (all such carve-outs referenced above, collectively, the "<u>Carve Outs</u>"), capped at $3,250,000 for DIP Professionals. |
| **Challenge Deadline** Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender shall not be required to file any proofs of claim in the Bankruptcy Case on account of any claims (as defined under section 101(5) of the Bankruptcy Code), and the allowance of any such claims of the Post-Petition Lender shall be provided for in the Final Order (subject to a customary challenge period for a creditors' committee, if appointed). |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection to the Pre-Petition Fluids Lender for any diminution in value of the Pre-Petition Fluids Lender's interest in the Pre-Petition Fluids Facilities Collateral, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Pre-Petition Fluids Facilities Collateral and/or the Debtors' use, sale or lease of the Pre-Petition |

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| | Fluids Facilities Collateral during the Chapter 11 Cases, the Pre-Petition Fluids Lender is hereby granted as of the Petition Date valid, perfected, first-priority (except as otherwise provided herein) additional and replacement security interests in and liens (collectively, the "Replacement Liens") upon all of the Debtors' rights, title and interest in, to, and under (i) all assets in which the Pre-Petition Fluids Lender holds validly perfected liens as of the Petition Date; and (ii) all of the Debtors' now owned and after-acquired real and personal property, assets and rights, of any kind or nature, wherever located, including, without limitation contracts, property, plant, equipment, general intangibles, documents, instruments, interests in leaseholds, patents, copyrights, trademarks, trade names, and all other intellectual property, capital stock of subsidiaries, cash, and cash collateral of the Debtor (whether maintained with the Pre-Petition Lender or other financial institutions), any investment of such cash and cash collateral, inventory, accounts receivable, any cause of action (excluding avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and the proceeds thereof (whether recovered by judgment, settlement or otherwise), any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits of all of the foregoing, but subject and subordinate to the DIP Liens, any Prior Liens, and the Carve Outs. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | <ul><li>The failure of the Debtors to obtain entry of the Final Order by the Bankruptcy Court in a form acceptable to the DIP Lender within thirty (30) days of the Petition Date;</li><li>The Debtors shall attempt to vacate or modify any of the DIP Orders over the objection of the DIP Lender;</li><li>The Debtors shall institute any proceeding or investigation, or support same by any other person, challenging the status and/or validity of the pre-petition or post-petition debt or liens of the DIP Lender;</li><li>The Debtors fail to comply with any Affirmative Covenants or Negative Covenants of the DIP Loan Documents;</li><li>Weekly variances from the Budget in an amount of more than 10% for aggregate expenditures, without consent of the DIP Lender;</li><li>The Debtors file a plan of reorganization or liquidation or disclosure statement, or any amendment to such plan or disclosure statement, without the consent of the DIP Lender, unless the DIP Obligations are paid in full;</li><li>The entry of an order amending, supplementing, staying, vacating or otherwise modifying any DIP Loan Documents, the Interim Order, or the Final Order, in each case without the consent of the DIP Lender, or the filing of a motion for reconsideration with respect thereto;</li><li>Using cash collateral or advances under the DIP Facility for any purpose other than those set forth in the Budget; and</li><li>Dismissal or conversion of any of the Debtors' bankruptcy cases to cases under chapter 7 of the Bankruptcy Code.</li></ul> |
| **Waiver / Modification of the Automatic Stay**<br>Bankruptcy Rule | The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Lender to exercise rights and remedies under certain circumstances. |

