**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| **In re:** | § Chapter 11 |
| | § |
| **NITRO FLUIDS, LLC,** *et al.* | § Case No. 24-60018 (CML) |
| | § |
| **Debtors.**[1] | § (Jointly Administered) |
| | § |
| | § |

**DECLARATION OF BRAD WALKER IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Brad Walker, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a Managing Director at Riverbend Special Situations Group ("<u>Riverbend</u>") where I specialize in advising distressed companies and other parties in restructuring and chapter 11 situations.   Riverbend and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.  Over the course of my career, I have advised senior management in a wide variety of industries in connection with restructurings, asset dispositions, wind-downs, and financing transactions.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave Ste 560, San Antonio, Texas 78232.

2.      I have served as a restructuring advisor to Nitro Fluids, LLC ("Fluids"), NFH Leasing, LLC ("Leasing" and together with Fluids, "Nitro") and a non-debtor affiliate of Nitro since October 2023.  Prior to the Petition Date, I was appointed as the Chief Restructuring Officer of Nitro and Straitline Pumps, LLC ("Straitline" and together with Nitro, the "Debtors").  In this capacity, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations.

3.      On May 15, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

4.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) to provide an overview of the Debtors' businesses and these chapter 11 cases (the "Chapter 11 Cases"), and (b) to support the Debtors' emergency applications and motions for "first day" relief (collectively, the "First Day Motions").

5.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. To the extent that any information provided herein is materially inaccurate, I will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge. I am authorized to submit this First Day Declaration on behalf of the

Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.       In addition to providing the factual support for the First Day Motions and the DIP Motion, the primary purpose of this First Day Declaration is to familiarize the Court with the Debtors, these Chapter 11 Cases and the relief sought in the First Day Motions and the DIP Motion. This First Day Declaration is organized as follows: <u>Part I</u> provides a general overview of the Nitro business and the Straitline business, along with each of their respective corporate histories, and corporate structures; <u>Part II</u> describes the Debtors' respective capital structures; <u>Part III</u> describes the events leading up to the commencement of these Chapter 11 Cases and the Debtors' prepetition restructuring efforts; <u>Part IV</u> sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions; and <u>Part V</u> sets forth my basis for testifying to the facts underlying and described in the DIP Motion.

7.       The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated. As set forth in <u>Part IV</u>, concurrently herewith, the Debtors have filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

## <u>INTRODUCTION</u>[2]

8.       The Debtors provide oilfield services in multiple segments of the oil and gas drilling and fracturing market.  Fluids owns equipment and performs work related to hydraulic fracturing, drilling, and well-completion activity; Leasing owns fracturing fleet equipment that it has leased

---

[2]   Capitalized terms used in this Introduction but not defined shall have the meaning ascribed thereto in the remainder of this First Day Declaration.

to Straitline; and Straitline delivers virtually all services related to hydraulic fracturing and pump down needs, including wireline assist, coiled tubing assist, and backside pressure maintenance, as well as fracturing protection services and other services.

9.      The Debtors have suffered several challenges in the months and years immediately preceding the Petition Date, including (a) a significant decline in revenue from 2020 to current, (b) a broader economic slowdown affecting the oil and gas well service space, (c) an event of default declared by the Prepetition Fluids Lender and consequent acceleration of all of the obligations under the MSELF Loan, and (d) an adverse trial verdict in the Cameron Litigation.

10.     The Debtors have commenced these Chapter 11 Cases to implement a marketing process (the "Marketing Process") and consummate one or more value-maximizing transactions, including with respect to the Straitline assets, the Fluids assets, and the Leasing assets.  The Marketing Process represents the cornerstone of these Chapter 11 Cases.  The efficient approval and execution of the Marketing Process is critical to maximizing recoveries for all creditors and will offer the best opportunity to preserve the value of the Debtors' estates.

11.     The DIP Motion seeks post-petition financing from the Prepetition Fluids Lender to support the operating costs and marketing process costs anticipated in these Chapter 11 Cases.  The Prepetition Fluids Lender (*i.e.*, the proposed DIP Lender) asserts liens on substantially all of the assets of Fluids and Leasing and asserts liens in certain SLP-Fluids Assets (defined below) where the purchase of such assets was funded by Fluids.  As proposed by the DIP Motion (discussed in greater detail below) the DIP Facility provides the Debtors with new-money financing, which, if granted, ensures consensual access to existing cash collateral of the Prepetition Fluids Lender.  In the absence of consensual access to the Prepetition Fluids Lender's cash collateral, it is unlikely that the Debtors would have been able to obtain postpetition financing

from another source because the Prepetition Fluids Lender asserts a security interest in all assets of Fluids, all assets of Leasing, and the SLP-Fluids Assets.[3]  The ability of the Debtors to timely implement the Marketing Process and maximize the value of the Debtors' estate depends upon the availability of post-petition financing akin to that which is proposed in the DIP Motion.

**PART I**
**ORGANIZATIONAL STRUCTURES & BUSINESSES**

*A.    Debtors' Corporate Structure & History*

12.    There are three debtors in these Chapter 11 Cases:  Fluids offers oil & gas frac support services including mixing plants, hydraulic chokes, frac stacks, missiles, and related services; Leasing, a wholly-owned subsidiary of Fluids that leases certain equipment to Straitline; and Straitline offers oil & gas frac and pump down services through three frac fleets and related equipment.  Although the Debtors have historically entered into transactions with one another and are considered Affiliates as such term is defined in the Bankruptcy Code, Nitro and Straitline operate separate businesses and have overlap in ownership but not identical ownership.

i.    <u>Nitro</u>

13.    Fluids was organized as a Texas limited liability company in 2010 and currently operates as a manager-managed LLC under the laws of Texas.  Fluids is owned by three equity holders identified further below, and Fluids is the sole member of Leasing.  Leasing was organized as a Texas limited liability company in 2021 and currently operates as a single member-managed LLC under the laws of Texas.  A diagram of the Debtors' organizational structure is attached as **<u>Exhibit A</u>**.

---

[3]    The SLP-Fluids Assets comprise a significant portion of the Straitline assets.

ii.    <u>Straitline</u>

14.    Straitline was organized as a Texas limited liability company in 2017 and currently operates as a manager-managed LLC under the laws of Texas.  Straitline is owned by five equity holders identified further below. A diagram of the Debtors' organizational structure is attached hereto as **<u>Exhibit A</u>**.

**B.    *The Debtors' Businesses and Assets***

i.    <u>Fluids</u>

15.    Fluids provides services in the frac portion of drilling and in connection with well-completion after drilling has concluded, and also provides pressure control services for the safe development of oil and gas assets.  Fluids generates revenue through a combination of daily rental fees, pass-through handling surcharges, and services fees.

