**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| **In re:** § | **Chapter 11** |
| § | |
| § | **Case No. 24-60018 (CML)** |
| **NITRO FLUIDS, LLC,** *et al.* § | |
| § | **(Jointly Administered)** |
| **Debtors.**[1] § | |
| § | |
| § | |
| § | |

**NOTICE OF STALKING HORSE APA**

Debtors Nitro Fluids, LLC ("Fluids"), NFH Leasing, LLC ("Leasing"), and Straitline Pumps, LLC ("Straitline" and, collectively with Fluids and Leasing, the "Debtors"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases, file this *Notice of Stalking Horse APA* (the "Notice") and respectfully give notice as follows:

1.      On June 27, 2024, the Court entered its Order Approving (I)(A) Bidding Procedures, and (B) Assumption and Assignment Procedures; (II) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Procedures for De Minimis Asset Sales; and (IV) Related Relief [Docket No. 174].

2.      On September 25, 2024, the Court entered its Order Approving Amended Bidding Procedures and Granting Related Relief [Docket No. 295] (the "Bidding Procedures Order") with the Amended Bidding Procedures (the "Amended Bidding Procedures") attached as Exhibit 1 thereto.  The Amended Bidding Procedures and the Bidding Procedures Order provided, among

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave., Ste. 560, San Antonio, Texas 78232.

other things, that the Debtors were authorized to enter into a purchase agreement providing certain

stalking horse protections in respect of a bid received by the Debtors from KLX (defined below).

3.      **PLEASE TAKE NOTICE** that attached hereto as **Exhibit A** is a true and correct

copy of the Stalking Horse Asset Purchase Agreement entered into by certain of the Debtors and

KLX Energy Services, LLC ("KLX"), dated as of October 21, 2024.

Dated: October 22, 2024                    Respectfully submitted,

                                           /s/ Eric T. Haitz
                                           **BONDS ELLIS EPPICH SCHAFER JONES LLP**
                                           Joshua N. Eppich (Texas Bar No. 24050567)
                                           Eric T. Haitz      (Texas Bar No. 24101851)
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: joshua@bondsellis.com
                                           Email: eric.haitz@bondsellis.com

                                           -and-

                                           Ken Green      (Texas Bar No. 24050698)
                                           402 Heights Boulevard
                                           Houston, Texas 77007
                                           (713) 335-4990 telephone
                                           (713) 335-4991 facsimile

                                           COUNSEL FOR THE DEBTORS

## CERTIFICATE OF SERVICE

I certify that on October 22, 2024, a true and correct copy of the foregoing document was
served via the Court's CM/ECF system.

                                           /s/ Eric T. Haitz
                                           Eric T. Haitz

# EXHIBIT  A

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of October 21, 2024 (this "Agreement"), is by and among KLX Energy Services LLC, a Delaware limited liability company (the "Buyer"), Nitro Fluids, LLC, a Texas limited liability company ("Seller"), and Bobby Lee Koricanek, an individual resident of the State of Texas (the "IP Seller"). Each of Buyer, Seller and the IP Seller is sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A.    The Seller is engaged in the business of providing oilfield services in multiple segments of the oil and gas drilling and fracturing market at various locations in the United States (the "Business").

B.    Seller and the IP Seller may each assert certain interests in the patents and patent applications comprising the IP Purchased Assets.

C.    On May 15, 2024, the Seller filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing Case Nos. 24-60018 and 24-60020 (the "Bankruptcy Cases").

D.    On June 27, 2024, the Bankruptcy Court entered an order [Docket No. 174] (the "Bidding Procedures Order") authorizing the Seller to sell assets pursuant to certain sale procedures (the "Sale Procedures").

E.    On September 12, 2024, the Seller filed a motion under the Bankruptcy Code in the Bankruptcy Court  requesting to amend the bidding procedures order requesting stalking horse bidder protections [Docket No. 275] (the "Motion").

F.    The Seller anticipates approval of the Motion and an entry of an order (the "Amended Bidding Procedures Order" and together with the Bidding Procedures Order, the "Orders") approving the amended bidding procedures ("Amended Sale Procedures", together with the Bidding Procedures, the "Procedures") no later than September 25, 2024.

Pursuant to the Orders and the Procedures Seller and the IP Seller have each determined in their respective business judgment that it is beneficial to sell to the Buyer, and the Buyer wishes to purchase from Seller and the IP Seller, the IP Purchased Assets and certain assets related to the Business, as applicable, upon the terms and subject to the conditions set forth herein.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I
# PURCHASE AND SALE

Section 1.1     <u>Purchase and Sale of the Assets</u>.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell and deliver to the Buyer all of the Seller's right, title and interest, direct or indirect, in and to (i) the assets listed on <u>Schedule 1.1</u> hereto and, though not specifically identified therein, the spare parts and consumables associated with, and necessary for the operation of, the assets identified on <u>Schedule 1.1</u>, which are at (x) the Monahans Facility, located at 5118 S. Veronica, Monahans, Texas 79756 and (y) the Nordheim Facility, located at 686 Cemetery Road, Nordheim, TX 78141, and (ii) the IP Purchased Assets (collectively, the "<u>Purchased Assets</u>").

(b)     Upon the terms and subject to the conditions of this Agreement, at the Closing, the IP Seller shall sell and deliver to the Buyer all of the IP Seller's right, title and interest, direct or indirect, in and to all assets listed on <u>Schedule 1.2</u> hereto (collectively, the "<u>IP Purchased Assets</u>").

Section 1.2     <u>Excluded Assets</u>.  Notwithstanding anything contained in <u>Section 1.1</u> to the contrary, neither the Seller nor the IP Seller is selling, and the Buyer is not purchasing, any assets other than the Purchased Assets and each other asset of the Seller and the IP Seller shall be retained by the Seller and the IP Seller (such retained assets being the "<u>Excluded Assets</u>").

Section 1.3     <u>Assumed Liabilities</u>.  In connection with purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the Buyer shall not assume any liabilities or obligations of the Seller or the IP Seller, however or whenever arising except to the extent that such liabilities arise from the Purchased Assets entirely from and after the Closing (the "<u>Assumed Liabilities</u>").

Section 1.4     <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities, notwithstanding any other provision of this Agreement to the contrary or any disclosure to the Buyer, the Buyer is not assuming (and the Seller and the IP Seller shall retain without recourse to the Buyer) any liabilities or obligations of the Seller and the IP Seller, as applicable, whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, and currently existing or hereinafter arising (the "<u>Excluded Liabilities</u>").

Section 1.5     <u>Ancillary Agreements</u>.  On or prior to the Closing Date, each of the Seller, the IP Seller and the Buyer shall execute, deliver and file as necessary, the documents contemplated by <u>Section 1.9</u> and such other documents as are (a) necessary to complete the transfer of the Purchased Assets to (b) otherwise necessary to complete the transactions contemplated hereby and (c) reasonably requested by either party (collectively, the "<u>Ancillary Agreements</u>").

Section 1.6     <u>Purchase Price Deposit</u>.  Buyer has deposited a sum of $325,000.00 (the "<u>Deposit Amount</u>") into the trust account maintained by Bonds Ellis Eppich Schafer Jones LLP (the "<u>Trust Account</u>") which will be held in the Trust Account and will be either delivered to Buyer or paid to the Seller as follows: (a) if the Closing occurs, the Deposit Amount shall be released to Seller at the Closing and be applied towards the Purchase Price payable by Buyer pursuant to

Section 1.7; (b) if this Agreement is terminated for any reason other than pursuant to Section 8.1(d), then the Deposit Amount shall, and the Seller shall take all action necessary to cause the Deposit Amount to, promptly be released to the Buyer; or (c) if this Agreement is terminated pursuant to Section 8.1(d), then the Deposit Amount shall promptly be released to the Seller (and such Deposit Amount will be deemed fully earned by the Seller as compensation and consideration for entering into this Agreement and shall be Seller's sole and exclusive remedy for a termination of this Agreement pursuant to Section 8.1(d) and with respect to any breaches underlying such termination).

