IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| In re:<br><br>**NITRO FLUIDS, LLC,** *et al.*<br><br>Debtors.[1] | § Chapter 11<br>§<br>§ Case No. 24-60018 (CML)<br>§<br>§ (Jointly Administered)<br>§<br>§<br>§ |

**DECLARATION OF RAYMOND L. BROWN JR. IN SUPPORT OF ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND GRANTING RELATED RELIEF**

I, Raymond L. Brown Jr., declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I am Partner of PPHB LP ("PPHB"). PPHB is a provider of financial advisory and investment banking services that maintains offices which has its principal office at 1885 St. James Pl, Suite 900, Houston, TX 77056. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of An Order Approving (I) (a) Bidding Procedures, and (b) Assumption and Assignment Procedures; (II) Sale of Certain of The Debtors Assets Free And Clear Of Liens, Claims, Interests, And Encumbrances; (III) Procedures for De Minimis Asset Sales; and (IV) Related Relief* [Docket No. 61] (the "Sale Motion") filed by the above-captioned debtors and debtors in possession (each a "Debtor" and together, the "Debtors").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave Ste 560, San Antonio, Texas 78232.

2. On May 15, 2024, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), initiating the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, experience and information concerning the Debtors, my review of relevant business records, and information provided to me by the Debtors and their professionals and PPHB employees working under my supervision. I am not being compensated specifically for this testimony.

4. PPHB, as a professional retained by the Debtors, will receive payments in its capacity as investment banker to the Debtors, including in connection with the closing of the transaction contemplated pursuant to the Sale Motion. If called upon to testify, I would testify competently to the facts set forth herein.

## QUALIFICATIONS

5. I have more than 21 years of investment banking experience with a focus on oil and gas merges and acquisitions, and financing transactions. Prior to becoming a founding member of PPHB in 2003, I work at GCP Securities, where I led and managed merger and acquisition and private equity transactions focused in oilfield services and manufacturing. Prior to entering the investment banking industry, Mr. Brown spent nine years with Halliburton Company in various capacities and divisions. My final position was *Director of Business Development* providing development capital to oil and gas companies. I have a degree in civil engineering from the University of Mississippi and a Masters in Business Administration from Southern Methodist University.

6. PPHB brings together tremendous investment banking insight from a cross-section of the firms from large institutions like Chase Securities (now JPMorgan Chase) and CIBC World

Markets to smaller, more middle-market focused firms like Raymond James and Rauscher Pierce. Prior to joining PPHB, PPHB's founding partners managed public and private debt offerings and advised on both the sell and buy sides of mergers and acquisitions.

7. PPHB and its professionals have worked with financially-troubled companies, including distressed oilfield services companies, and their stakeholders in complex financial restructurings, both in chapter 11 cases and out-of-court proceedings. PPHB's business reorganization professionals have served as financial advisors or investment bankers to companies and creditors in numerous restructurings.

8. I have experience with distressed companies, including advising both debtors and creditors in chapter 11 cases and in out-of-court restructurings. During the past 21 years, I have worked on and analyzed numerous financings for troubled companies. In addition, as a restructuring professional, I follow developments in the restructuring field and, in particular, keep abreast of the terms of current sale transactions in distressed and bankruptcy situations.

## THE MARKETING PROCESS

9. Since PPHB's engagement on or about May 29, 2024, I, along with other members of the team at PPHB, have worked closely with the Debtors' senior management team, Riverbend Special Situations Group ("Riverbend"), and Bonds Ellis Eppich Schafer Jones LLP, the Debtors' counsel in the Chapter 11 Cases (collectively with PPHB and Riverbend, the "Restructuring Advisors"), and have become knowledgeable about the Debtors' business, finances, operations and systems. PPHB, together with the other Restructuring Advisors, has been working to develop and execute a process to market and sell the Debtors' assets (collectively, the "Assets"). Such marketing and sale process included (a) the identification of the Assets, (b) the development of marketing materials describing the Assets, their history, their use, and the opportunities the Assets present, (c) the creation of a virtual data room containing information concerning the Assets,

(d) the identification of and contacting potential strategic and financial buyers for the Assets, (e) facilitating due diligence gathering via phone and in person meetings with potential buyers, and (f) negotiating transaction structure with potential buyers interested in acquiring some or all of the Assets.

