IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| In re:<br><br>NITRO FLUIDS, LLC, *et al.*<br><br>Debtors.[1] | § Chapter 11<br>§<br>§ Case No. 24-60018 (CML)<br>§<br>§ (Jointly Administered)<br>§<br>§<br>§ |

**DECLARATION OF BRAD WALKER IN SUPPORT OF ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND GRANTING RELATED RELIEF**

I, Brad Walker, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information, and belief:

1. My name is Brad Walker. I am over the age of twenty-one and am competent to make this Declaration.

2. I am the Managing Member of Brad Walker, LLC d/b/a Riverbend Special Situations Group ("Riverbend"), a restructuring advisory services firm based in Dallas, Texas, and I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collective, the "Debtors").

3. I submit this Declaration (this "Declaration") in support of the *Debtors' Motion for Entry of An Order Approving (I) (a) Bidding Procedures, and (b) Assumption and Assignment Procedures; (II) Sale of Certain of The Debtors Assets Free And Clear Of Liens, Claims, Interests,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave., Ste. 560, San Antonio, Texas 78232.

*And Encumbrances; (III) Procedures for De Minimis Asset Sales; and (IV) Related Relief* [Docket No. 61] (the "Sale Motion").

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, experience and information concerning the Debtors, my review of relevant business records, and information provided to me by the Debtors and their professionals and Riverbend personnel working under my supervision. If called upon to testify, I could and would testify competently to the facts set forth herein.

5. On May 15, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), initiating the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

## PROFESSIONAL QUALIFICATIONS

*A.     Riverbend and Brad Walker*

6. Riverbend and its professionals have a proven track record of enhancing value for financially distressed business organizations. Riverbend provides, among other services, restructuring solutions to companies in transition or distress and to other stakeholders in connection with out-of-court restructurings and bankruptcy proceedings. The Riverbend team has decades of experience in providing comprehensive analyses and advisory services to financially distressed companies and in assisting with strategic planning for companies facing financial or operational crossroads. Riverbend's turnaround management services include numerous interim management and advisory roles including debtor advisory, fiduciary roles, board advisory, secured lender advisory, unsecured creditor advisory, equity holder advisory and other financial consulting and related services.

7. Riverbend specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Riverbend's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position, including, among others: (a) developing or validating forecasts and business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction and performance improvement strategies; (d) supporting capital raises and strategic transactions; (e) designing and negotiating financial restructuring packages; and (f) negotiating with stakeholders.

8. Riverbend was first retained by an affiliate of the Debtors on October 1, 2023, to assist the Debtors' management with dual path contingency planning, cash management, financial forecasting, reporting and negotiations with such affiliate's lender, also the DIP Lender in these Chapter 11 Cases. During that process, it became clear that the Debtors would also require restructuring assistance. Riverbend therefore expanded its engagement to assist the Debtors and formalized that engagement on May 14, 2024, which included my appointment as CRO. Through the engagement with the Debtors and their affiliate, Riverbend has worked closely with the Debtors' management and other professionals and has become well acquainted with the Debtors' operations, debt structure, creditors, businesses, and related matters.

9. I am the Managing Director of Riverbend based in Dallas, Texas with approximately 36 years of experience in restructuring advisory, consulting, C role management, investment banking and principal investing. I have been involved in dozens of chapter 11 cases involving reorganization, orderly liquidation, and other turnaround strategies. Through these prior

engagements, I have routinely provided advice to a myriad of distressed companies in court-supervised restructurings and in out-of-court transactions.

10. During my career, I have advised numerous debtors, boards of directors, lenders, unsecured creditors, and other stakeholders in complex and often highly contentious matters. In addition to the oil and gas industry, my experience includes alternative energy, manufacturing, distribution, agriculture, retail, healthcare, technology, food retail, software and internet development. I also possess extensive experience advising on situations with complex capital structures. Moreover, throughout my restructuring career, I have advised on numerous distressed asset sales processes.

### B.   *Retention of Riverbend and Approval of Appointment of Chief Restructuring Officer*

11. Riverbend was retained by the Debtors as a financial advisor and it and my retention as the Debtors' chief restructuring officer was approved effective as of the Petition Date.  Since the Petition Date, the Debtors have retained PPHB LP ("PPHB") as the Debtors' investment banker to solicit and market the sale of the Debtors' assets in one or more sales to interested parties.  PPHB has filed a declaration in support of the Sale Motion [Docket No. 356] (the "Brown Declaration").

