United States Bankruptcy Court
Southern District of Texas

**ENTERED**
November 01, 2024
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| **In re:** § | **Chapter 11** |
| § | |
| § | **Case No. 24-60018 (CML)** |
| **NITRO FLUIDS, LLC,** *et al.* § | |
| § | **(Jointly Administered)** |
| **Debtors.**[1] § | |
| § | |
| § | |

**ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND GRANTING
RELATED RELIEF**

This Court having considered the *Debtors' Motion for Entry of an Order Approving
(I)(a) Bidding Procedures, and (b) Assumption and Assignment Procedures; (II) Sale of Certain
of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances,
(III) Procedures for de minimis Asset Sales, and  (IV) Related Relief* [Docket No. 61] (the
"Motion"),[2] filed by the above-captioned debtors and debtors in possession (the "Debtors") for
entry of an order (this "Sale Order") to sell the Purchased Assets free and clear of all liens, claims,
interests, and Encumbrances, pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the
United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007, 9008, and 9014
of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and upon the Declaration
of Brad Walker in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification
numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location
of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141.
The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave., Ste. 560, San Antonio,
Texas 78232.

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the Asset
Purchase Agreement (as defined below), as applicable.

[Docket No. 19] (the "First Day Declaration"); and upon that certain *Order Approving (I)(a) Bidding Procedures, and (b) Assumption and Assignment Procedures; (II) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Procedures for de minimis Asset Sales, and (IV) Related Relief* [Docket No. 174] (the "Initial Bidding Procedures Order"); and upon that certain *Order Approving Amended Bidding Procedures and Granting Related Relief* [Docket No. 295] (the "Amended Bidding Procedures Order" and together with the Initial Bidding Procedures Order, the "Bidding Procedures Order"); and upon the *Notice of Stalking Horse APA* [Docket No. 336]; and upon the Declaration of Brad Walker in Support of the Sale to the Buyer (the "Walker Sale Declaration"); and upon the Declaration of Raymond L. Brown Jr. in Support of the Sale to the Buyer (the "Brown Sale Declaration" and together with the Walker Sale Declaration, the "Sale Declaration"); and an auction (the "Auction") having been cancelled in accordance with the Bidding Procedures Order; and KLX Energy Services LLC, a Delaware Limited Liability Company ("Buyer") having submitted the highest or otherwise best bid for the Purchased Assets free and clear of any and all liens, claims, interests, and Encumbrances as reflected in that certain Asset Purchase Agreement, dated October 21, 2024 (as amended, supplemented or modified from time to time prior to the entry of this Sale Order, the "Asset Purchase Agreement") between Seller, IP Seller, and Buyer, which Asset Purchase Agreement is attached hereto as **Exhibit 1** and which, for purposes of this Sale Order, shall include all exhibits, schedules, and ancillary documents related thereto (all such documents, including the Asset Purchase Agreement, the "Transaction Documents"); and the Sale Hearing having been held on November 1, 2024 at 10:00 a.m. (prevailing Central Time) to consider certain of the relief requested in the Motion and approval of the Asset Purchase Agreement, at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and upon all of the proceedings had before this Court (including the testimony and other evidence proffered or

adduced at the Sale Hearing); and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having (i) reviewed and considered the Motion, all relief related thereto, the objections thereto, and statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at the Sale Hearing and (ii) found that, after an extensive marketing process by the Debtors and the IP Seller, Buyer has submitted the highest or otherwise best bid for the Purchased Assets; and that adequate and sufficient notice of the Bid Procedures, the Asset Purchase Agreement, and all transactions contemplated thereunder and in this Sale Order were given pursuant to and consistent with the Bidding Procedures Order; and that reasonable and adequate notice of the Motion and Bidding Procedures Order having been provided to all persons required to be served in accordance with the Bankruptcy Code and the Bankruptcy Rules; and that all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and that jurisdiction exists for the Court to consider the Motion and after due deliberation thereon; and upon the arguments and statements in support of the Motion presented at the Sale Hearing before the Court; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and that no other or further notice is necessary; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction to consider the Motion under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

B.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rules of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and directs entry of judgment as set forth herein.

C.      <u>Property of the Estate</u>.  All of the Purchased Assets being purchased by the Buyer, constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. To the extent the IP Seller has any interest in the IP Purchased Assets, the IP Seller shall sell and deliver to the Buyer all of the IP Seller's right, title and interest, direct or indirect, in and to all IP Purchased Assets pursuant to the Asset Purchase Agreement and the related sale (the "<u>Sale Transaction</u>") and pursuant to section 363(h) of the Bankruptcy Code.

D.      <u>Statutory Predicates</u>.  The statutory predicates for the approval of the Sale Transaction contemplated thereby are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 9007, 9008, and 9014.  The consummation of the transactions contemplated by this Sale Order, the Asset Purchase Agreement, the Transaction Documents, and all other ancillary documents entered into or delivered in connection therewith, is legal, valid and

---

[3]   The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Debtors and the Buyer have complied with all of the applicable requirements of such sections and rules in respect of such transactions.

E.     Petition Date.   On May 15, 2024 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas—Victoria Division (this "Court").

F.     Committee.   On May 30, 2024, the Office of the United States Trustee for the Southern District of Texas appointed the Official Committee of Unsecured Creditors of Nitro Fluids, LLC, *et al*. (the "Committee").

G.     Bidding Procedures Order.   On June 27, 2024 and September 25, 2024, this Court entered the Bidding Procedures Order. No appeal, motion to reconsider or similar pleading has been filed with respect to the Bidding Procedures Order, and the Bidding Procedures Order is a final order of this Court. The Bidding Procedures Order has not been vacated, withdrawn, rescinded or amended and remains in full force and effect.

H.     Compliance with Bidding Procedures Order.   As demonstrated by the Sale Declaration, and the testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Purchased Assets and conducted the sale process in compliance with the Bidding Procedures Order, and the Auction was duly noticed and, as applicable, conducted in a non-collusive, fair and good faith manner. The bidding procedures approved by the Bidding Procedures Order (the "Bidding Procedures") were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  Further, the Debtors and their

professionals have afforded potential purchasers a full and fair opportunity to make higher and better offers for the subject assets. Buyer has acted in good faith and in compliance with the terms of the Bidding Procedures. In accordance with the Bidding Procedures, the Debtors determined that the bid submitted by the Buyer and memorialized by the Asset Purchase Agreement is the Successful Bid. The Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment, and approval of the Asset Purchase Agreement and consummation of the transactions contemplated therein are in the best interests of the Debtors, their bankruptcy estates, their creditors, and other parties in interest.

I.      Notice. Proper, timely and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014 and in compliance with the Local Rules and Bidding Procedures Order, including to the Notice Parties (as defined below). The foregoing notice was proper, timely, good, sufficient and appropriate under the circumstances and reasonably calculated to reach and apprise all known and unknown holders of liens, claims, interests, or Encumbrances in the Purchased Assets, complied with the Bidding Procedures Order, and no other or further notice of the Motion, the Sale Hearing, the Asset Purchase Agreement or the Sale Transaction is required. The disclosures made by the Debtors concerning the Asset Purchase Agreement, the Sale Transaction and the Sale Hearing were proper, timely, sufficient, complete and adequate and no other or further notice of the Motion, the Bidding Procedures, the Auction, the Sale Hearing, or the Sale Transaction, is or shall be required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

J.      <u>Opportunity to be Heard.</u>  A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the Sale Transaction has been afforded to all interested persons and entities, including the following: (i) the U.S. Trustee; (ii) counsel to the DIP Lender; (iii) counsel for the Committee; (iv) counsel for the Successful Bidder in accordance with the Asset Purchase Agreement; (v) counsel for the IP Seller; (vi) all persons and entities known by the Debtors to have asserted any lien, claim, interest or Encumbrance in the Purchased Assets (for whom identifying information and addresses are available to the Debtors); (vi) any governmental authority known to have a claim against the Debtors in these cases; (viii) the United States Attorney for the Southern District of Texas; (ix) the Office of the Attorney General in each state in which the Debtors operate; (x) the Internal Revenue Service; (xi) all parties who have filed a notice of appearance and request for service of papers in these cases pursuant to Bankruptcy Rule 2002; and (xii) all other persons and entities as directed by the Court (the parties listed in (i) through (xii) collectively, the "<u>Notice Parties</u>").

K.      <u>Marketing Process</u>.  As demonstrated by (i) the First Day Declaration, (ii) the Sale Declaration, (iii) the testimony and other evidence proffered or adduced at the Sale Hearing and (iv) the representations of counsel made on the record at the Sale Hearing, the Debtors and their advisors thoroughly marketed the Debtors' assets (including the Purchased Assets) and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bidding Procedures Order, and the IP Seller thoroughly marketed any of its interests in the IP Purchased Assets. The sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' assets (including the Purchased Assets), and the process conducted by the Debtors pursuant to the Bidding Procedures Order obtained the highest or otherwise best value for the Debtors' assets (including the Purchased Assets), and there was no other transaction available or

presented that would have yielded a higher or better result for the Debtors' assets (including the Purchased Assets).  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Debtors' assets (including the Purchased Assets).

L.    <u>Highest and Best Offer</u>.  In accordance with the Bidding Procedures, the Debtors determined in a valid and sound exercise of their business judgment and after a robust and extensive marketing process, and in consultation with the Committee and the DIP Lender (the "<u>Consultation Parties</u>"), that the highest and best Qualified Bid for the Purchased Assets was that of the Buyer. The consideration provided by the Buyer for the Purchased Assets provides fair and reasonable consideration to the Debtors and the IP Seller for the sale of the Purchased Assets and the assumption of all Assumed Liabilities (limited in the Asset Purchase Agreement), and the performance of the other covenants set forth in the Asset Purchase Agreement will provide a greater recovery for the Debtors' estates than would have been provided by any other available alternative in respect of the Purchased Assets. The consideration provided by the Buyer to both the Debtors and the IP Seller for the Purchased Assets pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets, and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the section 548 of the Bankruptcy Code, Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable law) under the laws of the United States, any state, territory, possession, or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value and/or on better terms to the Debtors' estates than Buyer. Approval of the Motion, the Asset Purchase Agreement, and the consummation of the transactions

contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

M.     <u>Court Approval Required</u>.    Entry of an order approving and authorizing the Debtors' entry into the Asset Purchase Agreement and the Debtors' performance of all the provisions therein is a necessary condition precedent to the Buyer's consummation of the Sale Transaction.

N.     <u>Business Judgment</u>.    The Debtors' decisions to (i) enter into the Asset Purchase Agreement, the Transaction Documents, and all ancillary documents filed therewith or described therein and (ii) perform under and make payments, if any, required by such Asset Purchase Agreement constitute reasonable exercises of the Debtors' sound business judgment consistent with their fiduciary duties, and such decisions are in the best interests of the Debtors, their estates, their creditors and all other parties in interest. Good and sufficient reasons for the approval of the Asset Purchase Agreement, the Transaction Documents, and all ancillary documents filed therewith or described therein have been demonstrated by the Debtors. The Debtors have established that compelling circumstances exist for the Sale Transaction outside: (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.   To maximize the value of the Purchased Assets and preserve the viability of the business to which the Purchased Assets relate, it is essential that the Sale Transaction occur promptly. Time is of the essence in consummating the Sale Transaction. The Debtors' decision to enter into the Asset Purchase Agreement and pursue and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and officers.

O.      No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would give equal or greater economic value to the Debtors in the aggregate than the value being provided by the Buyer pursuant to the Asset Purchase Agreement. Among other things, the Sale Transaction is the best alternative available to the Debtors to maximize the return to their estates in respect of the Purchased Assets. The terms and conditions of the Asset Purchase Agreement, including the consideration to be realized by the Debtors, are fair and reasonable. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the consideration provided by the Buyer under the Asset Purchase Agreement, approval of the Motion, the Asset Purchase Agreement and the transactions contemplated thereby, including the Sale Transaction, is in the best interests of the Debtors, their estates and creditors and all other parties in interest.

P.      <u>Best Interests</u>.  Consummation of the sale of the Purchased Assets is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

Q.      <u>Arm's-Length Sale</u>.  The Transaction Documents were negotiated, proposed and entered into by the Debtors, the IP Seller, and the Buyer without collusion, in good faith within the meaning of section 363(m) of the Bankruptcy Code and from arm's-length bargaining positions. None of the Debtors, the IP Seller, the Buyer, other parties in interest or their respective representatives has engaged in any conduct that would cause or permit the Transaction Documents, or the consummation of the Sale Transaction, to be avoidable or avoided, or to cause costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any entity in connection therewith.  Specifically, the Buyer has not acted in a collusive manner with any person, and the purchase price was not controlled by any agreement among bidders.