| DIP Facility Term | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|
| 4001(c)(1)(B)(iv) | |
| **Waiver of Rights Under Section 506(c)** Bankruptcy Rule 4001(c)(1)(x) | The Final Order shall provide that no costs or expenses of administration shall be imposed against the Post-Petition Lender's pre-petition or post-petition collateral under section 506(c) of the Bankruptcy Code. |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | Debtors shall stipulate that each of the Prepetition Fluids Secured Facilities is valid and existing and that all liens, claims and interests held by the Prepetition Fluids Lender to secure the Prepetition Fluids Secured Facilities are valid, existing and properly perfected. The Debtors' stipulations shall be subject to a customary challenge period for a creditors' committee, if appointed. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify the DIP Lender and its officers, directors, employees, affiliates, agents, attorneys, financial advisors, and controlling persons and hold them harmless from and against all costs, expenses (including fees, disbursements and other charges of counsel) and liabilities of any such indemnified person arising out of or relating to any claim arising out of or relating to any claim or litigation or other proceedings (regardless of whether any such indemnified person is a party thereto), that relate to the DIP Loans; *provided* that no indemnified party will be indemnified for its gross negligence or willful misconduct. The scope of such indemnification will be at least as broad as that provided in the documentation for the Prepetition Fluids Loan Documents. |

## **BENEFITS OF PROPOSED FACILITY; FAIR & REASONABLE TERMS**

### *A.    Benefits of the Proposed DIP Facility*

39.    In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains several favorable terms and conditions to the Debtors.

40.    As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above. Based on the foregoing, the proposed use of Cash Collateral and

the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their businesses in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

**B.      *The DIP Facility Terms Are Reasonable under the Circumstances***

41.      The obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances. Accordingly, the DIP Lender has acted in good faith and has agreed to provide the DIP Facility to the Debtors on terms that are fair and reasonable under the current circumstances and market conditions.

i.      <u>Consensual Priming Liens</u>

42.      The DIP Lender requires a perfected first-priority security interest and lien on substantially all of the Debtors' assets for the New Money Term DIP Facility.  Absent such protections, the DIP Lender would not have agreed to provide the DIP Facility to the Debtors. The Prepetition Fluids Lender has consented to the priming liens and to the adequate protection package provided to the Prepetition Fluids Lender and would have likely contested such priming liens in an alternative DIP proposal.

ii.      <u>Liens on Unencumbered Assets</u>

43.      The DIP Lender requires a perfected first-priority security interest and lien on substantially all of the Debtors' unencumbered assets.  Absent such protections, the DIP Lender would not have agreed to provide the DIP Facility to the Debtors.

iii.      <u>Roll Up</u>

44.      After entry of the Final Order, a portion of the MSELF Facility and Underlying Credit Facility will roll up into the DIP Facility on a cashless basis, in the amount of $6 million.

Such Roll Up will be secured by the same collateral as the Prepetition Fluids Secured Facilities and have the same priority as the New Money Term DIP Facility.  The Roll Up of a portion of the Prepetition Fluids Secured Facilities was a condition to the DIP Lender providing the DIP Facility, and without the inclusion of the Roll Up, the DIP Lender would not have provided the DIP Facility.

45.     The DIP Facility provides numerous benefits to the Debtors, their estates, and their stakeholders justifying the Roll-Up. For example, given that the DIP Lender is the Debtors' incumbent lender, moving forward with certain other DIP proposals would have likely resulted in the DIP Lender seeking additional adequate protection and subjected the Debtors to a priming and valuation fight at the outset of these cases.

46.     The terms of the DIP Facility, including the liens being granted and the Roll Up, are an important part of the DIP Facility that will allow the Debtors to maintain sufficient liquidity during these Chapter 11 Cases.

### C.     The Proposed DIP Facility Fees Are Fair and Reasonable

47.     The DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility.  As discussed in the First Day Declaration, in view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lender for its costs and the assurances it is providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their businesses and (ii) maximize the value of their estates.

i.      DIP Fees

48.     In consideration for the DIP Lender's commitments in connection with the DIP Facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "DIP Fees"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "Out-of-Pocket Expenses" and, together with the DIP Fees, the "DIP Fees and Expenses"), and (iii) indemnify the DIP Lender in accordance with the DIP Loan Agreement.

ii.     Reasonableness

49.     The DIP Fees and Expenses were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lender, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lender as consideration for the extension of postpetition financing. As discussed in the First Day Declaration, it is unlikely that a financing commitment with terms similar to those in the DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, and the Debtors' liquidity position.