16.    Fluids principally operates in the Eagle Ford Shale, which has been one of the largest and most prolific oil and gas shale regions in the United States since the late 2000s, and Fluids's services—mainly related to pressure control—are a critical component of the well completion process.  Although the market for pressure control services generally moves parallel to the overall well-completions market; however, as discussed in greater detail below, Fluids's business declined following significant consolidation in the industry, which significantly affected Fluids's customer base.

17.    Fluids owns significant assets related to hydraulic fracturing, including fracturing pumps, other fracturing equipment, and industrial and commercial trucks and other vehicles related to Fluids's business.

ii.    <u>Leasing</u>

18.    Leasing does not have significant operations.  Leasing exists largely as a vehicle through which oilfield services frac assets have been leased to Straitline.  Leasing's assets were acquired with funds contributed by Leasing's sole member, Fluids.

iii.    <u>Straitline</u>

19.    Straitline operates as a hydraulic fracturing company focused on hydraulic fracturing and well completions activities in the Eagle Ford Shale and Permian Basin.  Straitline initially focused its business on pump-down and well support services, but later expanded into hydraulic fracturing with the acquisition of its first frac fleet in 2020 to serve a then-growing market need.  Following 2020, fracturing revenues across the industry fell considerably, and the post-Covid pressure pumping market has been slow to recover.

20.    Straitline owns considerable frac equipment and vehicles required to provide hydraulic fracturing and pressure pumping services.  In January 2021, Straitline acquired certain assets, the purchase price for which was funded by Fluids (the "<u>SLP-Fluids Assets</u>").

**PART II**
**THE DEBTORS' CAPITAL STRUCTURE**

*C.    Nitro Capital Structure*

21.    As of the Petition Date, Fluids has approximately $234 thousand of cash, approximately $38.23 million in total principal amount outstanding under its funded secured debt obligations, and approximately $14.40 million in total outstanding unsecured debt obligations.[4] The funded secured debt obligations consist of a (a) first lien secured credit facility with a principal amount outstanding of approximately $1.2 million as of the Petition Date, (b) a *pari pasu* first lien Main Street Loan credit facility with a principal amount outstanding of approximately $36.95

---

[4]    This includes approximately $12.0 million owed to non-Debtor affiliates on account of notes payable.

million, and (c) certain vehicle financing facilities in the aggregate amount of approximately $87 thousand as more fully described below.

i.   Fluids Underlying Credit Facility

22.   On July 17, 2019, Spirit of Texas Bank, SSB (the "Original Prepetition Fluids Lender") extended a loan to Fluids in the original principal amount of $4,000,000 (the "Underlying Credit Facility").  The Underlying Credit Facility is evidenced by that certain Promissory Note, dated August 31, 2020 (the "Underlying Note"), made by Fluids payable to the order of the Original Prepetition Fluids Lender, and the Underlying Credit Facility is secured by certain collateral constituting substantially all of the assets of Fluids, in addition to assets of certain of Fluids's non-Debtor affiliates.

23.   Although the original maturity date for the Underlying Credit Facility was August 31, 2020, prior to maturity, the Original Prepetition Fluids Lender and Fluids renewed the Underlying Credit Facility and extended its maturity to August 31, 2025.

24.   Subsequent to the origination of the Prepetition Fluids Facilities (defined below), Simmons Bank NA (the "Prepetition Fluids Lender") became the successor in interest to the Original Prepetition Fluids Lender under the Prepetition Fluids Loan Documents (defined below).

25.   As of the date of the Petition Date, the principal balance under the Underlying Credit Facility was approximately $1.20 million. The Underlying Credit Facility accrues interest at a rate per annum equal to the higher of: (a) the Wall Street Journal Prime Rate plus one percentage point (totaling 9.5 percent as of the Petition Date), or (b) 4.25 percent.

ii.   Fluids MSELF Facility

26.   On November 25, 2020, the Original Fluids Prepetition Lender made an additional extension of credit to Fluids in the original principal amount of $36,000,000 (the "MSELF

Facility" and together with the Underlying Credit Facility, the "Prepetition Fluids Facilities").  The MSELF Facility is evidenced by that certain MSELF Promissory Note, dated November 25, 2020 (the "MSELF Note"), made by Fluids payable to the Original Prepetition Fluids Lender, and the MSELF Facility is secured by certain collateral (as set forth in the Security Agreement, the "Prepetition Fluids Facilities' Collateral"), in addition to assets of certain of Fluids's non-Debtor affiliates.

27.     The Underlying Credit Facility and the MSELF Facility are governed by (a) that certain Amended and Restated Security and Guaranty Agreement dated November 25, 2020 (the "Security Agreement"), entered into by the Original Prepetition Fluids Lender and Fluids; and (b) that certain Amended and Restated Loan Agreement, dated November 25, 2020, entered into by the Original Prepetition Fluids Lender and Fluids (the "Loan Agreement" and together with the Underlying Note, the MSELF Note, the Security Agreement and all other loan documents related to the foregoing, the "Prepetition Fluids Loan Documents").

28.     As set forth in the Prepetition Fluids Loan Documents, the Prepetition Fluids Lender asserts a lien on substantially all assets of Fluids and Leasing, and certain assets of Straitline.

29.     The MSELF Facility was issued pursuant to the Main Street Lending Program instituted by the Federal Reserve Bank of Boston (the "Fed").  Accordingly, the Fed purchased a 95% participation in the MSELF Note, and the Prepetition Fluids Lender is serving as the administrative agent under the MSELF Note.[5]

30.     As of the Petition Date, the principal balance under the MSELF Facility was approximately $36.95 million.  The maturity date of the MSELF Facility is November 25, 2025.

---

[5]     The term Prepetition Fluids Lender shall refer to such in its capacity as lender and/or as Administrative Agent as the context may provide.

The MSELF Facility initially accrued interest at a rate per annum equal to LIBOR, as of the applicable LIBOR Determination Date (as defined in the MSELF Note), *plus* 3.0 percent.[6]  As of August 2023, the MSELF Program began using the 1-month SOFR index in place of LIBOR; accordingly, the interest accrues at a current interest rate per annum equal to SOFR *plus* 3.0%.

     iii.     <u>Fluids Vehicle Financing Facilities</u>

31.     Fluids also has certain vehicle financing arrangements pursuant to which certain lenders have first-priority liens on certain vehicles of Fluids (in the aggregate, the "<u>Fluids Vehicle Debt</u>"); however, as of the Petition Date, the principal balance of the Fluids Vehicle Debt is approximately $87,000.

     iv.     <u>Nitro Equity</u>

32.     Fluids is a manager-managed LLC, with the managers being Jackie Ray Simpson, Jr. and Bobby Lee Koricanek.  Fluids has three members:

> a.  *Jackie Ray Simpson, Jr. owns 50% of the membership interests in Fluids;*
>
> b.  *The Tanner L. Koricanek Trust owns 25% of the membership interests in Fluids; and*
>
> c.  *The Wyatt J. Koricanek Trust owns 25% of the membership interests in Fluids.*

33.     Leasing is a member-managed LLC and is a wholly-owned subsidiary of Fluids.

     v.     <u>Fluids Unsecured Obligations</u>

34.     As of the Petition Date, Fluids estimates that its liquidated unsecured trade debt approximates $1.93 million.  In addition to trade debt obligations, Fluids owes approximately (a) $12.00 million to non-Debtor affiliate Nitro Construction, LLC, and (b) $15 thousand to non-Debtor affiliate Nitro Downhole, LLC.