Section 1.7   Consideration.   In full consideration for the Purchased Assets, at the Closing, the Buyer shall pay to the Seller $3,250,000.00 (the "Purchase Price"), in immediately available funds (which amount, for the avoidance of doubt, shall be inclusive of the Deposit Amount to be released to Seller pursuant to Section 1.6(a)).

Section 1.8   Closing.   The sale and purchase of the Purchased Assets shall take place at a closing (the "Closing") to be held electronically at a time mutually agreed between Buyer and Seller on a date that is no later than three (3) business days following the satisfaction or (to the extent permitted by applicable Law) waiver in accordance with this Agreement of all of the conditions set forth in Article VII (other than any such conditions which by their nature cannot be satisfied until the Closing Date, which shall be required to be so satisfied or (to the extent permitted by applicable Law) waived in accordance with this Agreement on the Closing Date), or at such other place or at such other time or on such other date as the Seller and the Buyer mutually may agree in writing (the date on which the Closing occurs, the "Closing Date").

Section 1.9   Closing Deliverables.

(a)   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall deliver or cause to be delivered to the Buyer:

(i)   a counterpart to the Bill of Sale and Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A (the "Bill of Sale"), pursuant to which the Seller shall convey the Purchased Assets and assign the Assumed Liabilities (to the extent legally transferrable to the Buyer) to the Buyer and the Buyer will accept the Purchased Assets and assume the Assumed Liabilities, duly executed by the Seller; and

(ii)   a certificate, dated as of the Closing Date, signed by an authorized officer of the Seller, certifying that the conditions set forth in Section 7.1(a) and Section 7.1(b) have been satisfied.

(b)   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the IP Seller shall deliver or cause to be delivered to the Buyer:

(i)   a counterpart to the Bill of Sale, duly executed by the IP Seller; and

(ii)   a certificate, dated as of the Closing Date, signed by the IP Seller, certifying that the conditions set forth in Section 7.1(c) and Section 7.1(d) have been satisfied.

3

(c)      Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer shall deliver or cause to be delivered to each of the Seller and the IP Seller:

(i)      a counterpart to the Bill of Sale, duly executed by the Buyer; and

(ii)      a certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer, certifying that the conditions set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been satisfied.

Section 1.10   <u>Warehousing and Transfer of Possession</u>.  For a period of 45 days from and after the Closing (the "<u>Warehousing Period</u>"), for no additional consideration, the receipt of the Purchase Price being sufficient, the Seller shall warehouse the Purchased Assets at Buyer's risk.  During the Warehousing Period, the Seller shall provide the Buyer reasonable access to the Purchased Assets and the premises on which the Purchased Assets are locate for purposes of enabling the Buyer to take possession of the Purchased Assets.  Prior to the expiration of the Warehousing Period, the Buyer shall take possession of the Purchased Assets and, if necessary, cause the Purchase Assets to be transferred and delivered to a location at which the Buyer is entitled to store the Purchased Assets.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as follows:

Section 2.1   <u>Organization and Qualification</u>.  The Seller is a limited liability company duly organized, validly existing and in good standing under the laws of Texas and has full corporate power and authority to own, lease and operate the Purchased Assets.  The Seller is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the ownership or operation of the Purchased Assets or the nature of the Business makes such qualification or licensing necessary.

Section 2.2   <u>Authority</u>.  The Seller has full limited liability company  power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements.  The execution, delivery and performance by the Seller of this Agreement and each of the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of the Seller and have been duly and validly authorized by the Bankruptcy Court pursuant to the Orders.  Subject to the Orders, this Agreement has been, and upon their execution each of the Ancillary Agreements will have been, duly executed and delivered by the Seller, and is, and upon their execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable upon and against the Seller.

Section 2.3   <u>No Conflict; Required Filings and Consents</u>.  The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of the limited liability company agreement  of the Seller; (b) violate any federal, state or local statute, law, regulation, order, injunction or decree ("<u>Law</u>") applicable to the Seller, the Business or the Purchased Assets; (c) conflict with, create a breach or default under, require

4

any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any Encumbrance (as defined below) upon any of the Purchased Assets pursuant to, any contract, agreement, license, permit or other instrument to which the Seller is a party or by which the Seller or any of the Purchased Assets may be bound, affected or benefited; (d) allow the imposition of any fees or penalties or require the offering or making of any payment to a third party on the part of the Seller; or (e) require any consent or approval of, registration or filing with, or notice to any federal, state or local governmental authority or any agency or instrumentality thereof (a "Governmental Authority").

Section 2.4    Title to, Condition and Sufficiency of Assets.   Subject to the IP Seller's interests in the IP Purchased Assets that are being sold and delivered to the Buyer pursuant to Section 1.1(b), the Seller has good and valid title to all of the Purchased Assets, free and clear of any lien (as defined in section 101(37) of the Bankruptcy Code), purported lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, licenses, encroachments, conditional sale or other title retention agreements and other similar restrictions on transfer or use, any other potential interest, or restriction of any kind (collectively, "Encumbrances").   Pursuant to this Agreement and the Ancillary Agreements, the Buyer will acquire good and valid title to all of the Purchased Assets, free and clear of any Encumbrance.

Section 2.5    Brokers.   No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Seller.

Section 2.6    Disclosure.   None of the representations or warranties of the Seller contained in this Agreement or any Ancillary Agreement or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE IP SELLER

The IP Seller hereby represents and warrants to the Buyer as follows:

Section 3.1    Authority.   The IP Seller has full power and legal capacity to execute, deliver and perform his obligations under this Agreement and each of the Ancillary Agreements to which he will be a party.   This Agreement has been, and upon their execution each of the Ancillary Agreements to which the IP Seller will be a party will have been, duly executed and delivered by the IP Seller, and is, and upon their execution each of the Ancillary Agreements to which the IP Seller will be a party will be, legal, valid, binding and enforceable upon and against the IP Seller.

Section 3.2    No Conflict; Required Filings and Consents.   The execution, delivery and performance by the IP Seller of this Agreement and the Ancillary Agreements to which he will be a party and the consummation by the IP Seller of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the IP Seller or the IP Purchased Assets; (b) conflict with, create a breach or default under, require any consent of or notice to or give to

5

any third party any right of modification, acceleration or cancellation, or result in the creation of any Encumbrance (as defined below) upon any of the IP Purchased Assets pursuant to, any contract, agreement, license, permit or other instrument to which the IP Seller is a party or by which the IP Seller or any of the IP Purchased Assets may be bound, affected or benefited; (c) allow the imposition of any fees or penalties or require the offering or making of any payment to a third party on the part of the IP Seller; or (e) require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

Section 3.3    Title to, Condition and Sufficiency of Assets.  Subject to the Seller's interests in the IP Purchased Assets that are being sold and delivered to the Buyer pursuant to Section 1.1(a), the IP Seller has good and valid title to all of the IP Purchased Assets, free and clear of any Encumbrances.  Pursuant to this Agreement and the Ancillary Agreements to which the IP Seller will be a party, the Buyer will acquire good and valid title to all of the IP Purchased Assets, free and clear of any Encumbrance.

Section 3.4    Brokers.  No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the IP Seller.

Section 3.5    Disclosure.  None of the representations or warranties of the IP Seller contained in this Agreement or any Ancillary Agreement to which the IP Seller will be a party or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents and warrants to each of the Seller and the IP Seller as follows:

Section 4.1    Organization.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

Section 4.2    Authority.  The Buyer has full limited liability company power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it will be a party.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of the Buyer.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer, and is, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will be, legal, valid, binding and enforceable upon and against the Buyer.

Section 4.3    Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any

6

representations or warranties whatsoever, express or implied, beyond those expressly given by Seller and the IP Seller in Article II and Article III, respectively, and the certificate to be delivered pursuant to Section 1.9(a)(ii) and Section 1.9(b)(ii), respectively, and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis, including with respect to any environmental conditions at, on, in, under, migrating to or from or relating to the Purchased Assets.   Buyer acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the transactions contemplated by this Agreement (the "Transactions"), Buyer has relied on the results of its own independent investigation.

Section 4.4    Required Filings and Consents.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby do not and will not require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

Section 4.5    Financial Capacity.  Buyer has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Buyer in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Buyer will not be impaired.