10. Specifically, in connection with marketing the Assets, PPHB contacted approximately 118 potential strategic partners and 34 financial buyers. Ultimately, 25 potential buyers and four potential debt financing providers executed a non-disclosure agreement and were given access to the data room. PPHB then worked extensively with approximately 20 interested parties to further diligence the Assets. Throughout the marketing process, PPHB worked cooperatively and constructively with all interested parties to consider all viable purchase opportunities.

11. On May 29, 2024, the Debtors filed the Sale Motion. June 27, 2024, the Court entered its *Order Approving (I)(A) Bidding Procedures, and (B) Assumption and Assignment Procedures; (II) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Procedures for De Minimis Asset Sales; and (IV) Related Relief* [Docket No. 174] (the "Initial Order").

12. On September 25, 2024, the Court entered its *Order Approving Amended Bidding Procedures and Granting Related Relief* [Docket No. 295] (together with the Initial Order, the "Bidding Procedures Order") with the Amended Bidding Procedures (the "Amended Bidding Procedures") attached as Exhibit 1 thereto.

13. The Bid Procedures Order authorized the Debtors to enter into a stalking horse agreement with KLX Energy Services, LLC (the "Stalking Horse", the "Stalking Horse Bid", and the underlying agreement, the "Stalking Horse Agreement"), and established a deadline of

deadlines by which bidders were required to submit bids for the Assets (as amended pursuant to duly authorized notices, the "Bid Deadline").

14. The Debtors and I viewed the Stalking Horse Bid as a critical component of an efficient sale process because the Stalking Horse Bid, among other things, (a) set floor value on the Assets comprising the purchased assets in the Stalking Horse Agreement (such assets, the "KLX Sale Assets") that allowed the Debtors to market the KLX Sale Assets in a manner that created competition and enhanced value; (b) allowed the Debtors to negotiate a fully integrated contract that contained terms and conditions likely to be acceptable to other potential buyers; (c) provided a template setting forth the deliverables required by an actual buyer in a form acceptable to the Debtors; (d) provided certainty that a sale would close; and (e) set value expectations.

15. Prior to, during, and subsequent to negotiations with the Stalking Horse, PPHB solicited bids for the Assets, including the KLX Sale Assets, setting a preliminary deadline of July 19, 2024, by which bidders were required to submit initial indications of interest. The Debtors received 11 initial indications of interest and provided those bidders with access to a more comprehensive diligence materials, including, in many instances, on site inspections of various portions of the Assets. On September 25, 2024, the Court formally extended the Bid Deadline to October 9, 2024, and rescheduled the Auction for October 11, 2024 [Docket Nos. 295, 296]. On October 4, 2024, the Debtors formally extended the Bid Deadline to October 23, 2024, and rescheduled the Auction for October 25, 2024 [Docket No. 311]. On October 22, 2024, the Debtors formally extended the Bid Deadline to October 25, 20244, and rescheduled the Auction for October 29, 2024.

## CANCELLATION OF THE AUCTION; DESIGNATION OF SUCCESSFUL BIDDER

16. The sole Qualified Bid received by the Debtors was the Stalking Horse Bid. Prior to commencing the Auction, the Debtors filed the Notice of Cancellation and Suspension of Auction and Designation of Successful Bidder [Docket No. 345], designating the Stalking Horse Bid as the Successful Bid.

17. In my opinion, the Debtors and the Stalking Horse Bidder, acted in good faith, in a non-collusive manner, and in accordance with the Bid Procedures Order, the Bid Procedures, and the rules announced at the Auction, which resulted in the highest and best value for the Debtors' KLX Sale Assets and their estates. In my view, the consideration provided by the Stalking Horse Bidder for the KLX Sale Assets constitutes fair and reasonable consideration to the Debtors for the sale of such KLX Sale Assets, and the performance of the other covenants in the Stalking Horse Agreement provides a greater recovery for the Debtors' estates and creditors than would be provided by any other available alternative. Finally, the Stalking Horse Agreement was negotiated, proposed, and entered into by the Debtors and the Stalking Horse Bidder without collusion and in good faith, and resulted from arm's-length bargaining positions.

18. Accordingly, I believe that the Stalking Horse Bid represents the highest and best offer available for the KLX Sale Assets after the reasonable and thorough marketing and auction process conducted by PPHB and the Debtors. I believe that, as a sound matter of business judgment, consummation of the transaction with the Stalking Horse Bidder will maximize the value of the Debtors' Assets and will provide the best possible result and recovery for the Debtors' estates and their creditors.

19. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 31, 2024
       Houston, Texas

/s/ Raymond L. Brown Jr.
Raymond L. Brown Jr.