## SALE AND MARKETING PROCESS

12. On May 29, 2024, the Debtors filed the Sale Motion. On June 27, 2024, the Court entered its *Order Approving (I)(A) Bidding Procedures, and (B) Assumption and Assignment Procedures; (II) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Procedures for De Minimis Asset Sales; and (IV) Related Relief* [Docket No. 174] (the "Initial Order").

13. On September 25, 2024, the Court entered its Order Approving Amended Bidding Procedures and Granting Related Relief [Docket No. 295] (together with the Initial Order, the

"Bidding Procedures Order") with the Amended Bidding Procedures (the "Amended Bidding Procedures") attached as Exhibit 1 thereto.

14. I, along with other members of the team at Riverbend, have worked closely with the Debtors' senior management team, PPHB, and Bonds Ellis Eppich Schafer Jones LLP, the Debtors' counsel in the Chapter 11 Cases (collectively with PPHB and Riverbend, the "Restructuring Advisors"), and have been acutely involved in the Debtors' restructuring efforts and have a thorough understanding and handle on the Debtors' businesses, finances, operations and systems. Riverbend, together with the other Restructuring Advisors, has been working to execute a process to market and sell the Debtors' assets (collectively, the "Assets"). Such marketing and sale process included (a) the identification of the Assets; (b) the development of marketing materials describing the Assets, their history, their use, and the opportunities the Assets present; (c) overseeing and assisting with the population and the creation of a virtual data room containing information concerning the Assets; (d) coordinating with the Debtors' management and the other Restructuring Advisors in the identification of potential strategic and financial buyers for the Assets; (e) facilitating due diligence gathering via phone and in person meetings with management personnel of the Debtors; and (f) negotiating transaction structure with potential buyers interested in acquiring some or all of the Assets.

## THE KLX APA

### A. Stalking Horse Bid

15. The Bid Procedures Order authorized the Debtors to enter into a stalking horse agreement with KLX Energy Services, LLC (the "Stalking Horse", the "Stalking Horse Bid", and the underlying agreement, the "Stalking Horse Agreement"), and established a deadline by which bidders were required to submit bids for the Assets (as amended pursuant to duly authorized notices, the "Bid Deadline").

16. The Debtors' management and I viewed the Stalking Horse Bid as a critical component of an efficient sale process because the Stalking Horse Bid, among other things, (a) set floor value on the Assets comprising the Purchased Assets (as defined in the Stalking Horse Agreement) (such assets, the "KLX Sale Assets") that allowed the Debtors to market the KLX Sale Assets in a manner that created competition and enhanced value; (b) allowed the Debtors to negotiate a fully integrated contract that contained terms and conditions likely to be acceptable to other potential buyers; (c) provided a template setting forth the deliverables required by an actual buyer in a form acceptable to the Debtors; (d) provided certainty that a sale would close; and (e) set value expectations.

B.      *Designation of KLX APA as the Successful Bid*

17. In my opinion, the Debtors and the Stalking Horse Bidder, acted in good faith, in a non-collusive manner, and in accordance with the Bid Procedures Order and the Bid Procedures, which resulted in the highest and best value for the Debtors' KLX Sale Assets and their estates. In my view, the consideration provided by the Stalking Horse Bidder for the KLX Sale Assets constitutes fair and reasonable consideration to the Debtors for the sale of such KLX Sale Assets, and the performance of the other covenants in the Stalking Horse Agreement provides a greater recovery for the Debtors' estates and creditors than would be provided by any other available alternative. Finally, the Stalking Horse Agreement was negotiated, proposed, and entered into by the Debtors and the Stalking Horse Bidder without collusion and in good faith, and resulted from arm's-length bargaining positions.

18. Accordingly, I believe that the Stalking Horse Bid represents the highest and best offer available for the KLX Sale Assets after the reasonable and thorough marketing and auction process conducted by PPHB and the Debtors. I believe that, as a sound matter of business judgment, consummation of the transaction with the Stalking Horse Bidder will maximize the

value of the Debtors' Assets and will provide the best possible result and recovery for the Debtors' estates and their creditors.