R.      <u>Good Faith Purchaser</u>.  The Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law. Furthermore, the Buyer is not an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, the Buyer is entitled to the full protections of section 363(m) of the Bankruptcy Code and has otherwise proceeded in good faith in all respects in connection with these chapter 11 cases. Specifically: (i) the Buyer recognized that the Debtors and the IP Seller were free to deal with any other party interested in purchasing the Purchased Assets; (ii) the Buyer complied in all respects with the provisions in the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order; (iv) all consideration to be provided by the Buyer and all other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Buyer and the Debtors; (vi) the negotiation and execution of the Transaction Documents were at arm's-length and in good faith, and at all times each of the Buyer, the IP Seller, and the Debtors were represented by competent counsel of their choosing; and (vii) the Buyer has not acted in a collusive manner with any person. As a result of the foregoing, the Buyer is a "good faith" Buyer within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal.

S.      <u>Insider Status</u>.  The Buyer is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

T.      <u>Sale Free and Clear</u>.  Except for liabilities specifically assumed by the Buyer pursuant to the Asset Purchase Agreement, the sale and transfer of the Purchased Assets to the Buyer shall be free and clear of liens, claims, and interests, in each case, in, on or related to the

Purchased Assets, including, but not limited to, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens (including but not limited to mechanics' or materialman's liens), purported liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, regulatory violations, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, offsets not taken prepetition, claims for reimbursement, contribution, indemnity or exoneration, successor liability, product liabilities, environmental liabilities, tax liabilities, labor liabilities, Employee Retirement Income Security Act of 1974 ("ERISA") liabilities, liabilities related to the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act"), liabilities related to the Internal Revenue Code, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on or related to the Purchased Assets (including all "claims" as defined in Bankruptcy Code section 101(5)), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances"). The foregoing is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

U.     In addition, each entity or person, including the IP Seller, with an Encumbrance upon the Purchased Assets (other than Assumed Liabilities and Permitted Encumbrances): (i) has consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest;

or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1) through (5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Encumbrances are adequately protected, thus satisfying section 363(e) of the Bankruptcy Code, by having their Encumbrances, if any, attach to the proceeds of the Sale Transaction, in the same order of priority and with the same validity, force and effect that such Encumbrances had before the Sale Transaction, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. Therefore, approval of the Asset Purchase Agreement and the consummation of the Sale Transaction free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

V.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the sale of Purchased Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if such sale was not free and clear of all Encumbrances (other than Assumed Liabilities) and without the protections of this Sale Order. A sale of the Purchased Assets, other than one free and clear of all Encumbrances, would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

W.      <u>No Fraudulent Transfer</u>.  The total consideration provided by the Buyer to both the Debtors and the IP Seller pursuant to the Asset Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The

Transaction Documents were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia, and none of the parties to the Transaction Documents are consummating the Sale Transaction for any other fraudulent or otherwise improper purpose.

X.      <u>No Successor Liability.</u>  Neither the Buyer nor any of its affiliates are successors to the Debtors or their estates or the IP Seller by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates or the IP Seller except to the extent explicitly provided in the Asset Purchase Agreement.

Y.      <u>Binding Agreement.</u>  The Transaction Documents are valid and binding contracts between the Debtors, the IP Seller, and the Buyer and shall be enforceable pursuant to their terms. The Transaction Documents and consummation of the Sale Transaction shall be, to the extent provided in the Transaction Documents, specifically enforceable against and binding upon the Debtors and any chapter 7 trustee or chapter 11 trustee appointed in any of the Debtors' cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

Z.      <u>Legal, Valid, Binding Transfer and Consummation.</u>  The Debtors have full power and authority (i) to perform all of their obligations under the Transaction Documents and (ii) to consummate the Sale Transaction. The transfer of the Purchased Assets to the Buyer will be a legal, valid and effective transfer of the Purchased Assets and will vest the Buyer with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of all interests, as set forth in the Asset Purchase Agreement. The Purchased Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Purchased Assets, and no other person has any ownership right, title or interests therein.

AA.     The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(h), 363(m) and 365 thereof, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated by the Asset Purchase Agreement. The transactions contemplated under the Transaction Documents (including the Sale Transaction) are inextricably linked and collectively constitute a single, integrated transaction.

BB.     Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, have been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

CC.     No *Sub Rosa* Plan.  Entry into the Asset Purchase Agreement and the transactions contemplated therein neither impermissibly restructure the rights of the Debtors' creditors, nor impermissibly dictate the terms of a chapter 11 plan of reorganization for the Debtors. Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

DD.     No Third-Party Beneficiaries.  Nothing in the Asset Purchase Agreement creates any third-party beneficiary rights in any entity not a party to the Asset Purchase Agreement.

EE.     Legal and Factual Bases.  The legal and factual bases set forth in the Motion and at the Sale Hearing, and evidence proffered or adduced at the Sale Hearing, establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**[4]

**Motion Granted, Objections Overruled**

1.      The relief requested in the Motion is granted as set forth herein. Any remaining objections to the Motion or the relief requested therein with respect to the Asset Purchase Agreement, the other Transaction Documents, and the Sale Transaction that have not been withdrawn, waived or settled and all reservations of rights included in such objections are overruled on the merits with prejudice and denied. All parties and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein with respect to the Asset Purchase Agreement, the other Transaction Documents, and the Sale Transaction.

2.      Those parties, including those holders of claims and interests, who did not object to the Motion or the entry of this Sale Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of interests who did object that have an interest in the Purchased Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their interests that constitute interests in the Purchased Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders

---

[4]      To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa. the Bidding Procedures Order or as otherwise agreed by the Debtors is deemed to have consented to such assumption and assignment.

had prior the Sale Transaction, subject to any claims, setoffs, deductions, offsets and defenses of the Debtors to such interests.  For the avoidance of doubt, the IP Purchased Assets are being sold to the Buyer pursuant to section 363(h) of the Bankruptcy Code and are being sold to the Buyer free and clear of any and all liens, claims, interests, or Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

3.      This Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

**The Asset Purchase Agreement is Approved and Authorized**

4.      The Asset Purchase Agreement and Transaction Documents filed therewith or described therein are approved pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, 6006 and 9014. The Debtors and the IP Seller are authorized and directed to perform under the Asset Purchase Agreement, the Transaction Documents, and all ancillary documents filed therewith or described therein (and each of the transactions contemplated thereby is hereby approved in its entirety and is incorporated herein by reference). The failure to include specifically any particular provision of the Asset Purchase Agreement or any other Transaction Document in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Asset Purchase Agreement and other Transaction Documents, and all of its provisions and the payments and transactions provided for therein, shall be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

5.      The consideration provided by the Buyer to the Debtors and the IP Seller for the Purchased Assets under the Asset Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession or the

District of Columbia, including, without limitation, the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act and any other applicable law. The Sale Transaction may not be avoided or rejected by any person, or costs or damages imposed or awarded against the Buyer, under section 363(n) or any other provision of the Bankruptcy Code.

6.    The Sale Transaction authorized herein shall be of full force and effect, regardless of the Debtors' lack or purported lack of good standing in any jurisdiction in which the Debtors are formed or authorized to transact business. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary, without further order of this Court, to implement the Sale Transaction and the other provisions of this Sale Order, including, without limitation, to allow the Buyer to: (a) deliver any notice provided for in the Asset Purchase Agreement, the Transaction Documents, and any ancillary documents; and (b) take any and all actions permitted under the Asset Purchase Agreement, the Transaction Documents, and any ancillary documents in accordance with the terms and conditions thereof; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

7.    Subject to the terms, conditions and provisions of this Sale Order, all persons and entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Debtors or the IP Seller to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Transaction Documents and this Sale Order and (b) with the ability of the Buyer to acquire, take possession of, use and operate the Purchased Assets in accordance with the terms of the Transaction Documents and this Sale Order; *provided*, *however*, that the foregoing restriction shall not prevent any party in interest from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

8.      Subject to the provisions of this Sale Order, the Debtors and the Buyer are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to consummate the Sale Transaction in accordance with the Asset Purchase Agreement, the Transaction Documents, and all ancillary documents filed therewith or described therein.

9.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are hereby authorized, empowered and directed to, and shall, take any and all actions necessary or appropriate to (a) sell the Purchased Assets to the Buyer free and clear of any and all liens, claims, interests and Encumbrances, (b) consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement and other Transaction Documents, and (c) transfer and assign to the Buyer all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Asset Purchase Agreement and other Transaction Documents free and clear of any and all liens, claims, interests and Encumbrances, in each case without further notice to or order of this Court. The Debtors are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement and other Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Buyer for the purposes of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement and other Transaction Documents without further notice to or order of this Court. Neither the Buyer nor the Debtors shall have any obligation to proceed with consummating

the Sale Transaction until all conditions precedent to their obligations to do so have been met, satisfied or waived.

10.      Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction.  Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing Date, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date. No governmental unit,[5] including the United States Patent and Trademark Office, may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation or use of the Purchased Assets on account of the filing or pendency of the chapter 11 cases or the consummation of the transactions contemplated by the Asset Purchase Agreement or Transaction Documents, including the Sale Transaction, and the transfer of the Purchased Assets.

**Sale and Transfer Free and Clear of Encumbrances**

11.      Upon the Closing Date, all of the Debtors' and IP Seller's legal, equitable and beneficial right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), 363(f), and 363(h) of the Bankruptcy Code free and clear of any and all liens, claims, interests and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances); *provided*, *however*, that all remaining Encumbrances shall attach to the Debtors' proceeds of the Sale Transaction in the order of their

---

[5]      As used in this Sale Order, the term "governmental unit" shall have the meaning given to such term in sections 101(27) and 101(41) of the Bankruptcy Code.

priority, with the same validity, force and effect that they now have against the Purchased Assets. On the Closing Date, this Sale Order shall be considered, and shall constitute for any and all purposes, a legal, valid, binding, effective and complete general assignment, conveyance and transfer of the Purchased Assets and a bill of sale or assignment transferring indefeasible title in the Purchased Assets to the Buyer and shall vest the Buyer with good and marketable title to the Purchased Assets; *provided further* that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order authorizing and approving the transfer of the Purchased Assets free and clear of all any and all liens, claims, interests, and Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order and the Asset Purchase Agreement.

12.     Following the Closing Date, the holders of claims related solely to the Assumed Liabilities shall have the right to seek payment directly from the Buyer on account of the Assumed Liabilities; *provided*, *however*, that the Buyer reserves any and all rights, defenses or objections with regard to such Assumed Liabilities, including the Buyer's rights hereunder and under the Asset Purchase Agreement.

13.     Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, employee, or equity owner of the Debtors shall be transferred to the Buyer free and clear of any and all liens, claims, interests and Encumbrances and shall be delivered to the Buyer immediately after the Closing Date.

**Sale Order Binding**

14.     All (a) entities or persons, including all filing agents, filing officers, title agents, patent agents, title companies or title agents, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental departments, United States Patent and Trademark Office, secretaries of state, and federal, state and local officials, and (b) other entities or persons, in each case, who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets, shall be authorized and directed to take any such actions in connection with the Sale Transaction or this Sale Order, and this Sale Order shall be binding upon such entities or persons. All entities or persons described in this paragraph are authorized and specifically directed to strike all recorded Encumbrances against the Purchased Assets from their records, official and otherwise, and record or otherwise memorialize the Buyer as the true and correct owner of the Purchased Assets following the Closing Date.

15.     This Sale Order and the terms and provisions of the Asset Purchase Agreement, the Transaction Documents, and all ancillary documents filed therewith or described therein shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Buyer and each of their respective affiliates, successors and assigns and any affected third parties, including all persons asserting an interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement (including the Transaction Documents and any other ancillary document related thereto), and any actions taken pursuant hereto or thereto shall survive the dismissal of any of the Debtors' chapter 11 or chapter 7 cases or entry of any order, which may be entered confirming or consummating any plan(s) of the Debtors or converting these cases from chapter 11 to chapter 7, and the terms and provisions of the Asset Purchase

Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Asset Purchase Agreement (including the Transaction Documents and any other ancillary document related thereto), shall continue in these or any superseding cases and shall be binding upon the Debtors, the Buyer and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in these cases shall be and hereby is authorized and directed to operate the businesses of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order and the Asset Purchase Agreement, and the Buyer and the trustee shall be and hereby are authorized to perform under the Asset Purchase Agreement upon the appointment of such trustee without the need for further order of this Court.