## BASIS FOR RELIEF

50.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. The Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)-(b); 503(b)(1). Having determined that post-petition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lender to secure the DIP Facility on the terms described herein. For these reasons, the Debtors submit that they satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

**A.**   ***Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment***

51.   The relief requested by the Motion is warranted for several reasons:

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

- The Debtors are entering chapter 11 with limited cash on hand. Immediate access to the DIP Facility is therefore critical to ensure sufficient working capital to operate their businesses, to maintain and preserve the equipment for the Marketing Process, and to administer their estates.

- The Debtors' proposed interim draw of up to $1.5 million under the New Money Term DIP Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- Negotiations with the DIP Lender were conducted in good faith and at arms' length. As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no better alternative financing available immediately to the Debtors in the market, subject to the post-petition DIP financing marketing process permitted by the DIP Lender prior to entry of the Final Order. The DIP Facility, taken as a whole, is reasonable under the facts and circumstances and represents the Debtors' best currently available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

52.   If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

53. Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06- 11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

54. Further, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

55. The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives. Given the nature of the Debtors' relatively limited unencumbered asset pool, the DIP Lender is the best available financing source that could commit to a facility on the most favorable terms, and enable the Debtors to avoid a potentially costly and protracted priming fight at the outset of these Chapter 11 Cases. The Debtor

negotiated the DIP Loan Agreement with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these Chapter 11 Cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

56.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

57.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender

before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

58.     Given the Debtors' cashflow constraints, a post-petition unsecured facility is not available. The Court should, therefore, authorize the Debtors to provide the DIP Lender with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) for the New Money Term DIP Facility, valid priming liens (the "Priming Liens") on any property encumbered with an existing lien pursuant to section 364(d)(1) of the Bankruptcy Code, and (iii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Primed Liens) pursuant to section 364(c)(3) of the Bankruptcy Code.

59.     The DIP Facility is necessary to preserve the Debtors' estates. The Debtors require access to the DIP Facility and access to Cash Collateral to ensure they have sufficient liquidity to operate their businesses, enter into post-petition agreements, and administer their estates in the ordinary course for the duration of these Chapter 11 Cases. The Debtors' operating cash flow, as currently projected, will not be sufficient to fund ongoing operations and expenses for the projected duration of these Chapter 11 Cases, including administrative costs associated with these Chapter 11 Cases.

60.     The terms of the DIP Facility are fair and reasonable under the circumstances. The DIP Facility represents the most favorable source of post-petition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these Chapter 11 Cases.

**B.      The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens Priming the Prepetition Lender**

61.      In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. See 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

62.      "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'" *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11. Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

63.      Here, the Prepetition Fluids Lender has consented to (i) the Debtors' use of Cash Collateral; (ii) the Debtors' entry into the DIP Facility; (iii) the granting of the DIP Liens, the DIP Superpriority Claims, and the Replacement Liens; and (iv) the priming of the liens held by the Prepetition Fluids Lender, in each case, upon the terms set forth in the Interim Order and the DIP

Loan Documents. Accordingly, the Debtors should be authorized to obtain post-petition financing secured by liens priming the Prepetition Lender.

**C.      The Debtors Should Be Authorized to Use Cash Collateral**

64.      For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their Chapter 11 Cases. Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

65.      The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  As noted above, the Prepetition Lender has consented to the Adequate Protection Replacement Liens to be provided pursuant to the Interim Order and the Debtors are providing the Prepetition Lender with adequate protection for the use of Cash Collateral.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

**D.      The Debtors Should Be Authorized to Pay Fees Required by the DIP Loan Documents**

66.      As described herein, the Debtors have agreed, subject to Court approval, to pay the DIP Fees in exchange for the DIP Lender providing the DIP Facility, and as set forth in the First

Day Declaration, taken as a whole, the terms of the DIP Loan Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best—and in fact only—currently available option to maintain their ongoing business operations and to fund these Chapter 11 Cases.