---

[6]    Subject to the applicable Maximum Rate (as defined in the Prepetition Fluids Loan Documents).

35.     Fluids also has accrued obligations to employees, consultants, and sales agents, which are more fully described below.

36.     On March 27, 2024, Cameron International Corporation ("Cameron") obtained a jury verdict in the amount of $8.9 million.[7]  A judgment has not been entered and various post-trial motions remain pending.

**D.     Straitline Capital Structure**

37.     As of the Petition Date, Straitline has approximately $150 thousand of cash,[8] approximately $15.60 million in total principal amount outstanding under its funded secured debt obligations, and approximately $60.78 million in total outstanding unsecured debt obligations.[9] The funded secured debt obligations consists of (a) a first lien credit facility with a principal amount outstanding of $150 thousand, (b) a secured credit facility with a principal amount outstanding of $15 million, and (c) certain vehicle financing facilities described below totaling approximately $397 thousand.

i.      SBA Secured EDIL

38.     On May 16, 2020, the Small Business Administration (the "SBA") made an extension of credit to Straitline in the amount of $150,000 (the "Straitline SBA Facility").  The Straitline SBA Facility is evidenced by that certain Note (the "SBA Note"), dated May 16, 2020, made by Straitline payable to the SBA.  In connection with the SBA Note, Straitline executed that certain Loan Authorization and Agreement, dated May 16, 2020 (the "SBA Loan Agreement"),

---

[7]     *Cameron International Corporation v. Nitro Fluids L.L.C.* in the United States District Court for the Southern District of Texas (Case No. 4:18-cv-02533) (the "Cameron Litigation").

[8]     On April 25, 2024, Blue Sky responded to a Receiver's Levy issued by a receiver appointed in Texas State Court pursuant to the request of creditor GD Energy Services (73rd Dist., Bexar County, Texas, Cause No. 2023CI26184).  Accordingly, this cash-on-hand figure reflects a balance that includes the amount held by such receiver.  The Debtors intend to compel turnover of such cash.  Approximately $106,191.89 is frozen in the Blue Sky accounts; accordingly, only $44 thousand is available immediately.

[9]     This includes approximately $46.30 million owed to non-Debtor affiliates on account of notes payable.

between the SBA and Straitline, and that certain Security Agreement, dated May 16, 2020 (the "SBA Security Agreement" and together with the SBA Note, the SBA Loan Agreement, and all other loan documents related thereto, the "SBA Loan Documents"). Pursuant to the SBA Security Agreement, the obligations owing under the SBA Note are secured by security interests in certain assets of Straitline constituting substantially all of the assets of Straitline (the "SBA Facility Collateral").

39.     As of the date of the Petition Date, the principal balance under the SBA Facility was approximately $150 thousand. The maturity date of the SBA Facility is May 16, 2050. The SBA Facility accrues interest at a rate per annum equal to 3.75 percent.

ii.     Blue Sky Secured Note

40.     On June 5, 2023, Blue Sky Bank ("Blue Sky") made an extension of credit to Straitline in the amount of $15,000,000 (the "Blue Sky Facility" and together with the SBA Facility, the "Prepetition Straitline Facilities").[10] The Blue Sky Facility is evidenced by that certain Promissory Note, dated June 5, 2023 (the "Blue Sky Note"), made by Straitline payable to Blue Sky. In connection with the Blue Sky Note, Straitline executed that certain Loan and Security Agreement, dated June 5, 2023 (the "Blue Sky Loan Agreement" and together with the Blue Sky Note and all other loan documents related thereto, the "Blue Sky Loan Documents"), between Blue Sky and Straitline. The Debtors believe that Blue Sky will assert that obligations owing under the Blue Sky Note are secured by liens in certain assets of Straitline (the "Blue Sky Facility Collateral").

41.     As of the Petition Date, the principal balance under the Blue Sky Facility was approximately $15,000,000. The maturity date of the Blue Sky Facility is April 5, 2027. The Blue

---

[10]     The Prepetition Straitline Facilities and the Prepetition Fluids Facilities are collectively referred to as the Prepetition Secured Facilities.

Sky Facility accrues interest at a rate per annum equal to the higher of: (a) the Wall Street Journal Prime Rate plus one percentage point (totaling 9.5% as of the Petition Date), or (b) 6.5%.

    iii.    <u>Straitline Vehicle Financing Facilities</u>

42.    Straitline also has certain vehicle financing arrangements with Ford Motor Credit and GM Financial pursuant to which such lenders have first-priority liens on certain vehicles of Straitline (in the aggregate, the "<u>Straitline Vehicle Debt</u>"); however, as of the Petition Date, the principal balance of the Straitline Vehicle Debt is approximately $397 thousand.

    iv.    <u>Straitline Equity</u>

43.    Straitline is a member-managed LLC.  Straitline has five members:

    a.  *Bobby Lee Koricanek owns 40% of the membership interests in Straitline;*

    b.  *Jackie Ray Simpson, Jr. owns 30% of the membership interests in Straitline;*

    c.  *Travis J. Baros owns 10% of the membership interests in Straitline;*

    d.  *John B. Strait, II owns 10% of the membership interests in Straitline; and*

    e.  *Anthony A. Giacobbe owns 10% of the membership interests in Straitline.*

    v.    <u>Notes Payable to Non-Debtor Affiliates</u>

44.    Straitline owes the following amounts under notes payable to insiders and affiliates:[11]

| | |
|---|---|
| Bobby Lee Koricanek | $4,300,000 |
| Jackie Ray Simpson | $2,100,000 |
| Tanner L. Koricanek Trust | $3,409,366 |
| Wyatt J. Koricanek Trust | $3,209,366 |
| Nitro Construction, LLC | $5,898,200 |

---

[11]  Certain of the outstanding amounts under the below notes payable do not include accrued and unpaid interest and fees.

Nitro Fluids, LLC[12]                         $27,358,058

Travis J. Baros                            $54,698.73

vi.       <u>Other Straitline Unsecured Obligations</u>

45.      As of the Petition Date, Straitline estimates that its liquidated unsecured trade debt and other ordinary course obligations approximate $14.50 million.  Straitline also has accrued obligations to employees, consultants, and sales agents, which are more fully described below and in the Wages Motion.