Section 4.6    Brokers.  No broker, finder or agent will have any claim against the Seller for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Buyer.

**ARTICLE V**
**COVENANTS**

Section 5.1    Notification of Certain Matters.  The Seller shall give prompt written notice to the Buyer of (a) the occurrence or non-occurrence of any event that would render any representation or warranty of the Seller herein, if made on or immediately following the date of such event, untrue or inaccurate, including any change required with respect to the Schedules hereto; (b) any event, change or development that has had or is reasonably likely to have a material adverse effect with respect to the Purchased Assets, Seller or the Business; (c) any failure of the Seller to comply with any covenant or agreement to be complied with by it hereunder or any event or condition that would otherwise result in the nonfulfillment of any of the conditions to the Buyer's obligations hereunder; (d) any notice or other communication received by the Seller  from any person or entity alleging that the consent of such person or entity is or may be required in connection with the consummation of the transactions contemplated by this Agreement; or (e) any action pending or threatened in connection with the transactions contemplated by this Agreement.

Section 5.2    Further Assurances.  Each of the parties agrees to work diligently, expeditiously and in good faith to consummate the transactions contemplated by this Agreement.

From time to time after the Closing Date, the Seller shall execute and deliver to the Buyer such instruments of sale, transfer, conveyance, assignment, consent, assurance, power of attorney, and other such instruments as may be reasonably requested by the Buyer in order to vest in the Buyer all right, title, and interest in and to the Purchased Assets and the Business.  The Buyer and the Seller shall each provide the other with such assistance as reasonably may be requested by the other in connection with the transition of the Business and the preparation of any tax return, an audit or examination of any such return by any taxing authority or any judicial or administrative proceeding relating to liability for taxes and shall each retain and provide the other with any records or other information which may be relevant to such a return, audit, examination or proceeding.

Section 5.3    <u>Survival of Representations and Warranties</u>.   The representations and warranties of the Seller and the Buyer contained in this Agreement and any schedule, certificate or other document delivered pursuant hereto or in connection with the transactions contemplated hereby shall be continuing and survive the Closing.

Section 5.4    <u>Special Provisions Regarding IP Purchased Assets</u>.   The Parties acknowledge and agree as follows:

(a)    <u>Allocation</u>.   Two Hundred Fifty Thousand dollars ($250,000.00) of the Purchase Price shall be specifically allocated as consideration for the IP Purchased Assets (the "<u>Patent Consideration</u>").

(b)    <u>Segregation</u>.   The Patent Consideration, and the remaining amount of the Purchase Price, shall be paid at Closing to Seller as otherwise set forth in this Agreement; *provided*, *however*, that Seller shall segregate the Patent Consideration from the other Purchase Price funds pending further order from the Bankruptcy Court.

(c)    <u>Sale Order</u>.   With respect to the IP Purchased Assets and the Patent Consideration, the Sale Order shall (i) authorize the sale and assignment of the IP Purchased Assets to Buyer free and clear of any liens, claims, or Encumbrances pursuant to Bankruptcy Code sections 363(f) and 363(h), and (ii) require Seller to segregate the Patent Consideration pending determination of (A) ownership of the IP Purchased Assets, prior to the Transactions contemplated herein, and (B) any right of Seller and the IP Seller to the Patent Consideration proceeds.  For the avoidance of doubt, nothing in the preceding clause (ii) shall impact the Buyers' purchase of the Purchased Assets or Buyer owning the entire right, title, and interest in all the Purchased Assets following entry of the Sale Order and the prompt Closing of the Transactions contemplated herein.

### ARTICLE VI
### BANKRUPTCY COURT MATTERS

Section 6.1    <u>Bankruptcy Court Approval</u>. Seller has filed with the Bankruptcy Court the Motion seeking entry of the Amended Bidding Procedures Order and authorizing the observance and performance of the Amended Bidding Procedures by Seller and Buyer. Seller will file with the Bankruptcy Court the sale order, including the approval of this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Orders, and shall be in form and substance acceptable

to the Buyer in its sole discretion (the "Sale Order").  The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement or any Ancillary Agreement, (ii) the sale of the Purchased Assets to Buyer (and any affiliate) on the terms set forth herein, and to the extent permitted by applicable law, free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Code, and (iii) the performance by Seller of its obligations under this Agreement, (b) (i) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and is not a successor to any Seller, and (ii) grant Buyer the protections of section 363(m) of the Bankruptcy Code, and (c) find that Buyer shall have no liability or responsibility for any liability or other obligation of the Seller (or any of its affiliates) arising under or related to the Purchased Assets.

Section 6.2    Bankruptcy Process.

(a)    Seller and Buyer acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Orders) and Bankruptcy Court approval (each, a "Competing Bid"), as determined in Seller's sole and exclusive discretion.  Buyer and Seller acknowledge that Seller must take reasonable steps to demonstrate that Seller has sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction"). Buyer agrees and acknowledges that Seller will be permitted, and will be permitted to cause their representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any person (in addition to Buyer and its affiliates, agents and representatives).  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Orders or other applicable Law, including supplying information relating to the Seller or the Purchased Assets to prospective buyers.

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction will be those reflected in the Orders.  Buyer agrees to be bound by and accept the terms and conditions of the Orders as entered by the Bankruptcy Court.

(c)    If this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Orders, Buyer and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in such form as approved by Buyer in its sole discretion.

(d)    Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the

Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

       (e)    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

       (f)    For the avoidance of doubt, nothing in this Agreement will restrict Seller from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

       (g)    Notwithstanding anything contained in this Section 5.2 to the contrary, in no event shall Seller be permitted to accept a Competing Bid unless the purchase price to be paid by the buyer pursuant to such Competing Bid is at least $200,000 greater than the Purchase Price.

Section 6.3    Approval of Break-Up Fee.  In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of the Seller, the Seller shall pay Buyer, in accordance with the terms hereof and the Orders, a break-up fee in an amount equal to (a) $90,000.00 (the "Break-Up Fee").  Subject to the entry of the Orders, the Break-Up Fee shall be paid on the fifth business day following the date of consummation of a transaction pursuant to a Competing Bid if no material breach by Buyer of this Agreement has occurred.  Pursuant to sections 364 and 503 of the Bankruptcy Code, the Break-Up Fee will constitute a superpriority administrative expense claim against the Seller's bankruptcy estates with priority over any and all administrative expense claims, subject to the Carve Out (as such term is defined in Docket 146 of the Bankruptcy Case).  The Seller shall file with and seek the entry by the Bankruptcy Court of the Orders approving the payment of the Break-Up Fee, pursuant to, and subject to the limitations set forth in, this Agreement.

Section 6.4    Back-Up Bidder.  Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction and in accordance with the Orders, if and only if (a) Buyer submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by the Seller, and (b) the Seller gives notice to Buyer that the Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Buyer shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including payment of the Purchase Price, as applicable, in accordance with Article I, as the same may be increased by Buyer at the Auction.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    Conditions to the Obligations of the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the Buyer in its sole discretion:

(a)    The representations and warranties of the Seller contained in Article II of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)    The Seller shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)    The representations and warranties of the IP Seller contained in Article III of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(d)    The IP Seller shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(e)    No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(f)    No action shall be pending or threatened (i) challenging the transactions contemplated by this Agreement or otherwise seeking damages in connection therewith or (ii) seeking to prohibit or limit the ability of the Buyer to own, operate or control the Purchased Assets.

(g)    The Seller shall have delivered to the Buyer (or be ready, willing and able to deliver at the Closing) the items set forth in Section 1.9(a) and any other Ancillary Agreements.

(h)    The IP Seller shall have delivered to the Buyer (or be ready, willing and able to deliver at the Closing) the items set forth in Section 1.9(b) and any other Ancillary Agreements.

(i)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Buyer in its sole discretion; the Sale Order shall not have been stayed, reversed or modified in a manner adverse to Buyer absent consent of the Buyer; and the Sale Order shall be final, binding, and non-appealable.

(j)      The Amended Bidding Procedures Order shall have been entered no later than October 4, 2024.