19. Although the KLX Sale Assets are a relatively small portion of the overall assets marketed by the Debtors, the Stalking Horse Agreement consideration will provide an injection of capital available to satisfy a portion of the roll-up debtor-in-possession financing facility or otherwise satisfy claims against the Debtors' chapter 11 estates. The sale proposed by the Stalking Horse Agreement follows a significant marketing and solicitation process, and represents the best available consideration for the KLX Sale Assets resulting from the marketing and solicitation process.

C. *The IP Seller; the IP Assets; and the IP Consideration*

20. During the course of negotiations with the Stalking Horse over the Stalking Horse Bid, the Stalking Horse expressed interest in acquiring certain intellectual property rights related to the other KLX Sale Assets. Specifically, the Stalking Horse sought to include in the sale certain Sand Lock Valve intellectual property more specifically identified on Schedule 1.2 of the Stalking Horse Agreement (the "IP Assets").

21. Certain of the filings submitted to the United States Patent Office in respect of the IP Assets reflect Nitro Fluids, LLC ("Fluids") as the *Applicant* and Bobby Lee Koricanek ("IP Seller") as the *Inventor*, while certain of the other filings related to the IP Assets were filed with IP Seller as both *Applicant* and *Inventor*. For example, an original application reflects Fluids as the *Applicant*, whereas a later-filed continuing application reflects IP Seller as the *Applicant* in respect of the same Sand Lock Valve patent. As a result, the IP Seller may assert an ownership interest in the IP Assets, and the Debtors may assert an ownership interest in some or all of the IP Assets.

22. The IP Assets are critical to the usefulness and value of the other KLX Sale Assets. In the absence of acquisition of the IP Assets along with the other KLX Sale Assets, the Debtors believe that the value of the other KLX Sale Assets would be significantly impaired, the ability of the Debtors to market and sell the other KLX Sale Assets would be irreparably hindered, and the Stalking Horse would not likely be willing to purchase the other KLX Sale Assets.

23. For this reason, the Debtors engaged in discussions with IP Seller to negotiate IP Seller joining in the Stalking Horse Agreement to ensure that Fluids and IP Seller—both of whom may assert interests in the IP Assets—agree to the terms of the Stalking Horse Agreement and assent to the consideration ascribed to the IP Assets: $250,000 (the "IP Consideration").

24. The Debtors and IP Seller have agreed to segregate the IP Consideration until a subsequent determination is made as to their ownership of the IP Assets. This construct facilitates a free and clear sale of the IP Assets to the Stalking Horse pursuant to the Stalking Horse Agreement without the need to determine the respective ownership interests of Fluids and IP Seller. I believe that it is in the best interest of the Debtors to proceed with the sale proposed by the Stalking Horse Agreement in this manner because the Debtors believe that first requiring a determination of the respective ownership of the IP Assets between Fluids and IP Seller will likely jeopardize or doom entirely the willingness of the Stalking Horse to consummate the sale. Additionally, I worked with the Debtors' other Restructuring Advisors, and with the Debtors' management to evaluate alternative prospective buyers for the IP Assets or other mechanisms for monetizing the Debtors' potential interest in the IP Assets. Ultimately, the Debtors determined that it was in the best interests of the Debtors and their estates to sell IP Assets pursuant to the Stalking Horse Agreement because separating the IP Assets from the other KLX Sale Assets will

likely result in a significant reduction in the value of the other KLX Sale Assets to potential purchasers in the marketplace.

### D.     Other Benefits of the KLX Sale

25.     Upon consummation of the sale pursuant to the Stalking Horse Agreement, Fluids will be able to realize additional cost savings from the sale of the KLX Sale Assets. For example, Fluids's lease of the facility from which Fluids has historically operated (the "Nordheim Facility") will terminate contemporaneously with the closing. The monthly lease-payment-savings will represent monthly cost savings for the Debtors. Relatedly, the reduction in the asset portfolio of the Debtors will enable the Debtors to realize cost savings in two ways. *First*, the Debtors will reduce the ongoing maintenance costs of the Fluids assets. *Second*, the Debtors will reduce their on ongoing wage expenses by downsizing the Fluids workforce. Fortunately, however, the Debtors anticipate that the Stalking Horse is likely to recruit former Fluids employees, thereby preserving jobs for existing and/or former employees of the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 31, 2024
       Dallas, Texas

                                        */s/ Brad Walker*
                                        Brad Walker
                                        Debtors' Chief Restructuring Officer