16.     Except with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Encumbrances arising under or out of, in connection with or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the business prior to the Closing Date or the transfer of Purchased Assets to Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Encumbrances against the Buyer, its property or the Purchased Assets. Following the Closing Date, no holder of any Encumbrance shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Encumbrance, or based on any action the Debtors may take in these cases. For the avoidance of doubt, nothing in this Sale Order shall establish a tax exemption under section 1146(a) of the Bankruptcy Code or enjoin any governmental entity from asserting or collecting such a stamp tax or transfer tax.

17.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction in proper form for filing and executed by the appropriate parties termination statements or instruments of satisfaction or release of all Encumbrances that such person or entity has with respect to such Purchased Assets, then (a) the Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets that are necessary or appropriate to effectuate the Sale Transaction, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate and (b) the Buyer is hereby authorized and empowered to cause to be filed, registered or otherwise recorded a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Buyer and the applicable Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office, including the United States Patent and Trademark Office.

**Good Faith**

18.     The Debtors, the IP Seller, and the Buyer (including, but not limited to, their equity owners, officers, directors, employees, professionals and other agents thereof) have not engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Entry into the Asset

Purchase Agreement is undertaken by the parties thereto, without collusion and in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and the Buyer shall be entitled to all of the benefits of and protections under sections 363(m) and 364(e) of the Bankruptcy Code. The Sale Transaction is not subject to avoidance pursuant to section 363(n) or chapter 5 of the Bankruptcy Code and the Buyer is entitled to all the protections, defenses, and immunities thereunder.

**No Successor Liability**

19.     The Buyer shall not be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale Transaction, or the transfer, operation or use of the Purchased Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors or IP Sellert ; (b) have, *de facto* or otherwise, merged with or into the Debtors or IP Seller; or (c) be an alter ego or a mere continuation or substantial continuation or successor in any respect of the Debtors or IP Seller, including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' or IP Seller's liability under such law, rule or regulation or doctrine.

20.     Except as expressly provided in this Sale Order or the Asset Purchase Agreement with respect to the Assumed Liabilities following the Closing Date, the Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) or the IP Seller's (or its predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') or the IP Seller's (or its predecessors' or affiliates') based, in whole or part, directly or indirectly, on any theory of successor or transferee liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or

unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date or such later time as the Buyer is assigned and assumes any contract. Except to the extent expressly included in the Assumed Liabilities or otherwise provided for in the Asset Purchase Agreement, the Buyer shall have no liability or obligation under the WARN Act, or any foreign, federal, state or local labor, employment law, whether of similar import or otherwise, by virtue of the Buyer's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

21.     The Buyer has given substantial consideration under the Asset Purchase Agreement for the benefit of the holders of any Encumbrance. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor or transferee liability of the Buyer to the greatest extent allowed by applicable law, which releases shall be deemed to have been given in favor of the Buyer by all holders of any Encumbrance.

22.     Effective upon the Closing Date, other than with respect to Assumed Liabilities, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, or its assets (including the Purchased Assets), or its successors and assigns, with respect to any (a) Encumbrance or (b) successor or transferee liability, including the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting any setoff not taken prepetition or right of subrogation of any kind; (v) commencing or continuing any action, in any manner or place, that does not

comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; (vi) disputing the Debtors' interests in or ability to sell to the Buyer any of the Purchased Assets; or (vi) to the extent set forth in section 525 of the Bankruptcy Code, revoking, terminating or failing or refusing to renew any license, permit or authorization to operate or use any of the Purchased Assets or conduct any of the businesses operated with such Purchased Assets.

**Other Provisions**

23.     <u>Exculpation and Release</u>.  None of the Buyer (solely in its capacity as such) or any of its members or their respective affiliates, successors, assigns, and advisors (in each case, solely in their capacity as such) shall be subject to any claims, interests, damages, remedies, causes of action, demands, rights, actions suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever by (a) the Debtors and their estates, (b) the IP Seller, and (c) the Debtors' and their estates' and the IP Seller's respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors, or assigns arising out of the negotiation, due diligence in respect of, preparation, execution or delivery of the Asset Purchase Agreement, and the entry into and consummation of the Sale Transaction and the agreements and ancillary documents memorializing and effectuating the Sale Transaction, other than the Assumed Liabilities, and as otherwise provided by the Asset Purchase Agreement being assumed by the Buyer.  For the avoidance of doubt, nothing in this paragraph alters the Debtors' or IP Sellers' rights or defenses under the Asset Purchase Agreement or any claims the Debtors or IP Seller may have to enforce the Asset Purchase Agreement or bring any claim for a breach thereof.

24.     <u>Excluded Liabilities and Excluded Assets</u>.  All persons, governmental units and holders of Encumbrances, including those based upon or arising out of the Excluded Liabilities,

are hereby barred and estopped from taking any action against the Buyer or the Purchased Assets to recover property on account of any adverse interests or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Asset Purchase Agreement. All persons holding or asserting any Encumbrances with respect to the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances against the Buyer or the Purchased Assets for any liability whatsoever associated with the Excluded Assets.

25.     <u>No Bulk Sales</u>.   No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale Transaction.

26.     <u>Allocation of Consideration</u>.   Except as otherwise provided in this Sale Order and the Asset Purchase Agreement, all rights of the respective Debtors' estates with respect to the allocation of consideration received from the Buyer in connection with the Sale Transaction are expressly reserved for later determination by this Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, such other Debtor shall have a claim against the recipient Debtor with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

27.     <u>Allocation of Patent Consideration</u>.   Notwithstanding any other provisions of this Sale Order and the Asset Purchase Agreement, $250,000 of the Purchase Price shall be allocated to the IP Purchased Assets (the "<u>Patent Consideration</u>").   For the avoidance of doubt, the Patent Consideration provided by the Buyer to the Debtors and the IP Seller for the IP Purchased Assets under the Asset Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession or the District of Columbia, including, without limitation, the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the

Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act and any other applicable law.

28.     <u>Segregation of Patent Consideration</u>.  The Debtors are hereby ordered to segregate the Patent Consideration from the other Purchase Price proceeds and from other cash assets of the Debtors and shall not distribute or remit proceeds from segregated funds absent further order from this Court.

29.     <u>Ownership of IP Assets Prior to Sale; After Sale</u>.  Nothing contained in this Sale Order shall be construed as determining or adjudicating the right or interest of the Debtors or the IP Seller in the IP Purchased Assets prior to the Closing.  For the avoidance of doubt, nothing contained in paragraphs 27, 28, and 29 of this Sale Order shall impact the Buyers' purchase of the Purchased Assets or the Buyer owning the entire right, title, and interest in all of the Purchased Assets following the Closing.

30.     <u>Subsequent Plan Provisions and Orders of the Court</u>. The Debtors (or any trustee) shall not propose a chapter 11 plan or request entry of an order in these cases that conflicts with or derogates from the terms of this Sale Order. Nothing contained in any chapter 11 plan to be confirmed in these cases or any order to be entered in these cases (including any order entered after conversion of these chapter 11 cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from, the rights, benefits, protections and consideration provided to the Buyer under the Asset Purchase Agreement or this Sale Order, and to the extent of any inconsistency, this Sale Order shall govern.

31.     <u>Further Assurances</u>. From time to time, as and when requested, all parties to the Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale

Transaction, including such actions as may be necessary to vest, perfect or confirm or record or otherwise in the Buyer its right, title and interest in and to the Purchased Assets.

32.     <u>Governing Terms</u>. To the extent this Sale Order is inconsistent with any prior order or pleading in these cases, the terms of this Sale Order shall govern. To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Asset Purchase Agreement (including the Transaction Documents and all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

33.     <u>Modifications</u>. The Asset Purchase Agreement, the Transaction Documents, and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof (after consultation with the Committee), without further order of this Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

34.     <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of this Court, to allow the Buyer to deliver any notice provided for in the Asset Purchase Agreement (or the Transaction Documents) and allow the Buyer to take any and all actions permitted or required under the Asset Purchase Agreement (or the Transaction Documents) in accordance with the terms and conditions thereof. The Buyer shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, the Transaction Documents, or any other sale-related document.

35.     <u>No Stay of Order; Further Instruments; Appeals</u>.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other

instruments in order to effectuate, consummate and implement the provisions of this Sale Order. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer are free to close the Sale Transaction under the Asset Purchase Agreement at any time pursuant to the terms thereof.

36.     <u>Notice of Sale Closing Date</u>. Within one business day of the occurrence of the Closing Date of the Sale Transaction, the Debtors shall file and serve a notice of same, substantially in the form attached hereto as **<u>Exhibit 2</u>** (the "<u>Notice of Sale Closing Date</u>").

37.     <u>Retention of Jurisdiction</u>. This Court shall retain exclusive jurisdiction to interpret, implement and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order and the Asset Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the Transaction Documents or other agreements executed in connection therewith, and decide any issues or disputes concerning this Sale Transaction, Sale Order, and the Asset Purchase Agreement, or the rights and duties of the parties related to the Sale Transaction, including, but not limited to, retaining jurisdiction to (a) interpret, implement, and enforce the provisions of this Sale Order, the Asset Purchase Agreement, the Transaction Documents, and all other ancillary documents entered into or delivered in connection therewith, (b) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, (c) protect Buyer against any applicable Encumbrances or other interests in the Debtors or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale Transaction, and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Sale Transaction.

38.     The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Sale Order.

39.     The provisions of this Sale Order are non-severable and mutually dependent.

40.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

41.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).


Signed:  November 01, 2024

Christopher Lopez
United States Bankruptcy Judge

# **EXHIBIT 1**

**Asset Purchase Agreement**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of October 21, 2024 (this "Agreement"), is by and among KLX Energy Services LLC, a Delaware limited liability company (the "Buyer"), Nitro Fluids, LLC, a Texas limited liability company ("Seller"), and Bobby Lee Koricanek, an individual resident of the State of Texas (the "IP Seller"). Each of Buyer, Seller and the IP Seller is sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A.     The Seller is engaged in the business of providing oilfield services in multiple segments of the oil and gas drilling and fracturing market at various locations in the United States (the "Business").

B.     Seller and the IP Seller may each assert certain interests in the patents and patent applications comprising the IP Purchased Assets.

C.     On May 15, 2024, the Seller filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing Case Nos. 24-60018 and 24-60020 (the "Bankruptcy Cases").

D.     On June 27, 2024, the Bankruptcy Court entered an order [Docket No. 174] (the "Bidding Procedures Order") authorizing the Seller to sell assets pursuant to certain sale procedures (the "Sale Procedures").

E.     On September 12, 2024, the Seller filed a motion under the Bankruptcy Code in the Bankruptcy Court  requesting to amend the bidding procedures order requesting stalking horse bidder protections [Docket No. 275] (the "Motion").

F.     The Seller anticipates approval of the Motion and an entry of an order (the "Amended Bidding Procedures Order" and together with the Bidding Procedures Order, the "Orders") approving the amended bidding procedures ("Amended Sale Procedures", together with the Bidding Procedures, the "Procedures") no later than September 25, 2024.

Pursuant to the Orders and the Procedures Seller and the IP Seller have each determined in their respective business judgment that it is beneficial to sell to the Buyer, and the Buyer wishes to purchase from Seller and the IP Seller, the IP Purchased Assets and certain assets related to the Business, as applicable, upon the terms and subject to the conditions set forth herein.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I
# PURCHASE AND SALE

**Section 1.1**    Purchase and Sale of the Assets.

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell and deliver to the Buyer all of the Seller's right, title and interest, direct or indirect, in and to (i) the assets listed on Schedule 1.1 hereto and, though not specifically identified therein, the spare parts and consumables associated with, and necessary for the operation of, the assets identified on Schedule 1.1, which are at (x) the Monahans Facility, located at 5118 S. Veronica, Monahans, Texas 79756 and (y) the Nordheim Facility, located at 686 Cemetery Road, Nordheim, TX 78141, and (ii) the IP Purchased Assets (collectively, the "Purchased Assets").

(b)    Upon the terms and subject to the conditions of this Agreement, at the Closing, the IP Seller shall sell and deliver to the Buyer all of the IP Seller's right, title and interest, direct or indirect, in and to all assets listed on Schedule 1.2 hereto (collectively, the "IP Purchased Assets").

**Section 1.2**    Excluded Assets.  Notwithstanding anything contained in Section 1.1 to the contrary, neither the Seller nor the IP Seller is selling, and the Buyer is not purchasing, any assets other than the Purchased Assets and each other asset of the Seller and the IP Seller shall be retained by the Seller and the IP Seller (such retained assets being the "Excluded Assets").