67.     The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### E.     The Carve Out is Appropriate

68.     The DIP Facility subjects the DIP Lender's security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Outs. Without the Carve Outs, the Debtors' estates and stakeholders could be harmed because the services professionals might otherwise provide in these Chapter 11 Cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve Outs protect against administrative insolvency during the pendency of these Chapter 11 Cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee. Accordingly, the Debtors submit that the Carve Outs are appropriate.

### F.     The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)

69.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

70.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the First Day Declaration, the negotiations of the terms of the DIP Facility with the DIP Lender were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Loan Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Loan Documents and in accordance with the Budget (subject to any Permitted Variance). Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender thus is entitled to all of the protections afforded by that section.

### G.     There Is Cause for Modification of the Automatic Stay

71.     The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Lender to exercise rights and remedies

under certain circumstances. These provisions were part of the quid pro quo for the Debtors' ability to obtain the DIP Facility and use Cash Collateral as provided therein and in the Interim Order. Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

72.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g., In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

**H.     The Debtors Have an Immediate Need for Access to Cash Collateral and DIP Financing**

73.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

74.     Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Thus, the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash

Collateral, to finance their operations and continue operating as going concerns during the pendency of these Chapter 11 Cases. In addition, access to the DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## I.      *Basis for Waiver of Section 552(b)*

75.     The Prepetition Lender is consenting, subject to the terms of the Interim Order, to the priming of its liens by the DIP Facility and to the Debtors' use of Cash Collateral, thereby permitting the Debtors to obtain sufficient funds to continue to operate their businesses and providing a substantial benefit to the Debtors' estates. As a condition to providing such consent, the Prepetition Lender requires the Debtors to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon entry of the Final Order. Absent the Prepetition Lender's consent, the Debtors would have been required to seek to prime the Prepetition Lender's liens and to use Cash Collateral on a non-consensual basis, which would have proven costly to the Debtors were they unable to prevail in such a priming fight. In addition, the Debtors are seeking approval of the "equities of the case" waiver only upon entry of the Final Order, thereby allowing parties in interest an opportunity to be heard in connection therewith. Therefore, the Debtors submit that the proposed "equities of the case" waiver is appropriate.

## REQUEST FOR FINAL HEARING

76.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request

that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## <u>EMERGENCY CONSIDERATION</u>

77.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion.  As set forth in the First Day Declaration, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## <u>REQUEST FOR WAIVER OF STAY</u>

78.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## **NOTICE**

79.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against Nitro Fluids, LLC; (c) the holders of the 20 largest unsecured claims against Straitline Pumps, LLC; (d) counsel to the DIP Lender, Simmons Bank, Winstead PC (Attn: Jason Enright); (e) counsel to Blue Sky Bank, Drummond Law, PLLC (Attn: Garry M. Gaskins); (f) any official committee appointed in these Chapter 11 Cases; and (g) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

80.     In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: May 17, 2024

Respectfully submitted,

*/s/ Joshua N. Eppich*

**BONDS ELLIS EPPICH SCHAFER JONES LLP**
Joshua N. Eppich    (Texas Bar No. 24050567)
Eric T. Haitz    (Texas Bar No. 24101851)
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: eric.haitz@bondsellis.com

-and-

Ken Green    (Texas Bar No. 24050698)
950 Echo Lane
Suite 120
Houston, Texas 77024
(713) 335-4990 telephone
(713) 335-4991 facsimile
Email: ken.green@bondsellis.com

PROPOSED COUNSEL FOR THE DEBTORS

## **CERTIFICATE OF SERVICE**

I certify that on May 17, 2024, a true and correct copy of the foregoing document was served via the Court's CM/ECF system.

*/s/ Eric T. Haitz*

Eric T. Haitz