**PART III**
**<u>CIRCUMSTANCES LEADING TO THE COMMENCMENT</u>**
**<u>OF THESE CHAPTER 11 CASES</u>**

**A.**     ***Challenges Facing the Debtors' Businesses***

46.      The Debtors have been unable to generate cash sufficient to service the substantial monthly interest payments required under the Prepetition Secured Facilities.  Although Straitline is current under the Blue Sky Note and the SBA Note, Straitline has over $12.6 million in accounts payable on account of trade debt, and several of Straitline's creditors have threatened or commenced actions to collect on claims for past-due amounts owed by Straitline.  At the same time, Fluids is behind on both interest payments due and on an approximately $5.56 million principal payment that was due in November 2023.  On December 5, 2023, the Prepetition Fluids Lender sent a notice of default to Fluids for failure to make its principal payment in November 2023, but acknowledged receipt of an informal request for a deferral of the principal payment.  On March 6, 2024, the Prepetition Fluids Lender sent a notice of default to Fluids, and on April 26,

---

[12]    The note payable issued by Straitline made to Fluids has been assigned to the Prepetition Fluids Lender as further collateral for the MSELF Facility, and there are liens filed against certain of the assets of Straitline in connection with this promissory note.

2024, the Prepetition Fluids Lender delivered a letter accelerating and demanding immediate payment of the entire principal balance and all accrued but unpaid interest on the MSELF Note.

47.     The Debtors' ability to generate positive cash flow and continue to service their ongoing debt and trade obligations has been further deterred by an economic slowdown in the broader oilfield frac services market and related infrastructure market.  Fluids's monthly revenue has declined from an average of approximately $1.2 million in 2023, to less than $100,000 in March 2024, and the market for Straitline's pressure pumping services has been sluggish to recover following the 2020 decline.  The decline in revenues is largely attributable to merger consolidation among the Debtors' customer base.  For example, in November of 2023, Earthstone was acquired by Permian Resources, resulting in a 50% decline in Fluids's revenue within a short period.  A similar revenue decline occurred when Anadarko and Occidental merged.  In 2019, Fluids generated $25.1 million in revenue from Occidental Petroleum, but less than $1 million in 2023. The Debtors have been unable to sufficiently replenish their customer base amidst the broader market consolidation.

48.     This decline in revenue has prompted a significant reduction in the Debtors' workforces, and likewise resulted in a surplus equipment base that exceeds the Debtors' ability to service projects which may generate cashflow for the Debtors. Additionally, the Debtors own and maintain significant equipment such as frac missiles and other industrial equipment.

49.     Fluids has also been entangled in the Cameron Litigation since 2018.  In March of 2024, trial commenced in the Cameron Litigation, the conclusion of which resulted in an adverse verdice against Fluids for a total of $8.9 million.  As of the Petition Date, post-trial motions have been partially briefed, and no final judgment has been entered; however, Fluids believes that an

adverse final judgment may range from $3 million to in excess of $27 million, depending on the Court's ultimate determination on the remaining legal issues.

**B.      *Prepetition Restructuring Efforts***

50.      The Debtors have been exploring potential avenues to successfully restructure their businesses and balance sheets through one or more potential out-of-court transactions since late 2022. In December 2022, Straitline hired SP Securities LLC ("SPS") as its investment banker to explore a potential sale of all or a portion of Straitline's assets. At the direction of Straitline, SPS began discussions with potential counterparties in December 2022 and continued these conversations throughout 2023 and into 2024 with potentially interested parties as recently as April. Through this process, SPS contacted over multiple potential strategic or financial buyers.

51.      In October of 2023, Riverbend was engaged to explore strategic alternatives for Nitro.  The intense decline of Nitro's revenues and cash flows, coupled with the default notices and acceleration of the MSELF Facility, shortened the timeline in which the Debtors could effect a potential out-of-court restructuring transaction.   Nitro commenced discussions with the Prepetition Fluids Lender regarding potential terms of forbearance under the Prepetition Fluids Facilities.  Shortly thereafter, on March 6, 2024, the Prepetition Fluids Lender delivered the default notice, and approximately three weeks later, in late March, the Cameron Litigation resulted in an adverse verdict, followed by acceleration of the MSELF Facility on April 26, 2024.   These developments largely foreclosed potential out-of-court restructurings or sale processes for the Debtors.

52.      Accordingly, given the continuing economic downturn affecting the broader frac market and oilfield services markets, the Debtors have been unable to identify or execute an out of court restructuring.

**PART IV**
**EVIDENTIARY SUPPORT FOR THE FIRST DAY MOTIONS**[13]

53.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed certain First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate in these Chapter 11 Cases with minimal disruption and loss of value to the Debtors' estates. The Debtors respectfully request that the relief requested in each of the First Day Motions be granted because such relief is critical to stabilizing and facilitating the Debtors' operations during the pendency of these Chapter 11 Cases.

54.     I have reviewed each of the First Day Motions. All of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management teams and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial conditions. A summary of the relief requested in each First Day Motion and the facts supporting each First Day Motion is set forth below.

55.     The First Day Motions (each as described in more detail below) include:

a.     *Debtors' Emergency Motion for Entry of an Order (a) Directing the Joint Administration of the Debtors' Chapter 11 Cases and (b) Granting Related Relief* (the "Joint Administration Motion");

b.     *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* (the "156(c) Application");

c.     *Debtors' Emergency Motion for Entry of an Order (a) Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List*

---

[13]     Capitalized terms in this Part IV not otherwise defined herein have the meanings set forth in the respective First Day Motions.

*of the 30 Largest Unsecured Creditors, (b) Authorizing the Debtors To Redact Certain Personal Identification Information, (c) Authorizing Limited Service and (d) Granting Related Relief* (the "<u>Consolidated Creditors Motion</u>");

d.  *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing (a) the Maintenance of the Cash Management Systems; (b) Maintenance of the Existing Bank Accounts; (c) Continued Use of Existing Business Forms; (d) Continued Use of Certain Fuel Cards; and (e) Granting Related Relief* (the "<u>Cash Management Motion</u>");

e.  *Debtors' Emergency Motion for Entry of an Order Authorizing Payment of (a) Certain Prepetition Wages, Salaries, and Other Compensation and (b) Certain Employee Benefits and Other Associated Obligations* (the "<u>Employee Wage Motion</u>");

f.  *Debtors' Emergency Motion for Entry of an Order (a) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (b) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (c) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* (the "<u>Utilities Motion</u>");

g.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (a) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Taxes and Obligations and (b) Granting Related Relief* (the "<u>Tax Motion</u>");

h.  *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing (a) Continuation, Renewal Modification, or Extension if the Insurance Policies, (b) Payment of Prepetition and Post-Petition Obligations Incurred in the Ordinary Course of Business in Connection with the Insurance Policies, and (c) Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* (the "<u>Insurance Motion</u>"); *and*

i.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (a) Authorizing the Debtors to Obtain Postpetition Financing, (b) Authorizing the Debtors to Use Cash Collateral, (c) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (d) Granting Adequate Protection to the Prepetition Secured Parties, (e)*

*Modifying the Automatic Stay, (f) Scheduling a Final Hearing, and (g) Granting Related Relief* (the "DIP Motion");

**A.     Joint Administration Motion**

56.     In the Joint Administration Motion, the Debtors request entry of an order providing for the joint administration of these Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court provide for joint administration by (a) establishing a joint docket and file for these Chapter 11 Cases, (b) approving the filing of a joint pleading caption, and (c) directing an entry be made on the dockets of Straitline and Leasing to reflect the joint administration of these Chapter 11 Cases.