(k)      (i) The Buyer and (ii)(A) Jackie Ray Simpson and (ii)(B) Bob Koricanek (Simpson and Koricanek together "Lessor") shall have entered into a lease agreement acceptable to Simpson, Koricanek, and Buyer in respect of certain real property in Nordheim, Texas commonly referred to as the Nordheim Facility.

(l)      There shall not have been any material damage, destruction or loss to the Purchased Assets, taken as a whole, following the date hereof.

Section 7.2      Conditions to the Obligations of the Seller.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the Seller in its sole discretion:

(a)      The representations and warranties of the Buyer contained in Article IV of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)      The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)      No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(d)      The Buyer shall have delivered to the Seller (or be ready, willing and able to deliver at the Closing) the items set forth in Section 1.9(c) and any other Ancillary Agreements.

(e)      The Sale Order shall have been entered by the Bankruptcy Court.

Section 7.3      Conditions to the Obligations of the IP Seller.  The obligations of the IP Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the IP Seller in its sole discretion:

(a)      The representations and warranties of the Buyer contained in Article IV of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)      The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)     No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(d)     The Buyer shall have delivered to the IP Seller (or be ready, willing and able to deliver at the Closing) the items set forth in Section 1.9(c) and any other Ancillary Agreements.

(e)     The Sale Order shall have been entered by the Bankruptcy Court.

## ARTICLE VIII
## TERMINATION

Section 8.1     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     By Buyer or Seller, if the Closing has not occurred by 5:00 p.m. Central time on the date that is three (3) days following the completion of a sale hearing (the "Outside Closing Date"), which date may be extended pursuant to mutual written agreement of Buyer and Seller; *provided*, *however* that if the Closing has not occurred on or before the Outside Closing Date due to a breach of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in Article VII not being satisfied by the Outside Closing Date (i) by Buyer, then Buyer may not terminate this Agreement pursuant to this Section 8.1(a) or (ii) by Seller, then the Seller may not terminate this Agreement pursuant to this Section 8.1(a).

(b)     By mutual written consent of the Buyer and Seller.

(c)     By Buyer, if (i)(A) either Seller or the IP Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition set forth in Section 7.1 and (C) such breach has not been cured within 10 business days after the giving of written notice by Buyer to Seller and the IP Seller of such breach; *provided* that Buyer is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 7.2; or (ii)(A) the conditions set forth in Section 7.2 and Section 7.3 have been satisfied, (B) the Outside Closing Date shall have occurred and (C) Buyer is ready and willing to consummate the Transactions but Seller or the IP Seller is unwilling or unable to consummate the Transactions.

(d)     By Seller, if  (i)(A) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition precedent set forth in Section 7.2 and (C) such breach has not been cured within 10 business days after the giving of written notice by Seller to Buyer; *provided* that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 7.1; or (ii)(A) the conditions set forth in Section 7.1 have been satisfied, (B) the Outside Closing Date shall have occurred and (C) Seller and the IP Seller are ready and willing to consummate the Transactions but Buyer is unwilling or unable to consummate the Transactions.

   (e) By Seller or Buyer, if there is in effect a final non-appealable order, decree or ruling of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; *provided* that the issuance of such order, decree or ruling was not primarily caused by the action or inaction of such Party in breach of this Agreement.

   (f) By Buyer or Seller, if a transaction is consummated in connection with a Competing Bid that is declared the successful bidder.

 Section 8.2 Effect of Termination.  If this Agreement is terminated in accordance with Section 8.1, then this Agreement shall become void and of no further force or effect (other than Section 1.6, Section 6.3, this Section 8.2, Section 9.1, Section 9.4, Section 9.5 and Section 9.8, which shall survive the termination of this Agreement).

# ARTICLE IX
# GENERAL PROVISIONS

 Section 9.1 Fees and Expenses.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  In addition, the Buyer shall pay (a) all transfer or recording taxes and (b) all recording or filing fees related to the transfer of the Purchased Assets.

 Section 9.2 Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

 Section 9.3 Waiver.  No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof.  Any such waiver by a Party shall be valid only if set forth in writing by such Party.

 Section 9.4 Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given if delivered personally or sent by email, overnight courier or registered or certified mail, postage prepaid, to the address set forth below, or to such other address as may be designated in writing by such Party:

   if to the Buyer, to:

   KLX Energy Services LLC
   3040 Post Oak Boulevard, 15th Floor
   Houston, Texas 77056
   Attention:  Max Bouthillette
   Email:  MaxB@KLX.Com

with copies (which will not constitute notice) to:

Vinson & Elkins L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Attention: Sarah K. Morgan
Email: smorgan@velaw.com

if to the Seller, to:

Riverbend Special Situations Group
Attention: Brad Walker
214-616-6256
bwalker@riverbendssg.com

with copies (which will not constitute notice) to:

Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102
Attention: Joshua Eppich
Email: joshua@bondsellis.com

if to the IP Seller, to:

Bobby Lee Koricanek
P.O. Box 865
Yorktown, Texas 78164
Email:  bobk@nitrooil.com

with copies (which will not constitute notice) to:

Dean W. Greer
West & West Attorneys at Law, P.C.
2929 Mossrock, Suite 204
San Antonio, Texas 78230
Email: dean@dwgreerlaw.com

Section 9.5    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements and understandings and all prior and contemporaneous oral agreements, arrangements and understandings between the Parties with respect to the subject matter of this Agreement.  No Party to this Agreement shall have any legal

obligation to enter into the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 9.6    Exculpation and Release.  In consideration of this Agreement, each of the Seller and the IP Seller, on behalf of itself and its respective affiliates, successors and permitted assigns hereby releases and forever discharges, effective as of the Closing, the Buyer and its affiliates, successors and permitted assigns, from any and all claims, interests, damages, remedies, causes of action, demands, rights, actions suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, arising out of or in any way relating to (i) the ownership or operation of the Purchased Assets prior to the Closing, or (ii) the negotiation, due diligence in respect of, preparation, execution or delivery of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby; *provided*, for the avoidance of doubt, that nothing in this Section 9.6 shall alter the rights or defenses of the Seller or the IP Seller under this Agreement or any claims the Seller or the IP Seller may have to enforce this Agreement or bring any claim for a breach hereof.

Section 9.7    Third-Party Beneficiaries.  Nothing in this Agreement shall confer upon any person other than the Parties and their respective successors and permitted assigns any right of any nature.

Section 9.8    Governing Law.  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Texas, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Texas.

Section 9.9    Assignment; Successors.  This Agreement may not be assigned by either party without the prior written consent of the other party, except that the Buyer may assign this Agreement to any of its affiliates.  Subject to the preceding sentence, this Agreement will be binding upon the Parties and their respective successors and assigns.

Section 9.10    Severability.  If any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 9.11    Counterparts.  This Agreement may be executed in counterparts (including facsimile and electronic transmission counterparts), all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party.