**Section 1.3**    Assumed Liabilities.  In connection with purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the Buyer shall not assume any liabilities or obligations of the Seller or the IP Seller, however or whenever arising except to the extent that such liabilities arise from the Purchased Assets entirely from and after the Closing (the "Assumed Liabilities").

**Section 1.4**    Excluded Liabilities.  Except for the Assumed Liabilities, notwithstanding any other provision of this Agreement to the contrary or any disclosure to the Buyer, the Buyer is not assuming (and the Seller and the IP Seller shall retain without recourse to the Buyer) any liabilities or obligations of the Seller and the IP Seller, as applicable, whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, and currently existing or hereinafter arising (the "Excluded Liabilities").

**Section 1.5**    Ancillary Agreements.  On or prior to the Closing Date, each of the Seller, the IP Seller and the Buyer shall execute, deliver and file as necessary, the documents contemplated by Section 1.9 and such other documents as are (a) necessary to complete the transfer of the Purchased Assets to (b) otherwise necessary to complete the transactions contemplated hereby and (c) reasonably requested by either party (collectively, the "Ancillary Agreements").

**Section 1.6**    Purchase Price Deposit.  Buyer has deposited a sum of $325,000.00 (the "Deposit Amount") into the trust account maintained by Bonds Ellis Eppich Schafer Jones LLP (the "Trust Account") which will be held in the Trust Account and will be either delivered to Buyer or paid to the Seller as follows: (a) if the Closing occurs, the Deposit Amount shall be released to Seller at the Closing and be applied towards the Purchase Price payable by Buyer pursuant to

Section 1.7; (b) if this Agreement is terminated for any reason other than pursuant to Section 8.1(d), then the Deposit Amount shall, and the Seller shall take all action necessary to cause the Deposit Amount to, promptly be released to the Buyer; or (c) if this Agreement is terminated pursuant to Section 8.1(d), then the Deposit Amount shall promptly be released to the Seller (and such Deposit Amount will be deemed fully earned by the Seller as compensation and consideration for entering into this Agreement and shall be Seller's sole and exclusive remedy for a termination of this Agreement pursuant to Section 8.1(d) and with respect to any breaches underlying such termination).

Section 1.7   Consideration.   In full consideration for the Purchased Assets, at the Closing, the Buyer shall pay to the Seller $3,250,000.00 (the "Purchase Price"), in immediately available funds (which amount, for the avoidance of doubt, shall be inclusive of the Deposit Amount to be released to Seller pursuant to Section 1.6(a)).

Section 1.8   Closing.   The sale and purchase of the Purchased Assets shall take place at a closing (the "Closing") to be held electronically at a time mutually agreed between Buyer and Seller on a date that is no later than three (3) business days following the satisfaction or (to the extent permitted by applicable Law) waiver in accordance with this Agreement of all of the conditions set forth in Article VII (other than any such conditions which by their nature cannot be satisfied until the Closing Date, which shall be required to be so satisfied or (to the extent permitted by applicable Law) waived in accordance with this Agreement on the Closing Date), or at such other place or at such other time or on such other date as the Seller and the Buyer mutually may agree in writing (the date on which the Closing occurs, the "Closing Date").

Section 1.9   Closing Deliverables.

(a)   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall deliver or cause to be delivered to the Buyer:

(i)   a counterpart to the Bill of Sale and Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A (the "Bill of Sale"), pursuant to which the Seller shall convey the Purchased Assets and assign the Assumed Liabilities (to the extent legally transferrable to the Buyer) to the Buyer and the Buyer will accept the Purchased Assets and assume the Assumed Liabilities, duly executed by the Seller; and

(ii)   a certificate, dated as of the Closing Date, signed by an authorized officer of the Seller, certifying that the conditions set forth in Section 7.1(a) and Section 7.1(b) have been satisfied.

(b)   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the IP Seller shall deliver or cause to be delivered to the Buyer:

(i)   a counterpart to the Bill of Sale, duly executed by the IP Seller; and

(ii)   a certificate, dated as of the Closing Date, signed by the IP Seller, certifying that the conditions set forth in Section 7.1(c) and Section 7.1(d) have been satisfied.

3

(c)     Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer shall deliver or cause to be delivered to each of the Seller and the IP Seller:

(i)     a counterpart to the Bill of Sale, duly executed by the Buyer; and

(ii)     a certificate, dated as of the Closing Date, signed by an authorized officer of the Buyer, certifying that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied.

Section 1.10   Warehousing and Transfer of Possession.  For a period of 45 days from and after the Closing (the "Warehousing Period"), for no additional consideration, the receipt of the Purchase Price being sufficient, the Seller shall warehouse the Purchased Assets at Buyer's risk.  During the Warehousing Period, the Seller shall provide the Buyer reasonable access to the Purchased Assets and the premises on which the Purchased Assets are locate for purposes of enabling the Buyer to take possession of the Purchased Assets.  Prior to the expiration of the Warehousing Period, the Buyer shall take possession of the Purchased Assets and, if necessary, cause the Purchase Assets to be transferred and delivered to a location at which the Buyer is entitled to store the Purchased Assets.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as follows:

Section 2.1   Organization and Qualification.  The Seller is a limited liability company duly organized, validly existing and in good standing under the laws of Texas and has full corporate power and authority to own, lease and operate the Purchased Assets.  The Seller is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the ownership or operation of the Purchased Assets or the nature of the Business makes such qualification or licensing necessary.

Section 2.2   Authority.  The Seller has full limited liability company  power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements.  The execution, delivery and performance by the Seller of this Agreement and each of the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of the Seller and have been duly and validly authorized by the Bankruptcy Court pursuant to the Orders.  Subject to the Orders, this Agreement has been, and upon their execution each of the Ancillary Agreements will have been, duly executed and delivered by the Seller, and is, and upon their execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable upon and against the Seller.

Section 2.3   No Conflict; Required Filings and Consents.  The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby do not and will not (a) violate any provision of the limited liability company agreement  of the Seller; (b) violate any federal, state or local statute, law, regulation, order, injunction or decree ("Law") applicable to the Seller, the Business or the Purchased Assets; (c) conflict with, create a breach or default under, require

4

any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any Encumbrance (as defined below) upon any of the Purchased Assets pursuant to, any contract, agreement, license, permit or other instrument to which the Seller is a party or by which the Seller or any of the Purchased Assets may be bound, affected or benefited; (d) allow the imposition of any fees or penalties or require the offering or making of any payment to a third party on the part of the Seller; or (e) require any consent or approval of, registration or filing with, or notice to any federal, state or local governmental authority or any agency or instrumentality thereof (a "<u>Governmental Authority</u>").

Section 2.4    <u>Title to, Condition and Sufficiency of Assets</u>.  Subject to the IP Seller's interests in the IP Purchased Assets that are being sold and delivered to the Buyer pursuant to <u>Section 1.1(b)</u>, the Seller has good and valid title to all of the Purchased Assets, free and clear of any lien (as defined in section 101(37) of the Bankruptcy Code), purported lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, licenses, encroachments, conditional sale or other title retention agreements and other similar restrictions on transfer or use, any other potential interest, or restriction of any kind (collectively, "<u>Encumbrances</u>").  Pursuant to this Agreement and the Ancillary Agreements, the Buyer will acquire good and valid title to all of the Purchased Assets, free and clear of any Encumbrance.

Section 2.5    <u>Brokers</u>.  No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Seller.

Section 2.6    <u>Disclosure</u>.  None of the representations or warranties of the Seller contained in this Agreement or any Ancillary Agreement or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE IP SELLER**

The IP Seller hereby represents and warrants to the Buyer as follows:

Section 3.1    <u>Authority</u>.  The IP Seller has full power and legal capacity to execute, deliver and perform his obligations under this Agreement and each of the Ancillary Agreements to which he will be a party.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which the IP Seller will be a party will have been, duly executed and delivered by the IP Seller, and is, and upon their execution each of the Ancillary Agreements to which the IP Seller will be a party will be, legal, valid, binding and enforceable upon and against the IP Seller.

Section 3.2    <u>No Conflict; Required Filings and Consents</u>.  The execution, delivery and performance by the IP Seller of this Agreement and the Ancillary Agreements to which he will be a party and the consummation by the IP Seller of the transactions contemplated hereby and thereby do not and will not (a) violate any Law applicable to the IP Seller or the IP Purchased Assets; (b) conflict with, create a breach or default under, require any consent of or notice to or give to

5

any third party any right of modification, acceleration or cancellation, or result in the creation of any Encumbrance (as defined below) upon any of the IP Purchased Assets pursuant to, any contract, agreement, license, permit or other instrument to which the IP Seller is a party or by which the IP Seller or any of the IP Purchased Assets may be bound, affected or benefited; (c) allow the imposition of any fees or penalties or require the offering or making of any payment to a third party on the part of the IP Seller; or (e) require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

Section 3.3    Title to, Condition and Sufficiency of Assets.   Subject to the Seller's interests in the IP Purchased Assets that are being sold and delivered to the Buyer pursuant to Section 1.1(a), the IP Seller has good and valid title to all of the IP Purchased Assets, free and clear of any Encumbrances.  Pursuant to this Agreement and the Ancillary Agreements to which the IP Seller will be a party, the Buyer will acquire good and valid title to all of the IP Purchased Assets, free and clear of any Encumbrance.

Section 3.4    Brokers.   No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the IP Seller.

Section 3.5    Disclosure.   None of the representations or warranties of the IP Seller contained in this Agreement or any Ancillary Agreement to which the IP Seller will be a party or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.


# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to each of the Seller and the IP Seller as follows:

Section 4.1    Organization.   The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

Section 4.2    Authority.   The Buyer has full limited liability company power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it will be a party.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of the Buyer.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer, and is, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will be, legal, valid, binding and enforceable upon and against the Buyer.

Section 4.3    Condition of the Purchased Assets.   Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any

6

representations or warranties whatsoever, express or implied, beyond those expressly given by Seller and the IP Seller in Article II and Article III, respectively, and the certificate to be delivered pursuant to Section 1.9(a)(ii) and Section 1.9(b)(ii), respectively, and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis, including with respect to any environmental conditions at, on, in, under, migrating to or from or relating to the Purchased Assets.  Buyer acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the transactions contemplated by this Agreement (the "Transactions"), Buyer has relied on the results of its own independent investigation.

Section 4.4    Required Filings and Consents.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby do not and will not require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

Section 4.5    Financial Capacity.  Buyer has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Buyer in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Buyer will not be impaired.

Section 4.6    Brokers.  No broker, finder or agent will have any claim against the Seller for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Buyer.

## ARTICLE V
## COVENANTS

Section 5.1    Notification of Certain Matters.  The Seller shall give prompt written notice to the Buyer of (a) the occurrence or non-occurrence of any event that would render any representation or warranty of the Seller herein, if made on or immediately following the date of such event, untrue or inaccurate, including any change required with respect to the Schedules hereto; (b) any event, change or development that has had or is reasonably likely to have a material adverse effect with respect to the Purchased Assets, Seller or the Business; (c) any failure of the Seller to comply with any covenant or agreement to be complied with by it hereunder or any event or condition that would otherwise result in the nonfulfillment of any of the conditions to the Buyer's obligations hereunder; (d) any notice or other communication received by the Seller  from any person or entity alleging that the consent of such person or entity is or may be required in connection with the consummation of the transactions contemplated by this Agreement; or (e) any action pending or threatened in connection with the transactions contemplated by this Agreement.

Section 5.2    Further Assurances.  Each of the parties agrees to work diligently, expeditiously and in good faith to consummate the transactions contemplated by this Agreement.

From time to time after the Closing Date, the Seller shall execute and deliver to the Buyer such instruments of sale, transfer, conveyance, assignment, consent, assurance, power of attorney, and other such instruments as may be reasonably requested by the Buyer in order to vest in the Buyer all right, title, and interest in and to the Purchased Assets and the Business.  The Buyer and the Seller shall each provide the other with such assistance as reasonably may be requested by the other in connection with the transition of the Business and the preparation of any tax return, an audit or examination of any such return by any taxing authority or any judicial or administrative proceeding relating to liability for taxes and shall each retain and provide the other with any records or other information which may be relevant to such a return, audit, examination or proceeding.

Section 5.3    <u>Survival of Representations and Warranties</u>.    The representations and warranties of the Seller and the Buyer contained in this Agreement and any schedule, certificate or other document delivered pursuant hereto or in connection with the transactions contemplated hereby shall be continuing and survive the Closing.