57.     Although the Nitro business and the Straitline business are managed separately, the historical interrelationships between the Nitro business and Straitline business warrant joint administration. There is considerable overlap in the equity structure and the management teams of Nitro and Straitline.  Indeed, under the Bankruptcy Code, each is an Affiliate of the other. Joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect all Debtors. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

58.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.**     *The 156(c) Application*

59.     In the 156(c) Application, the Debtors seek entry of an order authorizing the Debtors to retain Epiq as their claims, noticing, solicitation, and administrative agent in these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases. I submit, based on my experience in other chapter 11 cases and my familiarity with claims and noticing agents in chapter 11 proceedings, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be potentially hundreds of entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.

**C.**     *Consolidated Creditors Motion*

60.     In the Consolidated Creditors Motion, the Debtors request entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and a list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices for each Debtor, (b) authorizing the Debtors to redact certain personal identification information, (c) authorizing limited service, and (d) granting related relief.

61.     The relief requested in the Consolidated Creditors Motion will promote administrative efficiency and preserve value of the Debtors' estates for the benefit of all parties in interest.  Moreover, the request for limited service will ensure that the Debtors' limited estate resources are not wasted on overly-burdensome notices which, if provided to all creditors on the creditor matrix, may cost more than a thousand dollars per filing.  Accordingly, I believe that the

relief requested in the Consolidated Creditors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and, for the reasons set forth herein and in the Consolidated Creditors Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Consolidated Creditors Motion should be granted.

**D.      *Cash Management Motion***

62.      In the Cash Management Motion, the Debtors request entry of an order (a) authorizing the Debtors to (i) continue to use their Cash Management Systems (as defined below), (ii) maintain the Debtors' existing Bank Accounts, (iii) continue to use existing Business Forms, (iv) in their discretion, to (A) pay any Bank Account related fees and (B) to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor in possession accounts as may be necessary to facilitate their Chapter 11 Cases and operations, or as may otherwise be necessary to comply with the requirements of any debtor in possession financing and/or cash collateral order entered in these cases, (v) continue using the Fuel Cards and paying pre-petition amounts owing thereunder; and (vi) deposit funds in and withdraw funds from all Bank Accounts, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor in possession accounts and (b) granting related relief.

63.      As described in detail in the Cash Management Motion, the Debtors' business requires the collection, payment, and transfer of funds through numerous bank accounts. In the ordinary course of business and prior to the Petition Date, the Debtors maintained separate centralized cash management systems (the "Cash Management Systems"). Like other large businesses, the Debtors designed their Cash Management Systems to efficiently collect, transfer,

and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made. The Debtors' financial personnel manage the Cash Management Systems from the Nitro and Straitline headquarters in Nordheim, Texas and San Antonio, Texas, respectively. Each general category of account is described in the Cash Management Motion and a diagram of the Cash Management Systems is annexed as **Exhibit C** thereto.

64.      The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**E.      *Employee Wage Motion***

65.      In the Employee Wage Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay and/or remit, as applicable, (i) the Unpaid Wage Obligations, (ii) the Unremitted Withholdings Obligations, (iii) the Unpaid PTO Obligations, (iv) the Unpaid Reimbursable Expense Obligations, (v) the Health Plan Costs, (vi) the Unpaid Employee Insurance Coverage, (vii) the Unpaid Workers' Compensation Claims, and (viii) the Unremitted 401(k) Contributions, ((i) and (viii) collectively, together with all costs and fees incident to the foregoing, collectively, the "Employee Obligations"), and (c) continue to honor and/or collect, as applicable, (i) the Wage Obligations, (ii) the Withholding Obligations, (iii) the PTO Program, (iv) the Reimbursement Program, (v) the Health Plans, (vi) the Employee Insurance

Program, (vii) the Workers' Compensation Program, (viii) the Unpaid Workers' Compensation Claims, and (ix) the 401(k) Plan (collectively, the "Employee Plans and Programs").

66.     The Employees are all critical to ensuring that the value of the Debtors' assets is preserved during these Chapter 11 Cases and given the significantly trimmed workforce of the Debtors, the importance of the contribution of each of the Employees cannot be overstated. The institutional knowledge, experience, and skills of the Employees are essential to the Debtors' ability to preserve and maximize the value of the Debtors' assets during the Chapter 11 Cases. The Employees perform critical functions for the Debtors, including, among many other things, project/job implementation, engineering, accounting, finance, management, supervisory, and administrative functions.

67.     The relief requested in the Employee Wage Motion is necessary for the Debtors to be able to maintain morale, continue to maintain the businesses, and preserve the value of the Debtors' estates in anticipation of the Marketing Process. If the Debtors cannot assure their Employees that the Debtors will promptly pay Employee Obligations, as applicable, to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Plans and Programs, the Debtors believe that some Employees will likely seek employment elsewhere.

68.     The loss of Employees at this juncture would have a material adverse impact on the Debtors' businesses and ability to maximize value through the administration of these Chapter 11 Cases. This is particularly true given that the Debtors have recently reduced their workforce as part of the broader industry slowdown. The remaining Employees are those that the Debtors deemed absolutely critical to their ongoing obligations and absolutely critical to the Marketing Process, and in many respects they are performing work beyond their original duties. In light of the substantial reduction in the Debtors' workforce, the harm from any loss of any employee would

be compounded, as the Debtors have already narrowed their workforce to a critical number of essential Employees.

69.     Replacing any departing Employees while the Debtors are in chapter 11 while simultaneously pursuing the Marketing Process would not likely result in the quality of employee that the company currently enjoys. For this reason, it is essential that the Debtors be authorized to continue honoring the Employee Obligations and Employee Plans and Programs. The relief requested in the Employee Wage Motion is necessary for the Debtors to be able to maintain morale, continue to maintain the business, and preserve creditor confidence in the Debtors' continued operations and preserve value of the Debtors' estate during the pendency of the Marketing Process.

70.     Accordingly, for the reasons set forth herein and expanded on in the Employee Wage Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

## F.     *Utilities Motion*

71.     In the Utilities Motion, the Debtors request an order (a) prohibiting the Utility Providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services, (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors, and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

72.     In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various Utility Providers for, among other things, electricity, telecommunications, steam, water, gas, and sewer and other similar services (collectively, the "Utility Services"). A non-exhaustive list of the Utility Providers is annexed to the Utilities Motion as Exhibit B thereto. Fluids and Straitline have paid an average of approximately $18,700 per month and $9,102 per month, respectively, on account of all Utility Services for the 12-month period preceding the Petition Date.