*[The remainder of this page is intentionally left blank.]*

16

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

**BUYER:**

**KLX ENERGY SERVICES LLC**

By:_____

    Name: Max Bouthillette
    Title:  Vice President & General Counsel

**SELLER:**

**NITRO FLUIDS, LLC**

By: _____

    Name:  Brad Walker
    Title:  Chief Restructuring Officer

**IP SELLER:**

**BOBBY LEE KORICANEK**

_____

**Schedule 1.1**

*Tangible Purchased Assets*

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 15K | Best Way Hydraulic | Operable | 25 |
| Gate Valve | 7 1/16" - 15K | Best Way Manual | Operable | 10 |
| Gate Valve | 7 1/16" - 15K | Best Way | Machined - Requires Assembly | 7 |
| Gate Valve | 7 1/16" - 15K | Best Way | Requires Machining | 6 |
| Gate Valve | 7 1/16" - 15K | Top Shelf Hydraulic | Operable | 6 |
| Gate Valve | 7 1/16" - 15K | Top Shelf Manual | Operable | - |
| Gate Valve | 7 1/16" - 15K | Top Shelf | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf | Requires Machining | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock Hydraulic | Operable | 54 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock Manual | Operable | 8 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock | Requires Machining | 9 |
| Gate Valve | 5 1/8" - 15K | Best Way Hydraulic | Operable | 69 |
| Gate Valve | 5 1/8" - 15K | Best Way Manual | Operable | 67 |
| Gate Valve | 5 1/8" - 15K | Best Way | Machined - Requires Assembly | 39 |
| Gate Valve | 5 1/8" - 15K | Best Way | Requires Machining | 9 |
| Gate Valve | 4 1/16" - 15K | Manual | Operable | 2 |
| Gate Valve | 4 1/16" - 15K | Hydraulic | Operable | 2 |
| Gate Valve | 3 1/16" - 15K | Manual | Operable | 47 |
| Gate Valve | 3 1/16" - 15K | Hydraulic | Operable | 20 |
| Gate Valve | 2 1/16" - 15K | Manual | Operable | 124 |
| Gate Valve | 2 1/16" - 15K | Hydraulic | Operable | 62 |
| Flow Spool | 10 feet | N/A | Operable | 77 |
| Flow Spool | 8 feet | N/A | Operable | 36 |
| Flow Spool | 6 feet | N/A | Operable | 9 |
| Flow Spool | 5 feet | N/A | Operable | 38 |
| Flow Spool | 4 feet | N/A | Operable | 41 |
| Flow Spool | 36" | N/A | Operable | 27 |
| Flow Spool | 30" | N/A | Operable | 23 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Flow Spool | 28" | N/A | Operable | 30 |
| Flow Spool | 26" | N/A | Operable | 6 |
| Flow Spool | 24" | N/A | Operable | 35 |
| Flow Spool | 22" | N/A | Operable | 10 |
| Flow Spool | 20" | N/A | Operable | 54 |
| Flow Spool | 18" | N/A | Operable | 7 |
| Flow Spool | 16" | N/A | Operable | 102 |
| Flow Spool | 24" | N/A | Operable | 1 |
| Flow Spool | 16" | N/A | Operable | 86 |
| Flow Spool | 10 feet | N/A | Operable | 15 |
| Flow Spool | 8 feet | N/A | Operable | 13 |
| Flow Spool | 6 feet | N/A | Operable | - |
| Flow Spool | 5 feet | N/A | Operable | 26 |
| Flow Spool | 4 feet | N/A | Operable | 36 |
| Flow Spool | 36" | N/A | Operable | 25 |
| Flow Spool | 30" | N/A | Operable | - |
| Flow Spool | 28" | N/A | Operable | - |
| Flow Spool | 26" | N/A | Operable | - |
| Flow Spool | 24" | N/A | Operable | 6 |
| Flow Spool | 22" | N/A | Operable | - |
| Flow Spool | 20" | N/A | Operable | - |
| Flow Spool | 18" | N/A | Operable | 3 |
| Flow Spool | 16" | N/A | Operable | 62 |
| Flow Spool | 14" | N/A | Operable | 61 |
| Flow Spool | 24" | N/A | Operable | 1 |
| Flow Spool | 12" | N/A | Operable | 1 |
| Flow Spool | 16" | N/A | Operable | 1 |
| Flow Spool | 14" | N/A | Operable | 1 |
| Flow Spool | 12" | N/A | Operable | 1 |
| Flow Spool | 24" | N/A | Operable | 3 |
| Flow Spool | 24" | N/A | Operable | 2 |
| Flow Spool | 14" | N/A | Operable | 5 |
| Flow Spool | 12" | N/A | Operable | 3 |
| Goat Head | 5 1/8" - 15K (4 Port) | N/A | Operable | 2 |
| Goat Head | 5 1/8" - 15K (6 Port) | N/A | Operable | 20 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Goat Head | 7 1/16" - 15K (6 Port) | N/A | Operable | 9 |
| Weco Flange | 7" - 15K | N/A | Operable | - |
| Weco Flange | 5" - 15K | N/A | Operable | 30 |
| Weco Flange | 4" - 15K | N/A | Operable | 515 |
| Weco Flange | 3" - 15K | N/A | Operable | 92 |
| Weco Flange | 2 9/16" - 15K | N/A | Operable | 1 |
| Weco Flange | 2" - 15K | N/A | Operable | 117 |
| Weco Flange | 1 13/16" - 15K | N/A | Operable | 3 |
| Blind Flange | 7" - 15K | N/A | Operable | 196 |
| Blind Flange | 5" - 15K | N/A | Operable | 66 |
| Blind Flange | 4" - 15K | N/A | Operable | 13 |
| Blind Flange | 3" - 15K | N/A | Operable | 15 |
| Blind Flange | 2 9/16" - 15K | N/A | Operable | 1 |
| Blind Flange | 2" - 15K | N/A | Operable | 25 |
| Blind Flange | 1 13/16" - 15K | N/A | Operable | 2 |
| Flow Cross | 7" - 15K | N/A | Operable | 161 |
| Flow Cross | 5" - 15K | N/A | Operable | 124 |
| Flow Cross | 4" - 15K | N/A | Operable | 5 |
| Flow Cross | 3" - 15K | N/A | Operable | 5 |
| Flow Cross | 2" - 15K | N/A | Operable | 16 |
| Adapter Spool | 7" - 15K | N/A | Operable | 175 |
| Adapter Spool | 5" - 15K | N/A | Operable | 67 |
| Adapter Spool | 4" - 15K | N/A | Operable | 32 |
| Adapter Spool | 3" - 15K | N/A | Operable | 83 |
| Adapter Spool | 2" - 15K | N/A | Operable | 1 |
| Zipper Manifold Skid | 7 1/16" - 15K | N/A | Operable | 20 |
| Zipper Manifold Skid | 5 1/8" - 15K | N/A | Operable | 32 |
| Flow Cross Stand | 7 1/16" - 15K | N/A | Operable | 3 |
| Flow Cross Stand | 5 1/8" - 15K | N/A | Operable | 25 |
| Flow Cross Stand | 4 1/16" - 15K | N/A | Operable | 2 |

| Equipment Type | Make | Description | Unit # | Comments |
|---|---|---|---|---|
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-201 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-202 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-601 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-602 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-603 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-604 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-605 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-606 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-607 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-608 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-609 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-610 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-611 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-612 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-613 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-614 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-615 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-616 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-617 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-618 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-619 | Frame & Panel Face Only |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Performance Sales | Accumulator Unit | M125714 | ACC-101 |
| Accumulator Unit | Performance Sales | Accumulator Unit | M010115 | ACC-102 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M020915 | ACC-103 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M021015 | ACC-104 |
| Accumulator Unit | PMI | Accumulator Unit | M021115 | ACC-105 |
| Accumulator Unit | PMI | Accumulator Unit | M021215 | ACC-106 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M020815 | ACC-107 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M040215 | ACC-108 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M041115 | ACC-109 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Meyer Services | Accumulator Unit | M041215 | ACC-110 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M050915 | ACC-111 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051015 | ACC-112 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051515 | ACC-113 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051615 | ACC-114 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070517 | ACC-115 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070617 | ACC-116 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070717 | ACC-117 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070817 | ACC-118 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080117 | ACC-119 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080217 | ACC-120 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080317 | ACC-121 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080417 | ACC-122 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080517 | ACC-123 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080617 | ACC-124 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080717 | ACC-125 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080817 | ACC-126 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080917 | ACC-127 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M081017 | ACC-128 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028518 | ACC-601 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028618 | ACC-602 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028718 | ACC-603 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028818 | ACC-604 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028918 | ACC-605 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029018 | ACC-606 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029118 | ACC-607 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029218 | ACC-608 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029318 | ACC-609 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029418 | ACC-610 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039518 | ACC-611 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039618 | ACC-612 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039718 | ACC-613 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039818 | ACC-614 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039918 | ACC-615 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040118 | ACC-616 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040218 | ACC-617 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040318 | ACC-618 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040418 | ACC-619 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040518 | ACC-620 |
| Accumulator Unit | Top Shelf Oilfield Supply | Accumulator Unit - 6 Station | N/A | ACC-621 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016935 SA_GVL 271 | ACC-3001 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016935 SA_GVL 214 | ACC-3002 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016934 SA_GVL-280 | ACC-3003 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016937 SA_GVL-349 | ACC-3004 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016937 SA_GVL-3333 | ACC-3005 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016931 SA_GVL-314 | ACC-3006 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016931 SA_GVL-297 | ACC-3007 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016936 SA_GVL-311 | ACC-3008 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016936 SA_GVL-315 | ACC-3009 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016934 SA_GVL-300 | ACC-3010 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016938 SA_GVL-334 | ACC-3011 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016938 SA_GVL-352 | ACC-3012 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016939 SA_GVL-351 | ACC-3013 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016939 SA_GVL-270 | ACC-3014 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016941_SA-GVL-335 | ACC-3015 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016941_SA-GVL-272 | ACC-3016 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016942_SA_GVL-323 | ACC-3017 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016933 SA_GVL-299 | ACC-3018 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016933 SA_GVL-264 | ACC-3019 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011205/GVL-276 | ACC-3020 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011205/GVL-319 | ACC-3021 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011207/GVL-313 | ACC-3022 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011207/GVL-310 | ACC-3023 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011199/GVL-277 | ACC-3024 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011199/GVL-290 | ACC-3025 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012607_SA-GVL-328 | ACC-3026 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012607_SA-GVL-325 | ACC-3027 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016929 SA_GVL-289 | ACC-3028 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011202/GVL-318 | ACC-3029 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011202/GVL-324 | ACC-3030 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016930 SA_GVL-321 | ACC-3031 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016930 SA_GVL-320 | ACC-3032 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016929 SA_GVL-260 | ACC-3033 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016943_SA-GVL-309 | ACC-3034 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016942_SA_GVL-275 | ACC-3035 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012605_SA_GVL-288 | ACC-3036 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012605_SA_GVL-257 | ACC-3037 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K016943_SA-GVL-326 | ACC-4001 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011201/GVL-308 | ACC-4002 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011201/GVL-307 | ACC-4003 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011208/GVL-N/A | ACC-4004 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011208/GVL-265 | ACC-4005 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 8 Station | 10590 | ACC-8001 |