Section 5.4    <u>Special Provisions Regarding IP Purchased Assets</u>.    The Parties acknowledge and agree as follows:

(a)    <u>Allocation</u>.  Two Hundred Fifty Thousand dollars ($250,000.00) of the Purchase Price shall be specifically allocated as consideration for the IP Purchased Assets (the "<u>Patent Consideration</u>").

(b)    <u>Segregation</u>.  The Patent Consideration, and the remaining amount of the Purchase Price, shall be paid at Closing to Seller as otherwise set forth in this Agreement; *provided*, *however*, that Seller shall segregate the Patent Consideration from the other Purchase Price funds pending further order from the Bankruptcy Court.

(c)    <u>Sale Order</u>.  With respect to the IP Purchased Assets and the Patent Consideration, the Sale Order shall (i) authorize the sale and assignment of the IP Purchased Assets to Buyer free and clear of any liens, claims, or Encumbrances pursuant to Bankruptcy Code sections 363(f) and 363(h), and (ii) require Seller to segregate the Patent Consideration pending determination of (A) ownership of the IP Purchased Assets, prior to the Transactions contemplated herein, and (B) any right of Seller and the IP Seller to the Patent Consideration proceeds.  For the avoidance of doubt, nothing in the preceding clause (ii) shall impact the Buyers' purchase of the Purchased Assets or Buyer owning the entire right, title, and interest in all the Purchased Assets following entry of the Sale Order and the prompt Closing of the Transactions contemplated herein.

**ARTICLE VI**
**BANKRUPTCY COURT MATTERS**

Section 6.1    <u>Bankruptcy Court Approval</u>. Seller has filed with the Bankruptcy Court the Motion seeking entry of the Amended Bidding Procedures Order and authorizing the observance and performance of the Amended Bidding Procedures by Seller and Buyer. Seller will file with the Bankruptcy Court the sale order, including the approval of this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Orders, and shall be in form and substance acceptable

to the Buyer in its sole discretion (the "Sale Order").  The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller of this Agreement or any Ancillary Agreement, (ii) the sale of the Purchased Assets to Buyer (and any affiliate) on the terms set forth herein, and to the extent permitted by applicable law, free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Code, and (iii) the performance by Seller of its obligations under this Agreement, (b) (i) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and is not a successor to any Seller, and (ii) grant Buyer the protections of section 363(m) of the Bankruptcy Code, and (c) find that Buyer shall have no liability or responsibility for any liability or other obligation of the Seller (or any of its affiliates) arising under or related to the Purchased Assets.

Section 6.2    Bankruptcy Process.

(a)    Seller and Buyer acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Orders) and Bankruptcy Court approval (each, a "Competing Bid"), as determined in Seller's sole and exclusive discretion.  Buyer and Seller acknowledge that Seller must take reasonable steps to demonstrate that Seller has sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction"). Buyer agrees and acknowledges that Seller will be permitted, and will be permitted to cause their representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any person (in addition to Buyer and its affiliates, agents and representatives).  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Orders or other applicable Law, including supplying information relating to the Seller or the Purchased Assets to prospective buyers.

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction will be those reflected in the Orders.  Buyer agrees to be bound by and accept the terms and conditions of the Orders as entered by the Bankruptcy Court.

(c)    If this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Orders, Buyer and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in such form as approved by Buyer in its sole discretion.

(d)    Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the

Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(e)    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

(f)    For the avoidance of doubt, nothing in this Agreement will restrict Seller from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

(g)    Notwithstanding anything contained in this Section 5.2 to the contrary, in no event shall Seller be permitted to accept a Competing Bid unless the purchase price to be paid by the buyer pursuant to such Competing Bid is at least $200,000 greater than the Purchase Price.

Section 6.3    Approval of Break-Up Fee.  In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of the Seller, the Seller shall pay Buyer, in accordance with the terms hereof and the Orders, a break-up fee in an amount equal to (a) $90,000.00 (the "Break-Up Fee").  Subject to the entry of the Orders, the Break-Up Fee shall be paid on the fifth business day following the date of consummation of a transaction pursuant to a Competing Bid if no material breach by Buyer of this Agreement has occurred.  Pursuant to sections 364 and 503 of the Bankruptcy Code, the Break-Up Fee will constitute a superpriority administrative expense claim against the Seller's bankruptcy estates with priority over any and all administrative expense claims, subject to the Carve Out (as such term is defined in Docket 146 of the Bankruptcy Case).  The Seller shall file with and seek the entry by the Bankruptcy Court of the Orders approving the payment of the Break-Up Fee, pursuant to, and subject to the limitations set forth in, this Agreement.

Section 6.4    Back-Up Bidder.  Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction and in accordance with the Orders, if and only if (a) Buyer submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by the Seller, and (b) the Seller gives notice to Buyer that the Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Buyer shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including payment of the Purchase Price, as applicable, in accordance with Article I, as the same may be increased by Buyer at the Auction.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    <u>Conditions to the Obligations of the Buyer</u>.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the Buyer in its sole discretion:

(a)    The representations and warranties of the Seller contained in <u>Article II</u> of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)    The Seller shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)    The representations and warranties of the IP Seller contained in <u>Article III</u> of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(d)    The IP Seller shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(e)    No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(f)    No action shall be pending or threatened (i) challenging the transactions contemplated by this Agreement or otherwise seeking damages in connection therewith or (ii) seeking to prohibit or limit the ability of the Buyer to own, operate or control the Purchased Assets.

(g)    The Seller shall have delivered to the Buyer (or be ready, willing and able to deliver at the Closing) the items set forth in <u>Section 1.9(a)</u> and any other Ancillary Agreements.

(h)    The IP Seller shall have delivered to the Buyer (or be ready, willing and able to deliver at the Closing) the items set forth in <u>Section 1.9(b)</u> and any other Ancillary Agreements.

(i)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Buyer in its sole discretion; the Sale Order shall not have been stayed, reversed or modified in a manner adverse to Buyer absent consent of the Buyer; and the Sale Order shall be final, binding, and non-appealable.

(j)      The Amended Bidding Procedures Order shall have been entered no later than October 4, 2024.

(k)      (i) The Buyer and (ii)(A) Jackie Ray Simpson and (ii)(B) Bob Koricanek (Simpson and Koricanek together "<u>Lessor</u>") shall have entered into a lease agreement acceptable to Simpson, Koricanek, and Buyer in respect of certain real property in Nordheim, Texas commonly referred to as the Nordheim Facility.

(l)      There shall not have been any material damage, destruction or loss to the Purchased Assets, taken as a whole, following the date hereof.

Section 7.2    <u>Conditions to the Obligations of the Seller</u>.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the Seller in its sole discretion:

(a)      The representations and warranties of the Buyer contained in <u>Article IV</u> of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)      The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)      No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(d)      The Buyer shall have delivered to the Seller (or be ready, willing and able to deliver at the Closing) the items set forth in <u>Section 1.9(c)</u> and any other Ancillary Agreements.

(e)      The Sale Order shall have been entered by the Bankruptcy Court.

Section 7.3    <u>Conditions to the Obligations of the IP Seller</u>.  The obligations of the IP Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived (to the extent permitted by applicable Law) in writing by the IP Seller in its sole discretion:

(a)      The representations and warranties of the Buyer contained in <u>Article IV</u> of this Agreement shall be true and correct in all respects (other than *de minimis* exceptions) both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date.

(b)      The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing in all material respects.

(c)     No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(d)     The Buyer shall have delivered to the IP Seller (or be ready, willing and able to deliver at the Closing) the items set forth in Section 1.9(c) and any other Ancillary Agreements.

(e)     The Sale Order shall have been entered by the Bankruptcy Court.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     By Buyer or Seller, if the Closing has not occurred by 5:00 p.m. Central time on the date that is three (3) days following the completion of a sale hearing (the "Outside Closing Date"), which date may be extended pursuant to mutual written agreement of Buyer and Seller; *provided*, *however* that if the Closing has not occurred on or before the Outside Closing Date due to a breach of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in Article VII not being satisfied by the Outside Closing Date (i) by Buyer, then Buyer may not terminate this Agreement pursuant to this Section 8.1(a) or (ii) by Seller, then the Seller may not terminate this Agreement pursuant to this Section 8.1(a).

(b)     By mutual written consent of the Buyer and Seller.

(c)     By Buyer, if (i)(A) either Seller or the IP Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition set forth in Section 7.1 and (C) such breach has not been cured within 10 business days after the giving of written notice by Buyer to Seller and the IP Seller of such breach; *provided* that Buyer is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 7.2; or (ii)(A) the conditions set forth in Section 7.2 and Section 7.3 have been satisfied, (B) the Outside Closing Date shall have occurred and (C) Buyer is ready and willing to consummate the Transactions but Seller or the IP Seller is unwilling or unable to consummate the Transactions.

(d)     By Seller, if  (i)(A) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition precedent set forth in Section 7.2 and (C) such breach has not been cured within 10 business days after the giving of written notice by Seller to Buyer; *provided* that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 7.1; or (ii)(A) the conditions set forth in Section 7.1 have been satisfied, (B) the Outside Closing Date shall have occurred and (C) Seller and the IP Seller are ready and willing to consummate the Transactions but Buyer is unwilling or unable to consummate the Transactions.

13

(e)     By Seller or Buyer, if there is in effect a final non-appealable order, decree or ruling of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; *provided* that the issuance of such order, decree or ruling was not primarily caused by the action or inaction of such Party in breach of this Agreement.

(f)     By Buyer or Seller, if a transaction is consummated in connection with a Competing Bid that is declared the successful bidder.

Section 8.2     Effect of Termination.  If this Agreement is terminated in accordance with Section 8.1, then this Agreement shall become void and of no further force or effect (other than Section 1.6, Section 6.3, this Section 8.2, Section 9.1, Section 9.4, Section 9.5 and Section 9.8, which shall survive the termination of this Agreement).

**ARTICLE IX**
**GENERAL PROVISIONS**

Section 9.1     Fees and Expenses.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.  In addition, the Buyer shall pay (a) all transfer or recording taxes and (b) all recording or filing fees related to the transfer of the Purchased Assets.

Section 9.2     Amendment and Modification.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.3     Waiver.  No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof.  Any such waiver by a Party shall be valid only if set forth in writing by such Party.

Section 9.4     Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given if delivered personally or sent by email, overnight courier or registered or certified mail, postage prepaid, to the address set forth below, or to such other address as may be designated in writing by such Party:

if to the Buyer, to:

KLX Energy Services LLC
3040 Post Oak Boulevard, 15th Floor
Houston, Texas 77056
Attention:  Max Bouthillette
Email:  MaxB@KLX.Com

with copies (which will not constitute notice) to:

Vinson & Elkins L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Attention: Sarah K. Morgan
Email: smorgan@velaw.com

if to the Seller, to:

Riverbend Special Situations Group
Attention: Brad Walker
214-616-6256
bwalker@riverbendssg.com

with copies (which will not constitute notice) to:

Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102
Attention: Joshua Eppich
Email: joshua@bondsellis.com

if to the IP Seller, to:

Bobby Lee Koricanek
P.O. Box 865
Yorktown, Texas 78164
Email:  bobk@nitrooil.com

with copies (which will not constitute notice) to:

Dean W. Greer
West & West Attorneys at Law, P.C.
2929 Mossrock, Suite 204
San Antonio, Texas 78230
Email: dean@dwgreerlaw.com

Section 9.5    Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements and understandings and all prior and contemporaneous oral agreements, arrangements and understandings between the Parties with respect to the subject matter of this Agreement.  No Party to this Agreement shall have any legal

obligation to enter into the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 9.6    Exculpation and Release.  In consideration of this Agreement, each of the Seller and the IP Seller, on behalf of itself and its respective affiliates, successors and permitted assigns hereby releases and forever discharges, effective as of the Closing, the Buyer and its affiliates, successors and permitted assigns, from any and all claims, interests, damages, remedies, causes of action, demands, rights, actions suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, arising out of or in any way relating to (i) the ownership or operation of the Purchased Assets prior to the Closing, or (ii) the negotiation, due diligence in respect of, preparation, execution or delivery of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby; *provided*, for the avoidance of doubt, that nothing in this Section 9.6 shall alter the rights or defenses of the Seller or the IP Seller under this Agreement or any claims the Seller or the IP Seller may have to enforce this Agreement or bring any claim for a breach hereof.

Section 9.7    Third-Party Beneficiaries.  Nothing in this Agreement shall confer upon any person other than the Parties and their respective successors and permitted assigns any right of any nature.

Section 9.8    Governing Law.  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Texas, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Texas.