73.     I believe and am advised that the requested relief is necessary or else the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first few weeks of these Chapter 11 Cases. Moreover, a termination of (or disruption in) Utility Services could significantly disrupt the Debtors' business operations, thereby jeopardizing the Debtors' chances to maximize recoveries for creditors. It is, therefore, critical that Utility Services continue uninterrupted during these Chapter 11 Cases.

74.     Accordingly, for the reasons set forth herein and in the Utilities Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the course of these Chapter 11 Cases with minimal disruption.

## G.     Tax Motion

75.     In the Tax Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in the exercise of their reasonable business judgment, to pay Taxes (as defined below) without regard to whether such obligations accrued or arose before or after the Petition Date.

76.     In the ordinary course of business, the Debtors (a) incur certain tax liabilities, including Sales Taxes, Income Taxes, and Other Taxes (collectively, the "Taxes") necessary to operate their businesses and (b) remit such Taxes to applicable taxing and other regulatory authorities (collectively, the "Authorities").

77.     The Debtors pay the Taxes periodically to the respective Authorities, in each case as required by applicable laws and regulations. As of the Petition Date, the Debtors believe that they are substantially current in the payment of assessed and undisputed Taxes. Certain Taxes attributable to the prepetition period, however, have accrued and will not come due until after the Petition Date.[14] Additionally, certain Authorities may not have been paid or may have been sent checks for Taxes that may or may not have been presented or cleared as of the Petition Date.

78.     The Debtors must continue to pay the Taxes to continue operating in certain jurisdictions and to avoid costly distractions during these Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes could adversely affect the Debtors' business operations and the value of their assets because the Authorities could suspend the Debtors' operations, file liens against the Debtors' assets, or seek to lift the automatic stay to pursue remedies against the Debtors. In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key individuals from their duties related to the Debtors' restructuring efforts during the pendency of these Chapter 11 Cases. The Debtors seek authority to pay the Taxes, if any, that remain outstanding as of the Petition Date, and future Taxes that accrue in the ordinary course of business as and when such obligations become due and owing.

---

[14]     Straitline has approximately $9,899.26 of earmarked to pay for accrued Sales Tax, all of which was frozen as of the Petition Date.

79.    Accordingly, for the reasons set forth herein and in the Tax Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors because it will enable the Debtors to continue to operate their businesses while these Chapter 11 Cases are pending.

## H.    *Insurance Motion*

80.    In the Insurance Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to: (a) continue, renew, modify, supplement or extend their insurance policies, or obtain new insurance policies or surety bonds as needed in the ordinary course of business; (b) honor all of their prepetition and postpetition insurance obligations in the ordinary course of business; and (c) all banks and financial institutions (collectively, the "Banks") to honor and process checks and electronic transfer requests related thereto.

81.    As described in the Insurance Motion, in the ordinary course of their businesses, the Debtors maintain certain policies, including, but not limited to, auto liability, workers' compensation liability, general liability, control of well liability, directors and officers liability, employment practices liability, fiduciary liability, and crime liability, and various other insurance programs through several different insurance carriers (collectively, the "Insurers") under the insurance contracts (collectively, the "Insurance Policies"), as summarized in Exhibit C annexed to the Insurance Motion. Fluids renewed the annual policy terms under its Insurance Policies on September 15, 2023. The total premiums for the 2023/2024 coverage period total approximately $553,383 in the aggregate. To the best of my knowledge, no outstanding premiums are owing as of the Petition Date.  Straitline renewed the annual policy terms under its Insurance Policies on May 13, 2024. The total premiums for the 2024/2025 coverage period total approximately $824,587 in the aggregate.  An initial premium payment of approximately $178 thousand will be

payable substantially contemporaneously with the execution of the insurance premium financing agreement, followed by monthly premium payments of approximately $76 thousand over the following 8 months prior to dropping down to below $21 thousand for the following 2 months.

82.     Straitline negotiated its insurance policies through broker AFCO Insurance Premium Finance ("AFCO").  AFCO also assisted with financing a portion of the balance of premiums owed by Straitline for its Insurance Policies.  It is imperative that Straitline timely replace and pay for its 2024/2025 premiums for its Insurance Policies. AFCO's fees are paid in connection with the payment of premiums.

83.     Fluids employs Alliant Insurance Services, Inc. as their insurance broker (the "Broker"). The Broker is compensated for services rendered from commissions built into the premiums paid to the Debtors' insurance underwriters. The Broker's fees were paid in connection with the renewal of the Insurance Policies Prior to the Petition Date.

84.     The Insurance Policies are essential to preserving the value of the Debtors' business operations and their assets. In many cases, the insurance coverage provided by the Insurance Policies is required by various regulations, laws, and contracts that govern the Debtors' businesses and commercial activities.

85.     For the reasons set forth herein and in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in compliance with contractual and regulatory requirements and to safeguard the value of their estates.

## PART V
## DIP FINANCING AND CASH COLLATERAL MOTION[15]

86.      During Riverbend's representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and potential refinancings. I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor-in-possession financing proposals. Additionally, I have participated in numerous meetings with the Debtors' management teams to, among other things, address the Debtors' need for postpetition financing generally, and terms of the proposed debtor in possession superpriority priming senior secured financing facility described herein (the "DIP Facility," and the lender thereunder, the "DIP Lender").

### A.      *Relief Requested  by the DIP Motion*

87.      In the DIP Motion, the Debtors seek authority to utilize cash collateral, enter into the DIP Facility and obtain related relief. I believe that sufficient post-petition financing is necessary to ensure that these Chapter 11 Cases are well funded and to ensure that the Marketing Process has sufficient resources to support a value-enhancing sale or series of sales.  I believe a seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative to preserve the assets of the Debtors' estates, and the loyalty and goodwill of the Debtors' customers, suppliers, and employees.