| Product Type | Valve Size | Brand & Type | Total Quantity |
|---|---|---|---|
| Grease Equipment | Grease Manifold Complete | N/A | 22 |
| Grease Equipment | Grease Manifold Skid Only | N/A | 4 |
| Grease Equipment | Grease Pump with Compressor on Skid | N/A | 5 |
| Grease Equipment | Grease Pump Only on Skid | N/A | 5 |
| Grease Equipment | 4 Drum Skid with No Pump | N/A | 5 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 10K | Best Way Hydraulic | Operable | 41 |
| Gate Valve | 7 1/16" - 10K | Best Way Manual | Operable | 28 |
| Gate Valve | 7 1/16" - 10K | Best Way | Machined - Requires Assembly | 33 |
| Gate Valve | 7 1/16" - 10K | Best Way | Requires Machining | 11 |
| Gate Valve | 7 1/16" - 10K | Top Shelf Hydraulic | Operable | 10 |
| Gate Valve | 7 1/16" - 10K | Top Shelf Manual | Operable | 5 |
| Gate Valve | 7 1/16" - 10K | Top Shelf | Machined - Requires Assembly | - |
| Gate Valve | 7 1/16" - 10K | Top Shelf | Requires Machining | 17 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock Hydraulic | Operable | 17 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock Manual | Operable | 21 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock | Requires Machining | 9 |
| Gate Valve | 4 1/16" - 10K | Manual | Operable | 2 |
| Gate Valve | 4 1/16" - 10K | Hydraulic | Operable | 4 |
| Gate Valve | 3 1/16" - 10K | Manual | Operable | 115 |
| Gate Valve | 3 1/16" - 10K | Hydraulic | Operable | 67 |
| Goat Head | 5 1/8" - 10K (4 Port) | N/A | Operable | 1 |
| Goat Head | 7 1/16" - 10K (6 Port) | N/A | Operable | 4 |
| Weco Flange | 4" - 10K | N/A | Operable | 43 |
| Weco Flange | 3" - 10K | N/A | Operable | 102 |
| Weco Flange | 2 9/16" - 10K | N/A | Operable | 1 |
| Weco Flange | 2 9/16" - 5K | N/A | Operable | 1 |
| Weco Flange | 2" - 10K | N/A | Operable | 2 |
| Weco Flange | 2" - 5K | N/A | Operable | 15 |
| Weco Flange | 1 13/16" - 10K | N/A | Operable | 11 |
| Weco Flange | 1 13/16" - 5K | N/A | Operable | 1 |
| Blind Flange | 7" - 10K | N/A | Operable | 85 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Blind Flange | 4" - 10K | N/A | Operable | - |
| Blind Flange | 3" - 10K | N/A | Operable | 4 |
| Blind Flange | 2 9/16" - 10K | N/A | Operable | 2 |
| Blind Flange | 1 13/16" - 10K | N/A | Operable | 2 |
| Flow Cross | 7" - 10K | N/A | Operable | 45 |
| Flow Cross | 5" - 10K | N/A | Operable | 1 |
| Flow Cross | 4" - 10K | N/A | Operable | 1 |
| Flow Cross | 3" - 10K | N/A | Operable | 5 |
| Adapter Spool | 7" - 10K | N/A | Operable | 15 |
| Adapter Spool | 5" - 10K | N/A | Operable | 11 |
| Adapter Spool | 4" - 10K | N/A | Operable | 4 |
| Adapter Spool | 3" - 10K | N/A | Operable | 9 |
| Adapter Spool | 2" - 10K | N/A | Operable | 1 |
| Adapter Spool | 2" - 5K | N/A | Operable | 1 |
| Zipper Manifold Skid | 7 1/16" - 10K | N/A | Operable | 19 |
| Flow Cross Stand | 7 1/16" - 10K | N/A | Operable | 16 |
| Plug Catcher Manual Manifold | Skid Mounted | N/A | Operable | 4 |
| Plug Catcher Manual Manifold | Trailer Mounted | N/A | Operable | 6 |
| Plug Valve Manifold | 1X2 9 Valve Manifold | N/A | Operable | 1 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Plug Valve Manifold | 2x2 5 Valve Manifold | N/A | Operable | 1 |
| Plug Valve Manifold | 2x2 9 Valve Manifold | N/A | Operable | 10 |
| Plug Valve Manifold | Skid Only | N/A | Operable | 6 |
| Filter Pod | Dual Filter Pods | N/A | Operable | 7 |
| Filter Pod | Single Filter Pods | N/A | Operable | 7 |
| Filter Pod | Single Short Filter Pods | N/A | Operable | 4 |
| Pump Down Manifold | 2 1/16 15K PDM | N/A | Operable | 9 |
| Pump Down Manifold | 3 1/16 15K PDM | N/A | Operable | 2 |
| Hose & Flow Iron Basket | Hose Basket | N/A | Operable | 42 |
| Hose & Flow Iron Basket | Small Iron Basket | N/A | Operable | 2 |
| Hose & Flow Iron Basket | Large Iron Basket | N/A | Operable | 16 |
| 1502 Iron | 1502 Iron | N/A | Operable | TBD |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B6-6B40234 | AC-101 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B6-6B40214 | AC-102 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B66B40289 | AC-103 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B66B40295 | AC-104 |
| Air Compressor | Ingersoll Rand | 7.5 HP 80 Gal 2 Stage Compressor | CBV389510 | AC-105 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10134 | AC-106 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10139 | AC-107 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10133 | AC-108 |
| Air Compressor | Ingersoll Rand | 7.5 HP 80 Gallon Two Stage Air Compressor | NAR10301765 | AC-110 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Air Compressor | ATLASCOPO | Atlascopo Compressor 350-395 CFM Diesel | HOP073433 | AC-111 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-101 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-102 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-103 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-104 |
| Command Center | Haulmark | Command Center | 16HG52825DT026462 | CC-101 |
| Command Center | Haulmark | Command Center | 16HG52822DT026824 | CC-102 |
| Command Center | Haulmark | Command Center | 16HG52821CT026070 | CC-103 |
| Command Center | Haulmark | Command Center | 16HG52822CT025784 | CC-104 |
| Command Center | Haulmark | Command Center | 16HG52827DT026463 | CC-105 |
| Command Center | Haulmark | Command Center | 575G52823ET031461 | CC-106 |
| Command Center | Haulmark | Command Center | 575G52824ET032490 | CC-107 |
| Command Center | Haulmark | Command Center | 575G52821FT261842 | CC-108 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 4LYUS2227DH000569 | PFS-101 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 4LYUS2224DH000710 | PFS-102 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 5BSTU3013DC028308 | PFS-103 |
| Flare Stack | N/A | 2011 Portable Flare Stack | 4LYUS2228BH000674 | PFS-104 |
| Flare Stack | N/A | 2010 Portable Flare Stack | 4LYUS2529AH000354 | PFS-105 |
| Flare Stack | N/A | 2010 Portable Flare Stack | 4LYUS2220AH000635 | PFS-106 |
| Flare Stack | N/A | 30Ft. Portable Flare Stack | N/A | PFS-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Flare Stack | N/A | 2015 Portable Flare Stack | 2PLC0523XFBA174 50 | PFS-108 |
| Forklift | CAT | 2005 DP50K Caterpillar Forklift | AT28B60275 | FL-101 |
| Forklift | CAT | 2001 DP90 Pnumatic Cat Diesel Forklift | T32B50073 | FL-102 |
| Forklift | Doosan | 2006 D70S-2 Pnuematic Doosan Diesel Forklift | BH00499 | FL-103 |
| Forklift | Toyota | 2017 Toyota THD2200-24 22,000 lb Forklift | 100257 | FL-105 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-001 | 4C9U6TL14CC2731 67 | NFT-001 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-002 | 4C9U6TL19CC2731 64 | NFT-002 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-003 | 4C9U6TL16CC2738 79 | NFT-003 |
| Gas Buster | All Fabrications | Offshore Gas Buster #1 | N/A | OGB-101 |
| Gas Buster | All Fabrications | Offshore Gas Buster #2 | N/A | OGB-102 |
| Gas Buster | All Fabrications | Offshore Gas Buster #3 | N/A | OGB-103 |
| Gas Buster | All Fabrications | Offshore Gas Buster #4 | N/A | OGB-104 |
| Gas Buster | All Fabrications | Offshore Gas Buster #5 | N/A | OGB-105 |
| Gas Buster | All Fabrications | Offshore Gas Buster #6 | N/A | OGB-106 |
| Gas Buster | All Fabrications | Offshore Gas Buster #7 | N/A | OGB-107 |
| Gas Buster | All Fabrications | Offshore Gas Buster #8 | N/A | OGB-108 |
| Gas Buster | All Fabrications | Offshore Gas Buster #9 | N/A | OGB-109 |
| Manifold | MSI | BHP Tank Manifold | N/A | BHP-MF1 |
| Mixing Plant | McMahan | Mixing Plant #2 | MP102 | MP-102 |
| Mixing Plant | McMahan | Mixing Plant #3 | MP103 | MP-103 |
| Mixing Plant | McMahan | Mixing Plant #4 | MP104 | MP-104 |
| Mixing Plant | McMahan | Mixing Plant #5 | MP105 | MP-105 |
| Mixing Plant | McMahan | Mixing Plant #6 | MP106 | MP-106 |
| Mixing Plant | McMahan | Mixing Plant #7 | MP107 | MP-107 |
| Mixing Plant | McMahan | Mixing Plant #8 | MP108 | MP-108 |
| Mixing Plant | McMahan | Mixing Plant #9 | MP109 | MP-109 |
| Mixing Plant | McMahan | Mixing Plant #10 | MP110 | MP-110 |
| Mixing Plant | Star Metal | Mixing Plant #11 | MP111 | MP-111 |