Section 9.9    Assignment; Successors.  This Agreement may not be assigned by either party without the prior written consent of the other party, except that the Buyer may assign this Agreement to any of its affiliates.  Subject to the preceding sentence, this Agreement will be binding upon the Parties and their respective successors and assigns.

Section 9.10    Severability.  If any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 9.11    Counterparts.  This Agreement may be executed in counterparts (including facsimile and electronic transmission counterparts), all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

**BUYER:**

**KLX ENERGY SERVICES LLC**

By: _____
     Name: Max Bouthillette
     Title:  Vice President & General Counsel

**SELLER:**

**NITRO FLUIDS, LLC**

By: _____
     Name:  Brad Walker
     Title:  Chief Restructuring Officer

**IP SELLER:**

**BOBBY LEE KORICANEK**

_____

**Schedule 1.1**

*Tangible Purchased Assets*

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 15K | Best Way Hydraulic | Operable | 25 |
| Gate Valve | 7 1/16" - 15K | Best Way Manual | Operable | 10 |
| Gate Valve | 7 1/16" - 15K | Best Way | Machined - Requires Assembly | 7 |
| Gate Valve | 7 1/16" - 15K | Best Way | Requires Machining | 6 |
| Gate Valve | 7 1/16" - 15K | Top Shelf Hydraulic | Operable | 6 |
| Gate Valve | 7 1/16" - 15K | Top Shelf Manual | Operable | - |
| Gate Valve | 7 1/16" - 15K | Top Shelf | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf | Requires Machining | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock Hydraulic | Operable | 54 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock Manual | Operable | 8 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 15K | Top Shelf with Sand-Lock | Requires Machining | 9 |
| Gate Valve | 5 1/8" - 15K | Best Way Hydraulic | Operable | 69 |
| Gate Valve | 5 1/8" - 15K | Best Way Manual | Operable | 67 |
| Gate Valve | 5 1/8" - 15K | Best Way | Machined - Requires Assembly | 39 |
| Gate Valve | 5 1/8" - 15K | Best Way | Requires Machining | 9 |
| Gate Valve | 4 1/16" - 15K | Manual | Operable | 2 |
| Gate Valve | 4 1/16" - 15K | Hydraulic | Operable | 2 |
| Gate Valve | 3 1/16" - 15K | Manual | Operable | 47 |
| Gate Valve | 3 1/16" - 15K | Hydraulic | Operable | 20 |
| Gate Valve | 2 1/16" - 15K | Manual | Operable | 124 |
| Gate Valve | 2 1/16" - 15K | Hydraulic | Operable | 62 |
| Flow Spool | 10 feet | N/A | Operable | 77 |
| Flow Spool | 8 feet | N/A | Operable | 36 |
| Flow Spool | 6 feet | N/A | Operable | 9 |
| Flow Spool | 5 feet | N/A | Operable | 38 |
| Flow Spool | 4 feet | N/A | Operable | 41 |
| Flow Spool | 36" | N/A | Operable | 27 |
| Flow Spool | 30" | N/A | Operable | 23 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Flow Spool | 28" | N/A | Operable | 30 |
| Flow Spool | 26" | N/A | Operable | 6 |
| Flow Spool | 24" | N/A | Operable | 35 |
| Flow Spool | 22" | N/A | Operable | 10 |
| Flow Spool | 20" | N/A | Operable | 54 |
| Flow Spool | 18" | N/A | Operable | 7 |
| Flow Spool | 16" | N/A | Operable | 102 |
| Flow Spool | 24" | N/A | Operable | 1 |
| Flow Spool | 16" | N/A | Operable | 86 |
| Flow Spool | 10 feet | N/A | Operable | 15 |
| Flow Spool | 8 feet | N/A | Operable | 13 |
| Flow Spool | 6 feet | N/A | Operable | - |
| Flow Spool | 5 feet | N/A | Operable | 26 |
| Flow Spool | 4 feet | N/A | Operable | 36 |
| Flow Spool | 36" | N/A | Operable | 25 |
| Flow Spool | 30" | N/A | Operable | - |
| Flow Spool | 28" | N/A | Operable | - |
| Flow Spool | 26" | N/A | Operable | - |
| Flow Spool | 24" | N/A | Operable | 6 |
| Flow Spool | 22" | N/A | Operable | - |
| Flow Spool | 20" | N/A | Operable | - |
| Flow Spool | 18" | N/A | Operable | 3 |
| Flow Spool | 16" | N/A | Operable | 62 |
| Flow Spool | 14" | N/A | Operable | 61 |
| Flow Spool | 24" | N/A | Operable | 1 |
| Flow Spool | 12" | N/A | Operable | 1 |
| Flow Spool | 16" | N/A | Operable | 1 |
| Flow Spool | 14" | N/A | Operable | 1 |
| Flow Spool | 12" | N/A | Operable | 1 |
| Flow Spool | 24" | N/A | Operable | 3 |
| Flow Spool | 24" | N/A | Operable | 2 |
| Flow Spool | 14" | N/A | Operable | 5 |
| Flow Spool | 12" | N/A | Operable | 3 |
| Goat Head | 5 1/8" - 15K (4 Port) | N/A | Operable | 2 |
| Goat Head | 5 1/8" - 15K (6 Port) | N/A | Operable | 20 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Goat Head | 7 1/16" - 15K (6 Port) | N/A | Operable | 9 |
| Weco Flange | 7" - 15K | N/A | Operable | - |
| Weco Flange | 5" - 15K | N/A | Operable | 30 |
| Weco Flange | 4" - 15K | N/A | Operable | 515 |
| Weco Flange | 3" - 15K | N/A | Operable | 92 |
| Weco Flange | 2 9/16" - 15K | N/A | Operable | 1 |
| Weco Flange | 2" - 15K | N/A | Operable | 117 |
| Weco Flange | 1 13/16" - 15K | N/A | Operable | 3 |
| Blind Flange | 7" - 15K | N/A | Operable | 196 |
| Blind Flange | 5" - 15K | N/A | Operable | 66 |
| Blind Flange | 4" - 15K | N/A | Operable | 13 |
| Blind Flange | 3" - 15K | N/A | Operable | 15 |
| Blind Flange | 2 9/16" - 15K | N/A | Operable | 1 |
| Blind Flange | 2" - 15K | N/A | Operable | 25 |
| Blind Flange | 1 13/16" - 15K | N/A | Operable | 2 |
| Flow Cross | 7" - 15K | N/A | Operable | 161 |
| Flow Cross | 5" - 15K | N/A | Operable | 124 |
| Flow Cross | 4" - 15K | N/A | Operable | 5 |
| Flow Cross | 3" - 15K | N/A | Operable | 5 |
| Flow Cross | 2" - 15K | N/A | Operable | 16 |
| Adapter Spool | 7" - 15K | N/A | Operable | 175 |
| Adapter Spool | 5" - 15K | N/A | Operable | 67 |
| Adapter Spool | 4" - 15K | N/A | Operable | 32 |
| Adapter Spool | 3" - 15K | N/A | Operable | 83 |
| Adapter Spool | 2" - 15K | N/A | Operable | 1 |
| Zipper Manifold Skid | 7 1/16" - 15K | N/A | Operable | 20 |
| Zipper Manifold Skid | 5 1/8" - 15K | N/A | Operable | 32 |
| Flow Cross Stand | 7 1/16" - 15K | N/A | Operable | 3 |
| Flow Cross Stand | 5 1/8" - 15K | N/A | Operable | 25 |
| Flow Cross Stand | 4 1/16" - 15K | N/A | Operable | 2 |

| Equipment Type | Make | Description | Unit # | Comments |
|---|---|---|---|---|
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-201 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-202 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-601 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-602 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-603 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-604 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-605 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-606 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-607 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-608 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-609 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-610 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-611 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-612 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-613 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-614 | Operable |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-615 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-616 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-617 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-618 | Frame & Panel Face Only |
| Sand Lock Panel | Shop Built | Sand Lock Panel | SLP-619 | Frame & Panel Face Only |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Performance Sales | Accumulator Unit | M125714 | ACC-101 |
| Accumulator Unit | Performance Sales | Accumulator Unit | M010115 | ACC-102 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M020915 | ACC-103 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M021015 | ACC-104 |
| Accumulator Unit | PMI | Accumulator Unit | M021115 | ACC-105 |
| Accumulator Unit | PMI | Accumulator Unit | M021215 | ACC-106 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M020815 | ACC-107 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M040215 | ACC-108 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M041115 | ACC-109 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Meyer Services | Accumulator Unit | M041215 | ACC-110 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M050915 | ACC-111 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051015 | ACC-112 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051515 | ACC-113 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M051615 | ACC-114 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070517 | ACC-115 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070617 | ACC-116 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070717 | ACC-117 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M070817 | ACC-118 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080117 | ACC-119 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080217 | ACC-120 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080317 | ACC-121 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080417 | ACC-122 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080517 | ACC-123 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080617 | ACC-124 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080717 | ACC-125 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080817 | ACC-126 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M080917 | ACC-127 |
| Accumulator Unit | Meyer Services | Accumulator Unit | M081017 | ACC-128 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028518 | ACC-601 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028618 | ACC-602 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028718 | ACC-603 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028818 | ACC-604 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M028918 | ACC-605 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029018 | ACC-606 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029118 | ACC-607 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029218 | ACC-608 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029318 | ACC-609 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M029418 | ACC-610 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039518 | ACC-611 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039618 | ACC-612 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039718 | ACC-613 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039818 | ACC-614 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M039918 | ACC-615 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040118 | ACC-616 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040218 | ACC-617 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040318 | ACC-618 |
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040418 | ACC-619 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Meyer Services | Accumulator Unit - 6 Station | M040518 | ACC-620 |
| Accumulator Unit | Top Shelf Oilfield Supply | Accumulator Unit - 6 Station | N/A | ACC-621 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016935 SA_GVL 271 | ACC-3001 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016935 SA_GVL 214 | ACC-3002 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016934 SA_GVL-280 | ACC-3003 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016937 SA_GVL-349 | ACC-3004 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016937 SA_GVL-3333 | ACC-3005 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016931 SA_GVL-314 | ACC-3006 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016931 SA_GVL-297 | ACC-3007 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016936 SA_GVL-311 | ACC-3008 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016936 SA_GVL-315 | ACC-3009 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016934 SA_GVL-300 | ACC-3010 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016938 SA_GVL-334 | ACC-3011 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016938 SA_GVL-352 | ACC-3012 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016939 SA_GVL-351 | ACC-3013 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016939 SA_GVL-270 | ACC-3014 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016941_SA-GVL-335 | ACC-3015 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016941_SA-GVL-272 | ACC-3016 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016942_SA_GVL-323 | ACC-3017 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016933 SA_GVL-299 | ACC-3018 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016933 SA_GVL-264 | ACC-3019 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011205/GVL-276 | ACC-3020 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011205/GVL-319 | ACC-3021 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011207/GVL-313 | ACC-3022 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011207/GVL-310 | ACC-3023 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011199/GVL-277 | ACC-3024 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011199/GVL-290 | ACC-3025 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012607_SA-GVL-328 | ACC-3026 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012607_SA-GVL-325 | ACC-3027 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016929 SA_GVL-289 | ACC-3028 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011202/GVL-318 | ACC-3029 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K011202/GVL-324 | ACC-3030 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016930 SA_GVL-321 | ACC-3031 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016930 SA_GVL-320 | ACC-3032 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016929 SA_GVL-260 | ACC-3033 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016943_SA-GVL-309 | ACC-3034 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K016942_SA_GVL-275 | ACC-3035 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012605_SA_GVL-288 | ACC-3036 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Accumulator Unit | Kruse Energy | Accumulator Unit - 3 Station | K012605_SA_GVL-257 | ACC-3037 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K016943_SA-GVL-326 | ACC-4001 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011201/GVL-308 | ACC-4002 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011201/GVL-307 | ACC-4003 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011208/GVL-N/A | ACC-4004 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 4 Station | K011208/GVL-265 | ACC-4005 |
| Accumulator Unit | Kruse Energy | Accumulator Unit - 8 Station | 10590 | ACC-8001 |