88.      Pursuant to the DIP Motion, the Debtors request entry of an interim order (the "Interim DIP Order" authorizing the Debtors to, among other things:

---

[15]    Capitalized terms used but not otherwise defined in this Part V shall have the meanings ascribed to them in the DIP Motion or in the proposed Interim DIP Order.

a.  authorizing the Debtors to obtain postpetition financing from Simmons Bank NA, in its capacity as postpetition lender (the "<u>DIP Lender</u>" or <u>Postpetition Lender</u>") on a superpriority priming senior secured basis (the "<u>DIP Facility</u>", and the loans made, advanced or deemed advanced thereunder, the "<u>DIP Loans</u>") in the form of (i) a new money multiple draw term loan facility in an aggregate principal amount of up to $6 million (the "<u>New Money Term DIP Facility</u>"), pursuant to which (A) an aggregate principal amount of $1.5 million shall be funded (the "<u>Interim Funding</u>") following entry of the Interim Order, and (B) following entry of the Final Order, the remaining aggregate principal amount under the New Money Term DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim Funding, a "<u>DIP Borrowing</u>", and, collectively, the "<u>DIP Borrowings</u>"), and (ii) a credit facility pursuant to which $6 million in aggregate principal amount outstanding under the Prepetition Secured Notes (as defined below) held by the Prepetition Fluids Lender, shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, DIP Loans (such conversion, the "<u>Roll Up</u>") on a cashless dollar for dollar basis, in each case, in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and the Interim Order;

b.  authorizing the Debtors to (i) execute, deliver, and perform under the DIP Loan Agreement and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all "<u>Obligations</u>" (as defined in the DIP Loan Agreement), whether or not such obligations arose before or after the Petition Date, whenever the same shall become payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Loan Documents and the Interim Order (collectively, the "<u>DIP Obligations</u>"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

c.  authorizing the Debtors to incur all DIP Obligations, in accordance with the Interim Order and the DIP Loan Documents;

d.  granting to the DIP Lender, the DIP Liens in all DIP Collateral (as defined below), as set forth in the Interim Order and subject to the relative priorities set forth in the Interim Order;

e.  granting to the DIP Lender, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the Interim Order;

f.  authorizing the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Fluids Facilities Collateral, including Cash Collateral, solely in accordance with the terms and conditions set forth in the Interim Order and the DIP Loan Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Loan Agreement (the "Permitted Variances");

g.  approving certain stipulations, waivers, and releases by the Debtors with respect to, inter alia, (i) the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Collateral, and (ii) the Prepetition Fluids Facilities and liens relating thereto, the Prepetition Fluids Facilities Loan Documents, and the Prepetition Fluids Facilities Collateral, in each case, subject to the terms and provisions of the Interim Order

h.  approving the Debtors' waiver of the right to surcharge (a) the DIP Collateral as to the DIP Lender, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in the Interim Order and (b) the Prepetition Fluids Facilities Collateral, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in and subject to the entry of the Final Order;

i.  approving (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender, and (ii) subject to the Final Order, the Debtors' waiver of the equitable doctrine of "marshaling" and the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral, in each case, upon the terms set forth in the Interim Order;

j.  modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, providing for the immediate effectiveness of the Interim Order, and granting related relief; and

k.  scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of a final order (the "Final Order") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to

the DIP Lender, and approving the form of notice with respect to such Final Hearing.

89.     I have personally observed, and it is therefore my opinion, based on my experience, and in my professional judgment, that the proposed DIP Facility is the product of arm's length negotiations, represents the best postpetition financing alternative available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

**B.     *The Debtors' Need for DIP Financing and Use of Cash Collateral***

90.     The Debtors have an immediate and critical need to obtain DIP financing and the authority to use Cash Collateral throughout the chapter 11 process to permit, among other things, the orderly continuation of the operation of their significantly pared-down businesses, to make payroll, to maintain their equipment that is contemplated to be sold pursuant to the Marketing Process, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases. The Debtors have entered chapter 11 with approximately $385 thousand of cash on hand (of which approximately $106,191.89 is frozen in the Blue Sky operating account and approximate $9,899.26 is frozen in the Blue Sky sales tax money market account) and their operating cash flow, as currently projected, is not sufficient to fund ongoing operations and expenses for the projected duration of these Chapter 11 Cases, including costs associated with these Chapter 11 Cases. Moreover, the Debtors' available cash on hand may be subject to the liens of Simmons and/or Blue Sky.

91.     The Debtors' businesses are subject to substantial volatility based on both macroeconomic trends affecting the broader oilfield services segment and the continuing consolidation of the Debtors' customer base.  As further described above, the Debtors commenced these Chapter 11 Cases in large part due to significant liquidity concerns and the substantial decline

in the Debtors' revenues and cash flow in the months preceding these Chapter 11 Cases that can be traced back to the abrupt decline in revenues brought on by the loss of a few key customers.  In connection therewith, I have been involved with the efforts of the Debtors to explore strategic and financial alternatives and other restructuring and refinancing options.

92.     Following the significant decline in revenue, the Debtors engaged with Simmons Bank to discuss potential financing sources to assist with the Debtors' working capital needs. However, given the sustained decline in revenue and cashflow, the Debtors determined that additional financing would not likely be available outside of a chapter 11 proceeding and that commencing these Chapter 11 Cases best preserved the value of the Debtors' estates.  Through their prepetition efforts, the Debtors and their advisors have determined that debtor in possession funding is necessary to ensure sufficient working capital, timely payment of administrative expenses, and funding for the Marketing Process.

93.     Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $6 million of postpetition financing and access to Cash Collateral to finance their operations and maintain sufficient liquidity assuming a duration of up to twelve months for these Chapter 11 Cases.  Although the DIP Facility has a 6-month term, the Debtors and their advisors believe that the Debtors' estates are likely to repay the DIP Facility and have additional cash infused into the Debtors' estates pursuant to a successful Marketing Process through one or more sales.

94.     Under the proposed DIP Facility, the Debtors will gain critical access to DIP financing in the aggregate amount of up to $6 million, with an Interim DIP Borrowing of $1.5 million following entry of the Interim DIP Order.  The DIP Facility also provides for a Roll Up of certain amounts of the Prepetition Secured Obligations into DIP Loans on a cashless basis, upon

entry of the Final Order, in an amount equal to the principal amount of all DIP Borrowings advanced under the New Money Term DIP Facility, on a dollar-for-dollar basis. The Roll Up of a portion of the Prepetition Secured Obligations was heavily negotiated and was a critical condition to the DIP Lender providing the DIP Facility.

95.     Further, under the Interim DIP Order, the Debtors will be permitted to use prepetition collateral and, in exchange, the Debtors will provide adequate protection. Without the ability to access the prepetition collateral, the Debtors would require considerably more financing under the DIP Facility, which, even if available (which it is not clear it would be), would result in additional interest, fees and other costs to the Debtors' estates. The approved budget under the DIP Facility assumes access to the prepetition collateral, and, absent the authority to use the prepetition collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

96.     The Debtors intend to use funds from the Interim DIP Borrowing to, among other things, (i) avoid irreparable harm, (ii) pay outstanding prepetition amounts to employees, vendors, taxing authorities, and other critical stakeholders, (iii) pay ordinary course operating expenses to continue their oil and gas services, and (iv) provide a stable path forward for the duration of these Chapter 11 Cases.

97.     I have reviewed the DIP Motion, and it is my belief that the relief sought therein is (a) critical to ensure the uninterrupted operation of the Debtors' business and the success of the Debtors' Chapter 11 Cases, and (b) necessary to avoid immediate and potentially irreparable harm to the Debtors' estates. Absent the Court's entry of the Interim DIP Order, I believe the continued operation of the Debtors' businesses will be at risk, and could result in serious, immediate, and

irreparable harm to the Debtors' estates, and their creditors. Approval of the Interim DIP Order will ensure the uninterrupted operation of the Debtors' businesses and will facilitate the consummation of the transactions contemplated by the Restructuring Support Agreement.