| Mixing Plant | Star Metal | Mixing Plant #12 | MP112 | MP-112 |
| Mixing Plant | Regional Steel | Mixing Plant #13 | MP113 | MP-113 |
| Mixing Plant | Regional Steel | Mixing Plant #14 | MP114 | MP-114 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Other | Kruse Energy & Equipment | 4-1/16" Quad BOP | 11233228 | BOP-101 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-101 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-102 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-103 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-104 |
| Other | EZGO | 2019 EZGO - Golf Cart | 3380933 | CRT-102 |
| Other | Doosan | Doosan Forklift 36k# | FDC03-1880-01904 | FL-104 |
| Other | Magic Industries | Stand Alone Panel #101 | N/A | P-101 |
| Other | Magic Industries | Stand Alone Panel #102 | N/A | P-102 |
| Other | Magic Industries | Stand Alone Panel #103 | N/A | P-103 |
| Other | Hatec | Stand Alone Panel #104 | N/A | P-104 |
| Other | Thermal Dynamics | Plasma Cutting Unit | MX1313018329 | PCU-2 |
| Other | Schley Fence | 5 x 10 Kokie Cutting Table | N/A | PLT-101 |
| Other | Big Tex | 2010 Big Tex | 16VGX2425A2362630 | Red Monorail |
| Other | Wynco | Super Skid IV Diesel Steam Cleaner | Q-8-4 | SC-101 |
| Other | American Sales & Svc. | Shop Pressure Washer | 288967-HW | SPW-101 |
| Other | Praxair | Welding Maching - Millermatic 350P - WTX | MH503026N | WM-101 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-101 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-102 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-103 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-104 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-105 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-106 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Sand Blaster / Cannon | Clemco | Clemco 6060 Sand Blaster | 53368 | SB-101 |
| Sand Blaster / Cannon | Southern Frac | Sand Cannon | 583S6TA10GA000001 | SX-101 |
| Test Pump | Shop Built | High Pressure Test Pump | N/A | HPTP-101 |
| Test Pump | Shop Built | High Pressure Test Pump | 4P5FS2428E1211465 | HPTP-102 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2023CB050357 | HPTP-103 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2020CB049537 | HPTP-104 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2438BB047326 | HPTP-107 |
| Trailer | Neckover | Car Hauling Trailer | 1N9GU2827NT263483 | CHT-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA25CW293001 | DT-0112-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA25CW293004 | DT-0212-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA27CW293002 | DT-0312-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA29CW293003 | DT-0412-ST |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Support Trailer | 4S9S3LA25EW293050 | DT-0514-ST |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Support Trailer | 4S9S3LA25EW293051 | DT-0614-ST |
| Trailer | Southern Frac | 2015 Enclosed Flowback Trailer (Tank-11 Ton) | 583S6TA14FA000260 | EFT-101 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT102 | FBT-102 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | HPTP-104 | FBT-103 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT104 | FBT-104 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT105 | FBT-105 |
| Trailer | Southern Frac | 2015 Southern Frac 18' Trailer | 583BF1829FA000404 | FBT-106 |
| Trailer | Star Metal | 2015 Star Metal Lowboy Gooseneck Haul Trailer | 4S9S3LA2XFW293080 | HT-0115-SM |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KT1TX000000051937 | HT-0211-KO |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000519 58 | HT-0311-KO |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000520 28 | HT-0411-KO |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000520 29 | HT-0511-KO |
| Trailer | Star Metal | 2015 Star Metal Lowboy Gooseneck Haul Trailer | 4S9S3LA21FW293 081 | HT-0615-SM |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 93 | HT-0712-KO |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 92 | HT-0812-KO |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 94 | HT-0912-KO |
| Trailer | Star Metal | 2013 Star Metal Fab Lowboy Haul Trailer | 4S9S3LA24ADW29 312 | HT-1013-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailerw/Split Tail Gate | 4S9S3LA20EW293 068 | HT-1114-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Split Tail Gate | 4S9S3LA22EW293 069 | HT-1214-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Double Tail Gate | 4S9S3LA26EW293 074 | HT-1314-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Double Tail Gate | 4S9S3LA28EW293 075 | HT-1414-SM |
| Trailer | Top Hat | Monorail Trailer | 4R7GU20284T0517 71 | MRT-101 |
| Trailer | Texas Bragg | Monorail Trailer | 17XFG1821B10126 41 | MRT-102 |
| Trailer | Texas Bragg | Monorail Trailer | 17XFG1823C10203 23 | MRT-103 |
| Trailer | Top Hat | Monorail Trailer | 4R7GU202X4T0516 09 | MRT-104 |
| Trailer | Big Tex | Monorail Trailer | 16VGX1623C23192 19 | MRT-105 |
| Trailer | Maxey Trailer | Monorail Trailer | 5R8CA2022GM038 753 | MRT-106 |
| Trailer | Maxey Trailer | Monorail Trailer | 5R8CA2024GM038 754 | MRT-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | Big Tex | Pressure Washer Trailer | 16VAX1014A2A44840 | PW-101 |
| Trailer | Haulmark | 2015 Haulmark 20 Transport Trailer | 575GB2027FT283901 | RT-101 |
| Trailer | Haulmark | 2015 Haulmark 20 Transport Trailer | 575GB2220FT283915 | RT-102 |
| Trailer | Haulmark | 2015 Haulmark 24' Enclosed Trailer | 575GB2427FT292835 | RT-103 |
| Trailer | Haulmark | 2015 Haulmark 24' Enclosed Trailer | 575GB2428FT293606 | RT-104 |
| Trailer | Haulmark | 2014 Haulmark 24' Enclosed Trailer | 575GB2422ET265721 | RT-105 |
| Trailer | CM | 2017 CM 20' Enclosed All Steel Transport Trailer | 49TCB2025H1025037 | RT-106 |
| Trailer | CM | 2017 CM 20' Enclosed All Steel Transport Trailer | 49TCB2028J1025040 | RT-107 |
| Trailer | CM | 2018 CM 20' Enclosed All Steel Transport Trailer | 49TCB2024J1026234 | RT-108 |
| Trailer | CM | 2018 CM 20' Enclosed All Steel Transport Trailer | 49TCB2026J1026235 | RT-109 |
| Trailer | Everest | 2009 Everest Travel Trailer | 4YDF34829AE770228 | RV-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA2XCW293009 | ST-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA28CW293008 | ST-102 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA22CW293005 | ST-103 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA24CW293006 | ST-104 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA26CW293010 | ST-105 |
| Trailer | Star Metal | 2013 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA27DW293017 | ST-106 |
| Trailer | Star Metal | 2013 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA29DW293018 | ST-107 |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA28EW293027 | ST-108 |
| Trailer | John McClung | Small Fema Park Model Trailer | 1705702 | TH-101 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | John McClung | Small Fema Park Model Trailer | 1706561 | TH-102 |
| Trailer | John McClung | Large Fema Trailer - F1460S | 1650569 | TH-103 |
| Trailer | American Cleaning | Trailer Mounted Pressure Washer | 5UTBU1229JMO10344 | TMPW-101 |
| Trailer | American Sales | Trailer Mounted Pressure Washer | 585BC1222JE010442 | TMPW-102 |
| Trailer | Star Metal | 2013 Star Metal Fab Lowboy Bumper-Pull Trailer | 4S9S1LE23DW293015 | TST-102 |
| Wrench Set | Hytorc | Wrench Set | N/A | WS-101 |
| Wrench Set | Hytorc | Wrench Set | N/A | WS-102 |
| Wrench Set | Hytorc | Wrench Set | XC2MD1543-405 | WS-103 |
| Wrench Set | Hytorc | Wrench Set | XC4MD1523-038 | WS-104 |
| Wrench Set | Hytorc | Wrench Set | XC2MD1810-365 | WS-105 |
| Wrench Set | Hytorc | Wrench Set | 151461 | WS-106 |
| Wrench Set | Hytorc | Wrench Set | 151626 | WS-107 |
| Wrench Set | Hytorc | Wrench Set | F1814-185-5 | WS-108 |
| Wrench Set | Hytorc | Wrench Set | F1814-018-5 | WS-109 |
| Wrench Set | Hytorc | Wrench Set | F1814-215-5 | WS-110 |
| Wrench Set | Hytorc | Wrench Set | F1814-237-5 | WS-111 |
| Wrench Set | Hytorc | Wrench Set | M5FI2023-104 | WS-112 |