| Product Type | Valve Size | Brand & Type | Total Quantity |
|---|---|---|---|
| Grease Equipment | Grease Manifold Complete | N/A | 22 |
| Grease Equipment | Grease Manifold Skid Only | N/A | 4 |
| Grease Equipment | Grease Pump with Compressor on Skid | N/A | 5 |
| Grease Equipment | Grease Pump Only on Skid | N/A | 5 |
| Grease Equipment | 4 Drum Skid with No Pump | N/A | 5 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 10K | Best Way Hydraulic | Operable | 41 |
| Gate Valve | 7 1/16" - 10K | Best Way Manual | Operable | 28 |
| Gate Valve | 7 1/16" - 10K | Best Way | Machined - Requires Assembly | 33 |
| Gate Valve | 7 1/16" - 10K | Best Way | Requires Machining | 11 |
| Gate Valve | 7 1/16" - 10K | Top Shelf Hydraulic | Operable | 10 |
| Gate Valve | 7 1/16" - 10K | Top Shelf Manual | Operable | 5 |
| Gate Valve | 7 1/16" - 10K | Top Shelf | Machined - Requires Assembly | - |
| Gate Valve | 7 1/16" - 10K | Top Shelf | Requires Machining | 17 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock Hydraulic | Operable | 17 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock Manual | Operable | 21 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock | Machined - Requires Assembly | 1 |
| Gate Valve | 7 1/16" - 10K | Top Shelf with Sand-Lock | Requires Machining | 9 |
| Gate Valve | 4 1/16" - 10K | Manual | Operable | 2 |
| Gate Valve | 4 1/16" - 10K | Hydraulic | Operable | 4 |
| Gate Valve | 3 1/16" - 10K | Manual | Operable | 115 |
| Gate Valve | 3 1/16" - 10K | Hydraulic | Operable | 67 |
| Goat Head | 5 1/8" - 10K (4 Port) | N/A | Operable | 1 |
| Goat Head | 7 1/16" - 10K (6 Port) | N/A | Operable | 4 |
| Weco Flange | 4" - 10K | N/A | Operable | 43 |
| Weco Flange | 3" - 10K | N/A | Operable | 102 |
| Weco Flange | 2 9/16" - 10K | N/A | Operable | 1 |
| Weco Flange | 2 9/16" - 5K | N/A | Operable | 1 |
| Weco Flange | 2" - 10K | N/A | Operable | 2 |
| Weco Flange | 2" - 5K | N/A | Operable | 15 |
| Weco Flange | 1 13/16" - 10K | N/A | Operable | 11 |
| Weco Flange | 1 13/16" - 5K | N/A | Operable | 1 |
| Blind Flange | 7" - 10K | N/A | Operable | 85 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Blind Flange | 4" - 10K | N/A | Operable | - |
| Blind Flange | 3" - 10K | N/A | Operable | 4 |
| Blind Flange | 2 9/16" - 10K | N/A | Operable | 2 |
| Blind Flange | 1 13/16" - 10K | N/A | Operable | 2 |
| Flow Cross | 7" - 10K | N/A | Operable | 45 |
| Flow Cross | 5" - 10K | N/A | Operable | 1 |
| Flow Cross | 4" - 10K | N/A | Operable | 1 |
| Flow Cross | 3" - 10K | N/A | Operable | 5 |
| Adapter Spool | 7" - 10K | N/A | Operable | 15 |
| Adapter Spool | 5" - 10K | N/A | Operable | 11 |
| Adapter Spool | 4" - 10K | N/A | Operable | 4 |
| Adapter Spool | 3" - 10K | N/A | Operable | 9 |
| Adapter Spool | 2" - 10K | N/A | Operable | 1 |
| Adapter Spool | 2" - 5K | N/A | Operable | 1 |
| Zipper Manifold Skid | 7 1/16" - 10K | N/A | Operable | 19 |
| Flow Cross Stand | 7 1/16" - 10K | N/A | Operable | 16 |
| Plug Catcher Manual Manifold | Skid Mounted | N/A | Operable | 4 |
| Plug Catcher Manual Manifold | Trailer Mounted | N/A | Operable | 6 |
| Plug Valve Manifold | 1X2 9 Valve Manifold | N/A | Operable | 1 |

| Product Type | Valve Size | Brand & Type | Condition | Total Quantity |
|---|---|---|---|---|
| Plug Valve Manifold | 2x2 5 Valve Manifold | N/A | Operable | 1 |
| Plug Valve Manifold | 2x2 9 Valve Manifold | N/A | Operable | 10 |
| Plug Valve Manifold | Skid Only | N/A | Operable | 6 |
| Filter Pod | Dual Filter Pods | N/A | Operable | 7 |
| Filter Pod | Single Filter Pods | N/A | Operable | 7 |
| Filter Pod | Single Short Filter Pods | N/A | Operable | 4 |
| Pump Down Manifold | 2 1/16 15K PDM | N/A | Operable | 9 |
| Pump Down Manifold | 3 1/16 15K PDM | N/A | Operable | 2 |
| Hose & Flow Iron Basket | Hose Basket | N/A | Operable | 42 |
| Hose & Flow Iron Basket | Small Iron Basket | N/A | Operable | 2 |
| Hose & Flow Iron Basket | Large Iron Basket | N/A | Operable | 16 |
| 1502 Iron | 1502 Iron | N/A | Operable | TBD |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B6-6B40234 | AC-101 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B6-6B40214 | AC-102 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B66B40289 | AC-103 |
| Air Compressor | Airman | PDS 100 Skid Mounted Air Compressor | B66B40295 | AC-104 |
| Air Compressor | Ingersoll Rand | 7.5 HP 80 Gal 2 Stage Compressor | CBV389510 | AC-105 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10134 | AC-106 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10139 | AC-107 |
| Air Compressor | ANA | 100 CFM Air Compressor Skid | B6-6E10133 | AC-108 |
| Air Compressor | Ingersoll Rand | 7.5 HP 80 Gallon Two Stage Air Compressor | NAR10301765 | AC-110 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Air Compressor | ATLASCOPO | Atlascopo Compressor 350-395 CFM Diesel | HOP073433 | AC-111 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-101 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-102 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-103 |
| Ball Catcher | Navasota Oilfield Services | Ball Catcher | N/A | BC-104 |
| Command Center | Haulmark | Command Center | 16HG52825DT026462 | CC-101 |
| Command Center | Haulmark | Command Center | 16HG52822DT026824 | CC-102 |
| Command Center | Haulmark | Command Center | 16HG52821CT026070 | CC-103 |
| Command Center | Haulmark | Command Center | 16HG52822CT025784 | CC-104 |
| Command Center | Haulmark | Command Center | 16HG52827DT026463 | CC-105 |
| Command Center | Haulmark | Command Center | 575G52823ET031461 | CC-106 |
| Command Center | Haulmark | Command Center | 575G52824ET032490 | CC-107 |
| Command Center | Haulmark | Command Center | 575G52821FT261842 | CC-108 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 4LYUS2227DH000569 | PFS-101 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 4LYUS2224DH000710 | PFS-102 |
| Flare Stack | N/A | 2013 Portable Flare Stack | 5BSTU3013DC028308 | PFS-103 |
| Flare Stack | N/A | 2011 Portable Flare Stack | 4LYUS2228BH000674 | PFS-104 |
| Flare Stack | N/A | 2010 Portable Flare Stack | 4LYUS2529AH000354 | PFS-105 |
| Flare Stack | N/A | 2010 Portable Flare Stack | 4LYUS2220AH000635 | PFS-106 |
| Flare Stack | N/A | 30Ft. Portable Flare Stack | N/A | PFS-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Flare Stack | N/A | 2015 Portable Flare Stack | 2PLC0523XFBA17450 | PFS-108 |
| Forklift | CAT | 2005 DP50K Caterpillar Forklift | AT28B60275 | FL-101 |
| Forklift | CAT | 2001 DP90 Pnumatic Cat Diesel Forklift | T32B50073 | FL-102 |
| Forklift | Doosan | 2006 D70S-2 Pnuematic Doosan Diesel Forklift | BH00499 | FL-103 |
| Forklift | Toyota | 2017 Toyota THD2200-24 22,000 lb Forklift | 100257 | FL-105 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-001 | 4C9U6TL14CC273167 | NFT-001 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-002 | 4C9U6TL19CC273164 | NFT-002 |
| Frac Tank | Cen-Tex | Single Manifold Frac Tank NFT-003 | 4C9U6TL16CC273879 | NFT-003 |
| Gas Buster | All Fabrications | Offshore Gas Buster #1 | N/A | OGB-101 |
| Gas Buster | All Fabrications | Offshore Gas Buster #2 | N/A | OGB-102 |
| Gas Buster | All Fabrications | Offshore Gas Buster #3 | N/A | OGB-103 |
| Gas Buster | All Fabrications | Offshore Gas Buster #4 | N/A | OGB-104 |
| Gas Buster | All Fabrications | Offshore Gas Buster #5 | N/A | OGB-105 |
| Gas Buster | All Fabrications | Offshore Gas Buster #6 | N/A | OGB-106 |
| Gas Buster | All Fabrications | Offshore Gas Buster #7 | N/A | OGB-107 |
| Gas Buster | All Fabrications | Offshore Gas Buster #8 | N/A | OGB-108 |
| Gas Buster | All Fabrications | Offshore Gas Buster #9 | N/A | OGB-109 |
| Manifold | MSI | BHP Tank Manifold | N/A | BHP-MF1 |
| Mixing Plant | McMahan | Mixing Plant #2 | MP102 | MP-102 |
| Mixing Plant | McMahan | Mixing Plant #3 | MP103 | MP-103 |
| Mixing Plant | McMahan | Mixing Plant #4 | MP104 | MP-104 |
| Mixing Plant | McMahan | Mixing Plant #5 | MP105 | MP-105 |
| Mixing Plant | McMahan | Mixing Plant #6 | MP106 | MP-106 |
| Mixing Plant | McMahan | Mixing Plant #7 | MP107 | MP-107 |
| Mixing Plant | McMahan | Mixing Plant #8 | MP108 | MP-108 |
| Mixing Plant | McMahan | Mixing Plant #9 | MP109 | MP-109 |
| Mixing Plant | McMahan | Mixing Plant #10 | MP110 | MP-110 |
| Mixing Plant | Star Metal | Mixing Plant #11 | MP111 | MP-111 |
| Mixing Plant | Star Metal | Mixing Plant #12 | MP112 | MP-112 |
| Mixing Plant | Regional Steel | Mixing Plant #13 | MP113 | MP-113 |
| Mixing Plant | Regional Steel | Mixing Plant #14 | MP114 | MP-114 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Other | Kruse Energy & Equipment | 4-1/16" Quad BOP | 11233228 | BOP-101 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-101 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-102 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-103 |
| Other | All-Ways Hauling | C-Container | N/A | CCON-104 |
| Other | EZGO | 2019 EZGO - Golf Cart | 3380933 | CRT-102 |
| Other | Doosan | Doosan Forklift 36k# | FDC03-1880-01904 | FL-104 |
| Other | Magic Industries | Stand Alone Panel #101 | N/A | P-101 |
| Other | Magic Industries | Stand Alone Panel #102 | N/A | P-102 |
| Other | Magic Industries | Stand Alone Panel #103 | N/A | P-103 |
| Other | Hatec | Stand Alone Panel #104 | N/A | P-104 |
| Other | Thermal Dynamics | Plasma Cutting Unit | MX1313018329 | PCU-2 |
| Other | Schley Fence | 5 x 10 Kokie Cutting Table | N/A | PLT-101 |
| Other | Big Tex | 2010 Big Tex | 16VGX2425A2362630 | Red Monorail |
| Other | Wynco | Super Skid IV Diesel Steam Cleaner | Q-8-4 | SC-101 |
| Other | American Sales & Svc. | Shop Pressure Washer | 288967-HW | SPW-101 |
| Other | Praxair | Welding Maching - Millermatic 350P - WTX | MH503026N | WM-101 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-101 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-102 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-103 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-104 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-105 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-106 |
| Plug Catcher | Navasota | Plug Catcher Choke Manifold | N/A | PCCM-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Sand Blaster / Cannon | Clemco | Clemco 6060 Sand Blaster | 53368 | SB-101 |
| Sand Blaster / Cannon | Southern Frac | Sand Cannon | 583S6TA10GA000001 | SX-101 |
| Test Pump | Shop Built | High Pressure Test Pump | N/A | HPTP-101 |
| Test Pump | Shop Built | High Pressure Test Pump | 4P5FS2428E1211465 | HPTP-102 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2023CB050357 | HPTP-103 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2020CB049537 | HPTP-104 |
| Test Pump | Ameritrail | High Pressure Test Pump | 17YGN2438BB047326 | HPTP-107 |
| Trailer | Neckover | Car Hauling Trailer | 1N9GU2827NT263483 | CHT-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA25CW293001 | DT-0112-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA25CW293004 | DT-0212-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA27CW293002 | DT-0312-ST |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA29CW293003 | DT-0412-ST |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Support Trailer | 4S9S3LA25EW293050 | DT-0514-ST |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Support Trailer | 4S9S3LA25EW293051 | DT-0614-ST |
| Trailer | Southern Frac | 2015 Enclosed Flowback Trailer (Tank-11 Ton) | 583S6TA14FA000260 | EFT-101 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT102 | FBT-102 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | HPTP-104 | FBT-103 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT104 | FBT-104 |
| Trailer | Shop Built | 2014 Shop Built Flowback Trailer | FBT105 | FBT-105 |
| Trailer | Southern Frac | 2015 Southern Frac 18' Trailer | 583BF1829FA000404 | FBT-106 |
| Trailer | Star Metal | 2015 Star Metal Lowboy Gooseneck Haul Trailer | 4S9S3LA2XFW293080 | HT-0115-SM |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KT1TX000000051937 | HT-0211-KO |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000519 58 | HT-0311-KO |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000520 28 | HT-0411-KO |
| Trailer | Kotara | 2011 Kotara Lowboy Haul Trailer | KM1TX0000000520 29 | HT-0511-KO |
| Trailer | Star Metal | 2015 Star Metal Lowboy Gooseneck Haul Trailer | 4S9S3LA21FW293 081 | HT-0615-SM |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 93 | HT-0712-KO |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 92 | HT-0812-KO |
| Trailer | Kotara | 2012 Kotara Lowboy Haul Trailer | KM1TX0000000520 94 | HT-0912-KO |
| Trailer | Star Metal | 2013 Star Metal Fab Lowboy Haul Trailer | 4S9S3LA24ADW29 312 | HT-1013-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailerw/Split Tail Gate | 4S9S3LA20EW293 068 | HT-1114-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Split Tail Gate | 4S9S3LA22EW293 069 | HT-1214-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Double Tail Gate | 4S9S3LA26EW293 074 | HT-1314-SM |
| Trailer | Star Metal | 2014 Star Metal Gooseneck Lowboy Trailer w/Double Tail Gate | 4S9S3LA28EW293 075 | HT-1414-SM |
| Trailer | Top Hat | Monorail Trailer | 4R7GU20284T0517 71 | MRT-101 |
| Trailer | Texas Bragg | Monorail Trailer | 17XFG1821B10126 41 | MRT-102 |
| Trailer | Texas Bragg | Monorail Trailer | 17XFG1823C10203 23 | MRT-103 |
| Trailer | Top Hat | Monorail Trailer | 4R7GU202X4T0516 09 | MRT-104 |
| Trailer | Big Tex | Monorail Trailer | 16VGX1623C23192 19 | MRT-105 |
| Trailer | Maxey Trailer | Monorail Trailer | 5R8CA2022GM038 753 | MRT-106 |
| Trailer | Maxey Trailer | Monorail Trailer | 5R8CA2024GM038 754 | MRT-107 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | Big Tex | Pressure Washer Trailer | 16VAX1014A2A44840 | PW-101 |
| Trailer | Haulmark | 2015 Haulmark 20 Transport Trailer | 575GB2027FT283901 | RT-101 |
| Trailer | Haulmark | 2015 Haulmark 20 Transport Trailer | 575GB2220FT283915 | RT-102 |
| Trailer | Haulmark | 2015 Haulmark 24' Enclosed Trailer | 575GB2427FT292835 | RT-103 |
| Trailer | Haulmark | 2015 Haulmark 24' Enclosed Trailer | 575GB2428FT293606 | RT-104 |
| Trailer | Haulmark | 2014 Haulmark 24' Enclosed Trailer | 575GB2422ET265721 | RT-105 |
| Trailer | CM | 2017 CM 20' Enclosed All Steel Transport Trailer | 49TCB2025H1025037 | RT-106 |
| Trailer | CM | 2017 CM 20' Enclosed All Steel Transport Trailer | 49TCB2028J1025040 | RT-107 |
| Trailer | CM | 2018 CM 20' Enclosed All Steel Transport Trailer | 49TCB2024J1026234 | RT-108 |
| Trailer | CM | 2018 CM 20' Enclosed All Steel Transport Trailer | 49TCB2026J1026235 | RT-109 |
| Trailer | Everest | 2009 Everest Travel Trailer | 4YDF34829AE770228 | RV-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA2XCW293009 | ST-101 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA28CW293008 | ST-102 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA22CW293005 | ST-103 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA24CW293006 | ST-104 |
| Trailer | Star Metal | 2012 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA26CW293010 | ST-105 |
| Trailer | Star Metal | 2013 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA27DW293017 | ST-106 |
| Trailer | Star Metal | 2013 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA29DW293018 | ST-107 |
| Trailer | Star Metal | 2014 Star Metal Fab 20' Gooseneck Lowboy Haul Trailer | 4S9S3LA28EW293027 | ST-108 |
| Trailer | John McClung | Small Fema Park Model Trailer | 1705702 | TH-101 |