## C.    The Debtors' Efforts to Obtain DIP Financing

98.    In March of 2024, the Debtors and their advisors commenced discussions with the Prepetition Fluids Lender regarding the potential terms of forbearance and deferment.  Discussions with the lender evolved into shaping the Marketing Process and ensuring that the Debtors' estates have sufficient liquidity to effectuate the Marketing Process.

99.    The Debtors, their management, and their advisors considered a wide range of prospective lenders, including existing creditors in the Debtors' capital structures, banks outside the Debtors' capital structures, and institutional and alternative lenders outside the Debtors' capital structures.   The Debtors' strategic considerations when considering appropriate debtor in possession lenders included, among others (a) adequate sizing of a facility; (b) competitive pricing and terms; and (c) flexibility for operations and the Marketing Process.

100.    Prepetition, Riverbend contacted three lenders that it believed may have been interested in providing the Debtors with a DIP facility.  Two parties signed non-disclosure agreements.  Terms were discussed but gatekeeping requirements of both potential lenders were not competitive when compared to the terms of the proposed DIP Facility.  Accordingly, the DIP Loan Agreement permits the Debtors to market the DIP Facility and seek financing from another lender until the entry of the Final Order.

101.    The negotiations with the DIP Lender were rigorous, marked by hard bargaining, and resulted in significant concession by the DIP Lender and additional benefits to the Debtors. Subject to the continued marketing of the DIP Facility, I am confident that the Debtors would have

been unable to obtain committed DIP financing on an interim basis and on more attractive terms, taken as a whole, within the timeframe required.  I believe that entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment.

**D.      The DIP Facility is Beneficial, Fair and Reasonable**

      i.      <u>Benefits of the Proposed DIP Facility</u>

102.    In addition to providing a liquidity infusion necessary to fund various critical expenditures, the proposed DIP Facility contains several favorable terms and conditions to the Debtors.

103.    As a result of comprehensive good-faith and arm's-length negotiations and a competitive dynamic, the proposed DIP Facility satisfies the Debtors' primary strategic considerations outlined above. Based on the foregoing, the proposed use of Cash Collateral and the DIP Facility will satisfy the Debtors' postpetition liquidity needs, will provide the Debtors with sufficient flexibility to operate their businesses in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

104.    Of paramount importance is that the proposed DIP Facility provides for the consensual use of cash collateral from the Prepetition Fluids Lender, and also obviates a dispute between the Prepetition Fluids Lender and any potential alternate DIP lender regarding the scope of the Prepetition Fluids Lender's liens in respect for the Prepetition Fluids Facilities.  Specifically, it is anticipated that—if an alternate source of DIP financing were obtained—the Prepetition Fluids Lender would refuse to consent to the use of cash collateral and oppose any effort by such an alternate DIP lender to obtain first priority (priming/superpriority) liens on (a) the assets of Fluids, (b) the assets of Leasing, and (c) the SLP-Fluids Assets.  Such a dispute at the outset of these Chapter 11 Cases risks derailing the Marketing Process and incurring significant administrative

burdens on the estates—all amidst the backdrop of nominal revenue generation by the Debtors. In short, the DIP Facility resolves a significant dispute with a lender asserting liens in substantially all of the assets of Nitro, and significant assets of Straitline.

    ii.    <u>DIP Facility Terms Are Reasonable Under the Circumstances</u>

105.    The obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances. Accordingly, the DIP Lender has acted in good faith and has agreed to provide the DIP Facility to the Debtors on terms that are fair and reasonable under the current circumstances and market conditions.

    iii.    <u>Liens on Unencumbered Assets</u>

106.    The DIP Lender requires a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets. Absent such protections, the DIP Lender would not have agreed to provide the DIP Facility to the Debtors.

    iv.    <u>Roll Up</u>

107.    After entry of the Final DIP Order, a portion of the MSELF Facility will roll up into the DIP Facility on a dollar-for-dollar cashless basis, in the amount of $6 million. Such rolled up amount will be secured by the same collateral and the same priority as the New Money Term DIP Facility. The Roll Up of a portion of the Prepetition Secured Obligations was a critical condition to the DIP Lenders providing the DIP Facility, and without the inclusion of the Roll Up, the DIP Lender would not have provided the DIP Facility.

108.    Moreover, notwithstanding the Roll Up, the DIP Facility provides numerous benefits to the Debtors, their estates, and their stakeholders. For example, given that the DIP Lender is the Debtors' incumbent lender, moving forward with certain other DIP proposals would

have likely resulted in the DIP Lender asking for additional adequate protection and further arguing that there is insufficient value in unencumbered assets to cover both a third-party DIP financing and provide adequate protection to the DIP Lender, and may have resulted in litigation regarding the Prepetition Fluids Facilities Collateral.

109.    The terms of the DIP Facility, including the liens being granted and the Roll Up, are an important part of the DIP Facility that will allow the Debtors to maintain sufficient liquidity during these Chapter 11 Cases.

v.    Proposed DIP Facility Fees Are Fair and Reasonable

110.    The DIP Lender has committed to providing a substantial amount of capital to ensure successful execution of the DIP Facility. In view of those commitments and the circumstances of these cases, including the tangible benefit to the estates of a substantial committed postpetition financing, the consideration being provided to the DIP Lender, taken as a whole, in exchange for providing such commitment, is (a) reasonable in amount, (b) appropriately compensates the DIP Lender for its costs and the assurances they are providing to the process, and (c) is necessary to obtain the DIP Facility.  As a result, the DIP Facility will permit the Debtors to both (y) continue operating their businesses and (z) maximize the value of their estates.

vi.    DIP Fees

111.    In consideration for the DIP Lender's commitments in connection with the DIP facility, the Debtors have agreed to, among other things, pay the DIP Fees and Expenses, and indemnify the DIP Lender in accordance with the DIP Loan Agreement.  The DIP Fees and Expenses were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lender, are integral components of the overall terms of the DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing. It is unlikely that a

financing commitment with terms similar to those in the DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, and the Debtors' liquidity position.

112.    In sum, it is my professional opinion that (i) the terms of the DIP Facility – including the fee structure and applicable interest rates are, taken as a whole, (a) within the range of comparable DIP financing transactions (if not more favorable), and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the DIP Facility were the product of good faith, arm's-length negotiations; (iii) the DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Interim DIP Order, the Debtors' businesses will likely be immediately and irreparably harmed.

113.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  May 17, 2024                          _/s/ Brad Walker_____
                                              Brad Walker
                                              Chief Restructuring Officer

                                              *Nitro Fluids, LLC*
                                              *NFH Leasing, LLC*
                                              *Straitline Pumps, LLC*