**Schedule 1.2**

*IP Purchased Assets*

**Patents and Patent Applications:**

| Country | Title | Application No. / Patent No. | Filing Date / Issue Date | Status | Owner |
|---|---|---|---|---|---|
| United States | Sand Lock Valve | 63/214,674 / | 06/24/2021 / | Expired | Nitro Fluids, LLC |
| United States | Sand Lock Valve | 17/807,381 / 11,767,918 | 06/17/2022 / 09/26/2023 | Issued | Nitro Fluids, LLC |
| United States | Sand Lock Valve | 18/233,266 / | 08/11/2023 / | Pending | Nitro Fluids, LLC |

All other patents and patent applications, domestic or foreign, that claim priority to any of the listed patents and patent applications in this schedule, including any and all foreign counterparts.

## **Exhibit A**

***Form of Bill of Sale***

***[Attached]***

## BILL OF SALE

This BILL OF SALE (this "**Bill of Sale**"), dated as of November [●], 2024 (the "**Effective Date**"), by and among Nitro Fluids, LLC, a Texas limited liability company (the "**Seller**"), Bobby Lee Koricanek, an individual resident of the State of Texas (the "**IP Seller**"), and KLX Energy Services LLC, a Delaware limited liability company (the "**Buyer**"), is being executed and delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 18, 2024 (the "**Asset Purchase Agreement**"), by and among the Seller, the IP Seller and the Buyer. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

WHEREAS, at the Closing, Buyer will purchase from Seller, and Seller will sell to Buyer, all of the Seller's right, title and interest in and to the Purchased Assets listed on Annex A and Annex B hereto.

WHEREAS, at the Closing, Buyer will purchase from the IP Seller, and the IP Seller will sell to Buyer, all of the IP Seller's right, title and interest in and to the IP Purchased Assets listed on Annex B hereto.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.   Bill of Sale.

(a)   Seller hereby sells, assigns, conveys, transfers and delivers to Buyer, free and clear of all Encumbrances and in accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, and Buyer hereby accepts, all of Seller's right, title and interest in and to all of the Purchased Assets.

(b)   The IP Seller hereby sells, assigns, conveys, transfers and delivers to Buyer, free and clear of all Encumbrances and in accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, and Buyer hereby accepts, all of the IP Seller's right, title and interest in and to all of the IP Purchased Assets.

(c)   Notwithstanding the foregoing, neither Seller nor the IP Seller is selling, transferring, assigning, conveying or delivering to Buyer any of the Excluded Assets.

2.   Further Assurances.  Each of Seller and the IP Seller covenants that Seller and IP Seller, as applicable, will do, execute and deliver, and will cause to be done, executed and delivered, all such further acts, transfers, assignments and conveyances, powers of attorney and assurances for better assuring, conveying and confirming unto Buyer the Purchased Assets as Buyer shall reasonably request.

3.   No Amendments.  Seller nor the IP Seller may amend, modify or supplement this Bill of Sale without the prior written agreement of Buyer.

4.      <u>Miscellaneous</u>.  Notwithstanding any other provision of this Bill of Sale, nothing contained herein will in any way supersede, modify, replace, amend, rescind or waive any of the provisions of the Asset Purchase Agreement, including representations, warranties, covenants, agreements, conditions and any other rights or obligations of Buyer, Seller or the IP Seller under the Asset Purchase Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Buyer, the Seller and the IP Seller have caused this Bill of Sale to be duly executed as of the date first written above.

<u>**SELLER**</u>**:**

**NITRO FLUIDS, LLC**

By: _____
Name: Brad Walker
Title: Chief Restructuring Officer


<u>**IP SELLER**</u>**:**

**BOBBY LEE KORICANEK**


_____



<u>**BUYER**</u>**:**

**KLX ENERGY SERVICES LLC**

By: _____
Name: Max Bouthillette
Title: Vice President & General Counsel

**<u>Annex A</u>**[1]

***[Attached]***

---

[1] Schedule 1.1 of the Asset Purchase Agreement to be attached.

## **Annex B**[2]

### ***[Attached]***

---

[2] Schedule 1.2 of the Asset Purchase Agreement to be attached.