| Equipment Type | Make | Description | Serial / VIN # | Unit # |
|---|---|---|---|---|
| Trailer | John McClung | Small Fema Park Model Trailer | 1706561 | TH-102 |
| Trailer | John McClung | Large Fema Trailer - F1460S | 1650569 | TH-103 |
| Trailer | American Cleaning | Trailer Mounted Pressure Washer | 5UTBU1229JMO10 344 | TMPW-101 |
| Trailer | American Sales | Trailer Mounted Pressure Washer | 585BC1222JE0104 42 | TMPW-102 |
| Trailer | Star Metal | 2013 Star Metal Fab Lowboy Bumper-Pull Trailer | 4S9S1LE23DW293 015 | TST-102 |
| Wrench Set | Hytorc | Wrench Set | N/A | WS-101 |
| Wrench Set | Hytorc | Wrench Set | N/A | WS-102 |
| Wrench Set | Hytorc | Wrench Set | XC2MD1543-405 | WS-103 |
| Wrench Set | Hytorc | Wrench Set | XC4MD1523-038 | WS-104 |
| Wrench Set | Hytorc | Wrench Set | XC2MD1810-365 | WS-105 |
| Wrench Set | Hytorc | Wrench Set | 151461 | WS-106 |
| Wrench Set | Hytorc | Wrench Set | 151626 | WS-107 |
| Wrench Set | Hytorc | Wrench Set | F1814-185-5 | WS-108 |
| Wrench Set | Hytorc | Wrench Set | F1814-018-5 | WS-109 |
| Wrench Set | Hytorc | Wrench Set | F1814-215-5 | WS-110 |
| Wrench Set | Hytorc | Wrench Set | F1814-237-5 | WS-111 |
| Wrench Set | Hytorc | Wrench Set | M5FI2023-104 | WS-112 |

## Schedule 1.2

### *IP Purchased Assets*

**Patents and Patent Applications:**

| Country | Title | Application No. / Patent No. | Filing Date / Issue Date | Status | Owner |
|---|---|---|---|---|---|
| United States | Sand Lock Valve | 63/214,674 / | 06/24/2021 / | Expired | Nitro Fluids, LLC |
| United States | Sand Lock Valve | 17/807,381 / 11,767,918 | 06/17/2022 / 09/26/2023 | Issued | Nitro Fluids, LLC |
| United States | Sand Lock Valve | 18/233,266 / | 08/11/2023 / | Pending | Nitro Fluids, LLC |

All other patents and patent applications, domestic or foreign, that claim priority to any of the listed patents and patent applications in this schedule, including any and all foreign counterparts.

## **Exhibit A**

### *Form of Bill of Sale*

### *[Attached]*

# BILL OF SALE

This BILL OF SALE (this "**Bill of Sale**"), dated as of November [●], 2024 (the "**Effective Date**"), by and among Nitro Fluids, LLC, a Texas limited liability company (the "**Seller**"), Bobby Lee Koricanek, an individual resident of the State of Texas (the "**IP Seller**"), and KLX Energy Services LLC, a Delaware limited liability company (the "**Buyer**"), is being executed and delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of October 18, 2024 (the "**Asset Purchase Agreement**"), by and among the Seller, the IP Seller and the Buyer. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

WHEREAS, at the Closing, Buyer will purchase from Seller, and Seller will sell to Buyer, all of the Seller's right, title and interest in and to the Purchased Assets listed on Annex A and Annex B hereto.

WHEREAS, at the Closing, Buyer will purchase from the IP Seller, and the IP Seller will sell to Buyer, all of the IP Seller's right, title and interest in and to the IP Purchased Assets listed on Annex B hereto.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.    Bill of Sale.

(a)    Seller hereby sells, assigns, conveys, transfers and delivers to Buyer, free and clear of all Encumbrances and in accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, and Buyer hereby accepts, all of Seller's right, title and interest in and to all of the Purchased Assets.

(b)    The IP Seller hereby sells, assigns, conveys, transfers and delivers to Buyer, free and clear of all Encumbrances and in accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, and Buyer hereby accepts, all of the IP Seller's right, title and interest in and to all of the IP Purchased Assets.

(c)    Notwithstanding the foregoing, neither Seller nor the IP Seller is selling, transferring, assigning, conveying or delivering to Buyer any of the Excluded Assets.

2.    Further Assurances.  Each of Seller and the IP Seller covenants that Seller and IP Seller, as applicable, will do, execute and deliver, and will cause to be done, executed and delivered, all such further acts, transfers, assignments and conveyances, powers of attorney and assurances for better assuring, conveying and confirming unto Buyer the Purchased Assets as Buyer shall reasonably request.

3.    No Amendments.  Seller nor the IP Seller may amend, modify or supplement this Bill of Sale without the prior written agreement of Buyer.

4.        <u>Miscellaneous</u>.  Notwithstanding any other provision of this Bill of Sale, nothing contained herein will in any way supersede, modify, replace, amend, rescind or waive any of the provisions of the Asset Purchase Agreement, including representations, warranties, covenants, agreements, conditions and any other rights or obligations of Buyer, Seller or the IP Seller under the Asset Purchase Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Buyer, the Seller and the IP Seller have caused this Bill of Sale to be duly executed as of the date first written above.

**SELLER:**

**NITRO FLUIDS, LLC**

By: _____
Name: Brad Walker
Title: Chief Restructuring Officer

**IP SELLER:**

**BOBBY LEE KORICANEK**

_____

**BUYER:**

**KLX ENERGY SERVICES LLC**

By: _____
Name: Max Bouthillette
Title: Vice President & General Counsel

**<u>Annex A[1]</u>**

***[Attached]***

---

[1] Schedule 1.1 of the Asset Purchase Agreement to be attached.

## **Annex B[2]**

### ***[Attached]***

---

[2] Schedule 1.2 of the Asset Purchase Agreement to be attached.

## EXHIBIT 2

**Notice of Sale Closing Date**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 24-60018 (CML)** |
| **NITRO FLUIDS, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**NOTICE OF OCCURRENCE OF KLX SALE CLOSING DATE**

     **PLEASE TAKE NOTICE** that, on [●], 2024, the United States Bankruptcy Court for the Southern District of Texas entered the Order Approving the Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Granting Related Relief [Docket No. ___] (the "Sale Order"),[2] thereby authorizing and approving that certain Asset Purchase Agreement (the "APA"), dated as of [●], 2024, attached to the Sale Order as Exhibit 1, between certain of the Debtors, Bobby Lee Koricanek, and KLX Energy Services LLC.

     **PLEASE TAKE FURTHER NOTICE** that the Closing Date under the APA occurred on [●], 2024.

     **PLEASE TAKE NOTICE** that copies of the Sale Order and the APA are available free of charge on the Debtors' case information website, located at:

https://dm.epiq11.com/case/nitrofluids/info

or can be requested by contacting counsel for the Debtors at eric.haitz@bondsellis.com.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Nitro Fluids, LLC (2119); NFH Leasing, LLC (9218); Straitline Pumps, LLC (4168). The location of the service address for Nitro Fluids, LLC and NFH Leasing, LLC is: 117 Broadway, Nordheim, TX 78141. The location of the service address for Straitline Pumps, LLC is: 13750 San Pedro Ave., Ste. 560, San Antonio, Texas 78232.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Order or APA, as applicable.

Dated: [●], 2024

_____
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
Joshua N. Eppich (Texas Bar No. 24050567)
Eric T. Haitz (Texas Bar No. 24101851)
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: eric.haitz@bondsellis.com

-and-

Ken Green (Texas Bar No. 24050698)
402 Heights Blvd.
Houston, Texas 77007
(713) 335-4990 telephone
(713) 335-4991 facsimile
Email: ken.green@bondsellis.com

**COUNSEL FOR DEBTORS**